**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| TOMIKA HUGHEY | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civil Action No. 07 CV 01513 |
| | ) (RJL) |
| | ) |
| WASHINGTON METROPOLITAN | ) |
| AREA TRANSIT AUTHORITY | ) |
| | ) |
| Defendant. | ) |
| _____ | ) |

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S**
**OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

COMES NOW, Tomika Hughey, by and through her undersigned counsel, and hereby respectfully submits this opposition to defendant's Motion for Summary Judgment.

**STATEMENT OF MATERIAL FACTS IN DISPUTE**

Pursuant to Local Rule 7(h), plaintiff respectfully submits the following statement of material facts for which there exists a genuine dispute.

1.      Plaintiff admits the facts contained in paragraph 1 of defendant's Statement of Material Facts.

2.      Plaintiff *denies* that the facts contained in paragraph 2 of defendant's Statement of Material Facts to the extent that the hiring panel recommended Ms Hughey for the two Strategic Communications positions. (Exhibit G)**.**

3.      Plaintiff admits the facts contained in paragraph 3 of defendant's Statement of Material Facts.

4.      Plaintiff admits the facts contained in paragraph 4 of defendant's Statement of

¶Material Facts.

5.     Plaintiff admits the facts contained in paragraph 5 of defendant's Statement of Material Facts.

6.     Plaintiff *denies* the facts contained in paragraph 6 of defendant's Statement of Material Facts to the extent that she was never told by Lipman or Feldman during her that she was no longer under consideration for either of the two Strategic Communications positions. (Exhibit E at ¶ 6).

7.     Plaintiff admits the facts contained in paragraph 7 of defendant's Statement of Material Facts, but denies that the conversation between Lipman and Ms. Hughey took place "just after Thanksgiving 2005. (Exhibit E ¶ 9).

8.     Plaintiff admits the facts contained in paragraph 8 of defendant's Statement of Material Facts that she was informed on or about December 8, 2005, that she had not been selected for the Strategic Advocacy position.  Plaintiff has no personal knowledge that a WMATA announcement was made on December 7, 2005, relating to the hiring of candidates for the Strategic Policy and Communications positions and therefore *denies* the allegations contained in defendant's Statement of Material Fact. (Exhibit E ¶ 29).

9.     Plaintiff *denies* the facts contained in paragraph 9 of defendant's Statement of Material Facts to the extent that Ms. Hughey protested her non-selection for the two Strategic Policy and Communications positions and the Strategic Advocacy position during her initial contact with the Washington Field Office of the EEOC on July 10, 2006.  Ms. Hughey protested her non-selection to all three of the positions through her Intake Questionnaire and supporting documentation submitted to the EEO counselor on July 10, 2006.(Exhibit E ¶¶ 21 and 22; Exhibit R).

10.     Plaintiff *denies* the facts contained in paragraph 10 of defendant's Statement of Material Facts. (Exhibit E ¶¶ 21, 22 and 27; Exhibit R; Exhibit W).

11.     The screening panel recommended Black, Potts, Hughey, Robert Fuentes, a Hispanic, Horace Jennings, an African-American male, and Sara Jennings, a white woman, for the Strategic Communications positions.   For the Strategic Advocacy position, the panel recommended Jennings, Evelyn Frazier, an African-American woman, and Steve Strauss, a white male, for the position.   The panel recommended considering Craig Kwiecinski, a white male, only after interviewing the other candidates. (Exhibit "G").

12.     According to Ms. Hughey, Lipman told her during the interview that she believed that Ms. Hughey's "skills best fit" the Strategic Advocacy position, but did not inform her that she was *not* being considered for the two Strategic Communications positions. (Exhibit E ¶ 6).

13.     During the course of her *own* investigation into defendant's illegal conduct in the Spring of 2007, Ms. Hughey learned that defendant had announced on or about December 7, 2005, that the positions for the Strategic Policy and Communications positions had been filled. Ms. Hughey had no actual or first-hand, contemporaneous knowledge of any WMATA announcement or that the positions had been filled until she was informed on February 21, 2006, when Feldman told her. (Exhibit E ¶¶ 12, 30; Exhibit "Z").

14.     On July 10, 2006, Ms. Hughey went to the Washington Field Office of the EEOC and completed an Intake Questionnaire. (Intake Questionnaire, incorporated herein as Plaintiff's Exhibit "S").   Ms. Hughey believed and told the EEO that the Office of Civil Rights was "dragging its feet" to make a final recommendation for "fear of management's response." (Exhibit E ¶ 21; Exhibit S).   On that day, Ms. Hughey also submitted to the EEOC a written summary of her complaint.   In her submission, Ms. Hughey alleged that "there were three

positions advertised under two different postings. The individuals selected for these positions were offered jobs and began employment with WMATA between the months of November 2005 and January 2006. In addition to myself another candidate was highly qualified and not selected for either of the advertised positions, according to the current ongoing, internal WMATA investigation." (Exhibit R, p. 1). Finally, Ms. Hughey complained that she was "not confident in the [WMATA's] Office of Civil Rights to fairly and efficiently resolve my case." (Exhibit R, p. 2).

## INTRODUCTION

Tomika Hughey filed suit against defendant, her former employer, for its willful and maliciously discriminatory acts against her on the basis of her race when it denied her promotion opportunities during the fall and winter of 2005 and 2006. Ms. Hughey submits that defendant violated Title VII of the Civil Rights Act of 1964 when it denied her promotion and other opportunities on the same basis as non-statutorily protected individuals. In short, defendant's motion for summary judgment is baseless.

## FACTS

Tomika Hughey ("Ms. Hughey"), an African-American woman, had been employed with Washington Metropolitan Area Transit Authority ("WMATA") in Washington, D.C. as an Assistant Planning Project Manager since November 3, 2003. Prior to arriving at WMATA, Ms. Hughey had received a Bachelor's degree in Finance from Howard University, a Master's of Science degree in Urban/Transportation Planning from Florida State University, and was pursuing a second Master's of Science degree in Historic Preservation from the George Washington University with an emphasis in the preservation of transportation systems and resources. At WMATA, Ms. Hughey was assigned to work in the Office of Business Planning

& Project Development.   Her duties in that office included, but were not limited to managing the community outreach and environmental processes for the Anacostia Corridor Demonstration Project and the multi-million dollar District of Columbia-funded District of Columbia Transit Alternatives Analysis (DCAA).   Ms. Hughey also acted as a liaison and representative for WMATA on all District of Columbia economic development, planning and transportation projects and provided  analysis of future land development trends in the District of Columbia and their impact on existing and future Metrorail and Metrobus service.   Ms. Hughey was also assigned as a liaison to the Metropolitan Washington Council of Governments (MWCOG) and the Washington Metropolitan Area Planning Organization (MPO) to ensure WMATA's engagement with the regional jurisdictions. (Complaint at ¶ 6).

In her 2005 to 2006 performance review, Ms. Hughey was rated either outstanding or exceeds expectations on 10 out of 11 rating categories and an overall rating of "exceeds expectations." (Performance Review of Tomika Hughey, incorporated herein as Plaintiff's Exhibit "A").   Ms. Hughey's supervisor noted that she had "demonstrated on numerous occasions real acumen in assessing alternative approaches to preparing and delivering information for both executive decision-making and public presentation.  She also has been very energetic in becoming involved with . . . doing stakeholder outreach as a precursor to scope preparation." (Exhibit A at Bates Number 15).

On or about July 21, 2005, WMATA issued vacancy announcements for three new positions in the Department of Policy and Government Relations.  Two of the new positions were for Strategic Policy and Communications Specialists. ("Strategic Policy and Communications"). (Deposition Transcript of Deborah Lipman, pp. 19-20, incorporated herein as Plaintiff's Exhibit "B").  The job descriptions for both Strategic Policy and Communications

positions were identical. (Exhibit B, pp. 20-21). The third new position in the Government Relations Department was for a Strategic Advocacy Specialist. ("Strategic Advocacy"). (Exhibit B, pp. 21-22).

In September 2005, Ms. Hughey applied for a promotion to fill the vacancy for the Strategic Advocacy Specialist and the two vacancies for Strategic Policy and Communications Specialists. The minimum qualifications for each position were a Master's Degree in planning and eight years of experience in public administration and government relations. The Strategic Advocacy Specialist, specifically, involved "developing and recommending strategic positions for the authority and communicating those on behalf of the Authority; communicating/business/stakeholder outreach and coalition building; directing and performing research and analysis to support the Authority's communications bother internally and externally; assist in the developing of policy." The Strategic Policy and Communications Specialist positions involved "analyzing, developing and recommending policy and strategic positions for the Authority and communicating those on behalf of the Authority; research and analysis to support the Authority's communications both internal and externally." (Complaint at ¶ 7; Job Descriptions, incorporated herein as Plaintiff's Exhibit "C").

Ms. Hughey not only possessed the minimum qualifications for each of these positions, but had extensive experience in urban planning with a specific expertise in building neighborhood planning capacity and public involvement and participation in urban transportation and economic development projects in small (up to 250,000 population) and large (over 500,000+ population) urban areas. Her experience included engaging communities in Los Angeles, California for the proposed extension of the Red Line Metrorail for the Los Angeles County Metropolitan Transit Authority (LACMTA) and aided underserved Los Angeles

communities in identifying methods to enhance their access to transit and transit information; conducting community outreach to support long range planning efforts of Tallahassee-Leon County, Florida;  the analysis of the capital and operating budgets of  Federally-funded transit properties in the United States as a former Transit Analyst for over 80 public transit agencies in support of the Federal Transit Administration's (FTA) National Transit Database (NTD); directing all activities (outreach strategy, campaign events, primary and general election staffing) as the Ward 6 Coordinator for the Re-Election Campaign of Mayor Anthony Williams; and managing the volunteer-led and publicly funded revitalization efforts of the H Street, NE commercial corridor as the first Executive Director of the H Street Main Street Program. (Complaint at ¶ 7).

Since the positions were in the department of Policy and Government Relations, Deborah Lipman, its Director and a white female, and Ray Feldman, her immediate supervisor and a white male, were picked as the selecting officials for all of the positions. (Exhibit B, pp. 15-16). This was Lipman's sixth occasion as a hiring official at WMATA and was familiar with the defendant's hiring procedures. (Exhibit B, pp. 12-13).  According to Lipman, following any interviews, the hiring official sends a recommendation to WMATA's Human Resources Department, which makes the final determinations and extends an offer to a successful candidate. (Exhibit B, pp. 13-16).

On September 1, 2005, submitted her applications for the vacancy announcements. (Tomika Hughey's Applications, incorporated herein as Plaintiff's Exhibit "D"; Declaration of Tomika Hughey ¶3, incorporated herein as Plaintiff's Exhibit "E"). Ms. Hughey and the other candidates' applications were sent to Sandy Reed, a recruiter in the office of Human Resources (Exhibit B, pp. 23-24), and an initial hiring panel consisting of Shiva Pant, who was assigned as

chair of the panel, Matthew Greenwald and Candace Smith was convened to screen and interview applicants. (Exhibit B, p. 24; Investigative Report of Anne Anderson, p. 5, incorporated herein as Plaintiff's Exhibit "F").

On November 1, 2005, the panel interviewed Ms. Hughey for each of the three open positions. (Exhibit D ¶ 4). Following their initial interviews, the panel recommended Black, Potts, Hughey, Robert Fuentes, a Hispanic, Horace Jennings, an African-American male, and Sara Jennings, a white woman, for the Strategic Communications positions. For the Strategic Advocacy position, the panel recommended Jennings, Evelyn Frazier, an African-American woman, and Steve Strauss, a white male, for the position. The panel recommended considering Craig Kwiecinski, a white male, only after interviewing the other candidates. (Written Recommendations submitted by Shiva Pant, incorporated herein as Plaintiff's Exhibit "G"). As to the Strategic Advocacy position, Craig Kwiecinski was one of the two *least* recommended candidates for the position. (Exhibit F, p. 5).

According to Lipman she received the candidates applications after the panel completed its work, and Lipman determined whom to interview based on the panel's recommendations. (Exhibit B, pp. 25-26). Curiously, Shiva Pant informed the investigator that he had not provided Lipman with *any* information about the panel's recommendations until November 9, 2005. Pant further told the WMATA investigator that he did not know how Lipman could effectively hold second interviews without having reviewed the panel's written reports. (Exhibit G, p. 5). Nevertheless, before the panel had even interviewed Ms. Hughey, Lipman and Feldman interviewed two white applicants from outside WMATA, Gregory Potts and Jeanine Black. On October 11, 2005, Lipman and Feldman interviewed Potts. On October 21, 2005, Black was

8

interviewed by Lipman and Feldman. (Exhibit B, pp. 29, 32, 39). Although during the investigation of Ms. Hughey's complaint Lipman denied knowing Black before conducting her interview (Exhibit B, p. 60; Interview Notes of Deborah Lipman, incorporated herein as Plaintiff's Exhibit "H"), Lipman had indeed known Black from her work with a former employer. (Exhibit B, pp. 33-34, 60). Black was unemployed at the time of her interview. (Exhibit B, pp. 34-35).

Following the interviews of Potts and Black, Lipman determined that she had found candidates with the "skill sets" for the two Strategic Communications positions, and set about interviewing candidates for the Strategic Advocacy position. (Exhibit B, pp. 26, 38-39). Lipman did not recall whether <u>any</u> candidate was interviewed for the Strategic Communications positions other than Potts and Black. (Exhibit B, pp. 40-41). Despite Lipman's protests that she relied on the panel's recommendations in evaluating the candidates, Lipman had interviewed and made initial determinations about Potts and Black's candidacies before the panel had even interviewed Ms. Hughey. (Exhibit B, pp. 31-32).

On November 8, 2005, Lipman began to contact Black's references. (Exhibit B, p. 46). The next day, Lipman directed her assistant to contact Pott's references. (Exhibit B, pp. 46-47). Indeed, despite the fact that Potts and Black had been interviewed weeks earlier, in an email for her assistant regarding Potts and Black's references, Ms. Lipman expressed extreme urgency in completing the hiring process:

> I am requesting this be done ASAP so we can complete the hiring process for two very well qualified candidates. We are in grave jeopardy of losing the selected candidates. So it is imperative that we move this on the fast track.

(Exhibit B, pp. 58-59; Email from Deborah Lipman, dated November 8, 2005, incorporated herein as Plaintiff's Exhibit "I").

Later that day, Lipman and Feldman belatedly got around to interviewing Ms. Hughey. Although Lipman knew Ms. Hughey and they worked in the same building, Lipman and Feldman did not interview Ms. Hughey until November 9, 2005, almost a full month after her interview with Gregory Potts. (Exhibit B, pp. 30, 33-34, 41, 42, 60; Exhibit F, p. 3; Exhibit E ¶5).

Coincidentally, Lipman received panel's recommendation on the same day as Ms. Hughey's interview as well. (Exhibit B, p. 49). Although the panel had recommended that Ms. Hughey be interviewed for the Strategic Communications positions, Lipman claimed that the panel's report indicated that Ms. Hughey was "more interested in outreach," and Ms. Lipman considered the Strategic Advocacy position a "better fit" for Ms. Hughey. (Exhibit B, pp. 28-29, 50). According to Ms. Hughey, Lipman told her during the interview that she believed that Ms. Hughey's "skills best fit" the Strategic Advocacy position, but did not inform her that she was *not* being considered for the two Strategic Communications positions. (Exhibit E ¶ 6).

According to Lipman, a final decision on Black and Potts' candidacies had not yet been made, and that had not been "hired," but WMATA was "moving in that direction."(Exhibit B pp. 48, 50). During the course of the interview, Ms. Lipman asked, "I am trying to understand how I would send you to Virginia where the 'good old boys' are - how would you represent the Authority." (Exhibit E ¶ 7). Neither Lipman nor Feldman took notes during the interview. (Exhibit F, p. 2-4). Lipman and Feldman did not rank the candidates. (Exhibit B, p. 51).

On the day of Ms. Hughey's interview, Lipman forwarded to Sandy Reed a recommendation that Potts and Black be hired for the two Strategic Communications positions. In her memorandum to Reed, Lipman claimed that all six candidates recommended by the panel,

including Ms. Hughey, had been "interviewed" for the position. (Report by Deborah Lipman to Sandy Reed, dated November 9, 2005, incorporated herein as Plaintiff's Exhibit "J").

According to Feldman, Ms. Hughey was his choice to fill the Strategic Advocacy position. (Exhibit F, p. 4). Nevertheless, he agreed with Lipman to interview Craig Kwiecinski (Exhibit F, p. 4), and Lipman and Feldman interviewed Kwiecinski, a white male, for the Strategic Advocacy position on November 21, 2005. (Exhibit B, p. 57). On November 28, 2005, Lipman recommended Kwiecinski for the Strategic Advocacy position. (Report by Deborah Lipman to Sandy Reed, dated November 8, 2005, incorporated herein as Plaintiff's Exhibit "K"). On or about December 9, 2005, Hughey was informed that another candidate had been hired to fill the Strategic Advocacy position. (Exhibit E ¶ 9).

On February 21, 2006, Ms. Hughey met with Feldman at his request. Feldman informed Ms. Hughey that he believed that Lipman's comments about "good old boys" during the interview were inappropriate and racially motivated. Feldman further informed Ms. Hughey that the Strategic Communications positions had been filled by two external white candidates. (Exhibit E ¶¶ 11-12). The next day, Ms. Hughey filed a complaint through WMATA's internal process on February 22, 2006. Ms. Hughey complained that Ms. Lipman's statement during the interview made her "feel as though constituents may perceive me differently because of my racial background." (Tomika Hughey's Internal WMATA Complaint, incorporated herein as Plaintiff's Exhibit "L"). WMATA also acknowledged that on February 22, 2006, Ms. Hughey had alleged discrimination when WMATA failed to consider her for the Strategic Policy and Communications Specialist positions and failed to select her for the Strategic Advocacy Specialist position. (Letter to EEOC from Teresa Bailey, dated November 20, 2006, incorporated herein as Plaintiff's Exhibit "M").

According to WMATA's internal complaint procedures, investigations into complaints of discrimination were to be completed within 90 days from receipt. (WMATA Procedures: Discrimination Complaints, incorporated herein as Plaintiff's Exhibit "N").  Ms. Hughey cooperated fully with the investigation, and the case was assigned to Devin Walker, an investigator with WMATA's Office of Civil Rights. (Exhibit E ¶ 14).  During the course of the investigation, Walker informed Ms. Hughey that the evidence in her case, along with that of another complainant's, reflected negatively on the WMATA managers and the Human Resources Department.  Walker advised Ms. Hughey that he had warned about lax oversight by Human Resources during the past hiring processes. (Exhibit E ¶ 15.).  Nonetheless, Walker assured Ms. Hughey that his report on her internal discrimination complaint would be completed within the 90-day period. (Exhibit E ¶ 15).  On or about May 4, 2006, well within the 90-day period, Devin Walker referred his findings sustaining Ms. Hughey's allegations of discrimination to Teresa Bailey.  As a remedial measure, Walker recommended that Lipman receive a five-day suspension.  (Devin Walker Report, incorporated herein as Plaintiff's Exhibit "O"; Email from Devin Walker, dated May 4, 2006, incorporated herein as Plaintiff's Exhibit "P").  On May 10, 2006, Teresa Bailey forwarded to then acting general manager Dan Tangherlini the results of Walker's investigation and findings of probable cause. (Memorandum from Teresa Bailey to Dan Tangherlini, incorporated herein as Plaintiff's Exhibit "Q").

On June 9, 2006, Devin Walker was removed as the investigator on Ms. Hughey's matter, and Walker advised Hughey to "follow-up" with Teresa Bailey, Director of WMATA's Office of Civil Rights. (Tomika Hughey Submission to EEOC, dated July 10, 2006, incorporated herein as Plaintiff's Exhibit "R").  Walker told Hughey for the first time that he had submitted a final report and recommendations to the Office of Civil Rights. (Exhibit R, p. 1).  By June 2006, Ms.

Hughey had not received the report of investigation for her internal complaint, and on June 23, 2006, Ms. Hughey called Bailey for a status.  Bailey eventually told Ms. Hughey that Anne Anderson, another investigator, would be assigned her case. (Exhibit E ¶ 19; Exhibit R, p. 2). Ms. Hughey inquired why another investigator was being assigned to her matter, and Bailey responded that it was "customary" for cases to be reviewed by other investigators. (Exhibit E ¶ 20).  A few days later, Anderson contacted Hughey and again interviewed her about her claims. (Exhibit E ¶ 20; Exhibit R, p. 2).  Despite the curious delay in completing the investigation into Ms. Hughey's complaints of discrimination, neither Teresa Bailey, Brender Gregory, Deputy Manager of Workforce Development and Administration,  nor Anne Anderson advised her to file a complaint with the EEOC while her internal complaint was reinvestigated. (Exhibit E ¶ 21).

Frustrated with the pace and progress of the investigation, on July 10, 2006, Ms. Hughey went to the Washington Field Office of the EEOC and completed an Intake Questionnaire. (Intake Questionnaire, incorporated herein as Plaintiff's Exhibit "S").  Ms. Hughey believed and told the EEO that the Office of Civil Rights was "dragging its feet" to make a final recommendation for "fear of management's response." (Exhibit E ¶ 21; Exhibit S).  On that day, Ms. Hughey also submitted to the EEOC a written summary of her complaint.   In her submission, Ms. Hughey alleged that "there were three positions advertised under two different postings.  The individuals selected for these positions were offered jobs and began employment with WMATA between the months of November 2005 and January 2006.  In addition to myself another candidate was highly qualified and not selected for either of the advertised positions, according to the current ongoing, internal WMATA investigation." (Exhibit R, p. 1).  Finally, Ms. Hughey complained that she was "not confident in the [WMATA's] Office of Civil Rights to fairly and efficiently resolve my case." (Exhibit R, p. 2).

On July 20, 2006, Ms. Hughey again requested information from Brender Gregory about her complaint and protested WMATA's "lack of action." (Addendum to EEOC Complaint Submitted September 6, 2006, incorporated herein as Plaintiff's Exhibit "T"; Tomika Hughey email to Brender Gregory, dated July 20, 2006, incorporated herein as Plaintiff's Exhibit "U"). As a result of her persistent inquiries, Ms. Hughey finally met with Bailey about the status of the investigation on July 28, 2006. (Exhibit T).   On August 2, 2006, Hughey met with Gregory regarding the status of the investigation, and Gregory advised her that the internal investigation was not "fully" completed. (Exhibit E ¶ 27; Exhibit T).

Five days later, on August 7, 2006, Anne Anderson issued an internal report once again finding probable cause for Ms. Hughey's complaints as to all three of the positions. (Exhibit F). In her report, Anderson found that Lipman's reasons for selecting Potts and Black over Ms. Hughey were not "credible." (Exhibit F, p. 8).   Anderson further found that there was no "credible reason" for failing to interview Ms. Hughey, who was an internal candidate and worked in the same building, earlier given the purported urgency of filling the positions. (Exhibit F, p. 8).   In addition, Anderson confirmed that no evidence existed that Lipman reviewed the candidates' applications or the panel's recommendations before conducting her interviews. (Exhibit F, pp. 8-10).   And, Anderson determined that Lipman had not considered the panel's scores and recommendations in making her selections. (Exhibit F, p. 8).   Finally, Anderson ascertained that due to the "mendacity and non-credible statements" by Lipman to support her selections, Ms. Hughey's race was a factor in her non-promotions to the two Strategic Communications positions and the Strategic Advocacy position. (Exhibit F, p. 10).   Anderson recommended a three-day suspension for Lipman and required Lipman and Feldman to attend diversity training. (Exhibit F, p. 10-11).

On August 16, 2006, Ms. Hughes again contacted Ms. Gregory for information about the status of the investigation. (Exhibit T). On August 23, 2006, Gregory met with Ms. Hughey and orally presented Anderson's findings. (Exhibit T). On September 5, 2006, Ms. Hughey received a letter from Teresa Bailey, WMATA's Director of the Office of Civil Rights ("CIVR"), formally informing her of the results of CIVR's investigation into her complaints for her non-promotions to the Strategic Communications and Strategic Advocacy positions. (Letter from Teresa Bailey to Tomika Hughey, dated August 30, 2006, incorporated herein as Plaintiff's Exhibit V). The investigation by the Office of Civil Rights, according to Bailey, found "sufficient evidence to support a probable cause finding of discrimination in the failure to consider you for the Strategic, Policy and Communications Specialist position and fairly to select you for the Strategic Advocacy Specialist position. Moreover, witness statements tend to give credence to your claim regarding Ms. Lipman making a statement that appeared to have racial overtones." (Exhibit V). Ms. Bailey also advised Ms. Hughey that "Ms. Lipman's conduct will be subject to appropriate administrative action, including a requirement to attend diversity training." (Exhibit V). Finally, Bailey informed Ms. Hughey that WMATA's decision was "final," and that she had a "right to file a complaint of discrimination with the U.S. Equal Employment Opportunity Commission." (Exhibit V).

The next day, Ms. Hughey filed an "addendum" to her initial filing with the EEOC. By that addendum, Ms. Hughey alleged that on February 21, 2006, "I became aware that I was not selected for the positions of Strategic Policy and Communications Specialist (2 vacancies) and Strategic Advocacy Specialist (1 vacancy)." (Tomika Hughey's Addendum to EEOC, dated September 6, 2006, incorporated herein as Plaintiff's Exhibit "W"). Ms. Hughey further contended that it was "though the course of the formal WMATA investigation that I was made

aware of the hiring dates, interviews, etc. of the incumbents for the positions in question."
(Exhibit W).  Ms. Hughey also provided the EEOC with a copy of WMATA's final report.
(Exhibit E ¶ 28; Exhibit W).

On September 28, 2006, Eugene Reed, an intake officer at the EEOC, forwarded to Ms.
Hughey a copy of the charge of discrimination he had drafted for her signature. (Letter from
Eugene T. Reed, Jr. to Tomika Hughey, dated September 28, 2006, incorporated herein as
Plaintiff's Exhibit "X").  Ms. Hughey signed and filed the charge of Discrimination drafted by
the EEOC on October 5, 2006. (Charge of Discrimination, incorporated herein as Plaintiff's
Exhibit "Y").

Deborah Lipman was given a one-day suspension for her discriminatory conduct against
Ms. Hughey. (Exhibit B, p. 66).

## ARGUMENT

### I.    Summary Judgment Standards.

Rule 56 of the Federal Rules of Civil Procedure allows a trial court to render summary
judgment for a moving party only where "the pleadings, depositions, answers to interrogatories,
and admissions on file, together with the affidavits, if any, show that there is no genuine issue as
to any material fact and that the moving party is entitled to summary judgment as a matter of
law." Fed. R. Civ. P. 56(c); Aka v. Washington Hosp. Ctr., 156 F.3d 1284, 1288 (D.C. Cir.
1998). In its initial review of the evidence submitted in support and opposition to summary
judgment, the trial court may not make credibility determinations or weigh the evidence, which
are jury functions, not those of the judge. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 254-
255 (1982). Thus, although the court should review the record as a whole, it must disregard all

evidence favorable to the moving party that the jury is not required to believe. <u>Reeves v. Sanderson Plumbing Products, Inc.</u>, 530 U.S. 133, 151 (2000).

It is equally well-settled that the moving party bears the burden of showing that there is no genuine issue of material fact <u>or</u> that the opposing party has failed to make a showing sufficient to establish the existence of an element essential to that party's case. <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322-23 (1986).  In short, summary judgment is appropriate only when there are <u>no</u> triable issues of fact, and if the opposing papers reveal even one issue of disputed material fact, summary judgment must be denied.  And, when, as here, the validity of a complaint turns on questions of defendant's motive and intent, the Court must be especially cautious in granting summary judgment. <u>Lipsett v. U. of Puerto Rico</u>, 864 F.2d 881, 895 (1st Cir. 1988); <u>Lewis v. AT&T Technologies, Inc.</u>, 691 F. Supp. 915, 918 (D. Md. 1988)(<u>citing</u> <u>Morrison v. Nissan Co., Ltd.</u>, 601 F.2d 139, 141 (4th Cir. 1979)). Summary judgment, to be sure, is an extreme remedy and should be invoked with "special caution," particularly in, as here, discrimination cases. <u>Richards v. Nat'l Rifle Assoc.</u>, 871 F. Supp. 499, 501 (D.C. Cir. 1994).

Rule 56 of the Federal Rules of Civil Procedure allows the Court to render summary judgment for a moving party only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to summary judgment as a matter of law." Fed. R. Civ. P. 56(c); <u>Barwick v. Celotex Corp.</u>, 736 F.2d 946, 958 (4th Cir. 1984).  Summary judgment is an extreme remedy and should be invoked with "special caution," particularly in, as here, discrimination cases. <u>Richards v. Nat'l Rifle Assoc.</u>, 871 F. Supp. 499, 501 (D.C. Cir. 1994).  And, of course, in reviewing a motion for summary judgment, the Court must be extra-careful to view all the evidence in the light most favorable to the non-moving party,  <u>Anderson v.</u>

Liberty Lobby, Inc., 477 U.S. 242, 255 (1986), according the non-moving party the benefit of all reasonable inferences.

Here, the evidence submitted by defendant does not remotely meet its initial burden of showing the absence of a genuine issue concerning any material fact. Ms. Hughey identifies numerous issues of fact that when viewed in the light most favorable to her will not allow the Court to enter summary judgment, much less summary judgment in defendant's favor. That these disputed facts, as outlined above, are material to the essence of Ms. Hughey's claims and defendant's defenses can hardly itself be disputed as they relate directly to matters of credibility and the ultimate issues in the case. In sum, to the extent defendant contends that there are no disputed facts in this matter and that they should prevail as a matter of law, its arguments are without any merit.

## II.    Ms. Hughey Timely Exhausted All of Her Administrative Remedies for Each of Her Non-Selections.

By its specious Motion for Summary Judgment, defendant does not contest that Ms. Hughey has and can prove a prima facie case of race discrimination for her former employer's failure to promote her to positions for which she was qualified. Nor has defendant articulated any reason whatsoever, legitimate or otherwise, for its adverse employment actions against Ms. Hughey. Further, defendant does not contest that Ms. Hughey timely filed a complaint under its own internal procedures protesting defendant's intentional discrimination. And, finally, defendant does not protest that it mismanaged and delayed its own internal investigation into Ms. Hughey's meritorious complaint under circumstances that would lead a reasonable jury to conclude that WMATA was attempting to manipulate its own findings regarding Ms. Hughey's complaint, specifically, and the failings of its Human Rights division, generally. Rather, defendant complains that Ms. Hughey failed to timely file her complaint with the EEOC when,

after persistently seeking resolution of her internal WMATA complaint, she went to the EEOC on July 10, 2006. In short, defendant's posit on this score is utterly without merit.

It is, of course, defendant's burden to prove by a preponderance of the evidence that Ms. Hughey failed to exhaust her administrative remedies. Brown v. Marsh, 777 F.2d 8, 13 (D.C. Cir. 1985) (stating that "because untimely exhaustion of administrative remedies is an affirmative defense, the defendant bears the burden of pleading and proving it"). Meager and conclusory allegations that the plaintiff failed to exhaust her administrative remedies will not satisfy the defendant's burden. Brown v. Marsh, 777 F.2d at 12. Simply put, defendant's specious contention that Ms. Hughey sat on her well-founded rights while it played office politics with her internal complaint must be rejected.

A.    Ms. Hughey Filed a Timely Charge for the Strategic Policy and  Communications Specialist Position

The statutory enforcement scheme of Title VII requires that a plaintiff file a charge of discrimination with the EEOC with facts supporting her claim of unlawful discrimination. 42 U.S.C. Section 2000e-5(e)(1); Ledbetter v. Goodyear Tire & Rubber Co., 550 U.S. 321 (2007). These statutory limitations of the EEOC filing deadline "protect[s] employers from the burden of defending claims arising from employment decisions that are long past. Delaware State College v. Ricks, 449 U.S. 250, 256-257. The relatively short 180-day deadline is intended to encourage "*prompt processing* of all charged of employment discrimination through *voluntary conciliation and cooperation*." Mohasco Corp. v. Silver, 447 U.S. 807, 825 (1988)(Emphasis added). The EEOC limitation serves to ensure that an adversary is "put on notice" to defend within a specified period of time and the right to be free of stale claims. Ledbetter v. Goodyear Tire & Rubber Co., 550 U.S. at  342.

Here, defendant first asserts that Ms. Hughey failed to file a timely charge for her non-selection for the Strategic Policy and Communications Specialist position because, defendant argues, she was advised of her non-selection for both of the positions on December 8, 2005. Defendant's Motion for Summary Judgment, p. 4.  In support of this contention, defendant relies, in part, on a second-hand statement in Ms. Hughey's civil Complaint that defendant had announced the hiring of Potts and Black on December 7, 2005, as evidence that she knew in early December 2005 that she had not been selected for either Communication position and that white candidates had been chosen in her stead.  During the course of her *own* investigation into defendant's illegal conduct in the Spring of 2007, however, Ms. Hughey learned that defendant had announced on or about December 7, 2005, that the positions for the Strategic Policy and Communications positions had been filled.   Ms. Hughey had no actual or first-hand, contemporaneous knowledge of any WMATA announcement or that the positions had been filled until she was informed on February 21, 2006, when Feldman told her. (Exhibit E ¶¶ 12, 30; Memorandum of Ray Feldman, November 17, 1006, p. 8, incorporated herein as Plaintiff's Exhibit "Z").  Indeed, defendant proffers no evidence that such an announcement actually took place.  In short, nothing in the record contradicts Ms. Hughey's representations that she first learned on February 21, 2006, about the Strategic Communication positions, and defendant's insistence that "she is trying to have it both ways" is laughable.

In support of its contention that Ms. Hughey knew that she was not getting a promotion to either of the Strategic Communication positions in November or December 2005, defendant also relies on a declaration submitted by Deborah Lipman after her deposition. Deborah Lipman Declaration at ¶7.  Lipman's deposition testimony, however, contradicts her eleventh hour

declaration that she told Ms. Hughey that she would only be interviewing for the Strategic

Advocacy position:

> Q:    When you were interviewing Ms. Hughey, you weren't considering her for the strategic policy position, were you?
>
> A:    I don't believe so.
>
> Q:    When you say you "don't believe so," what do you mean?
>
> A:    I believe that we told her that it was—that she was being interviewed for the advocacy position.
>
> Q:    When you say "believe," is that a reference to that your recollection about that is not perfect or --
>
> A:    Correct.

(Exhibit B, pp. 48-49).  Lipman's declaration does not contain any of the caveats regarding her

memory that she attested to in her deposition.   Most importantly, Lipman's "refreshed"

recollection contradicts Ms. Hughey's recollection of Lipman's statements during the interview.

Simply stated, Lipman's proffered self-serving declaration cannot rehabilitate her deposition

testimony. Galvin v. Eli Lilly & Co., 488 F.3d 1026, 1030 (D.C. Cir. 2007(a deposition is the

time to make a record capable of granting summary judgment); Frederick v. TPG Hospitality,

Inc., 56 F. Supp. 2d 76, 79 n.4 (D.D.C. 1999)(if an affidavit is inconsistent with deposition

testimony, the deposition testimony controls).

Indeed, defendant's motion is devoid of any proof that Ms. Hughey knew or had reason

to know in December 2005 that those positions had been filled.  To be sure, had defendant

possessed any evidence of Ms. Hughey's personal notification in December 2005, it would have

produced it.  It does not have any such proof because none exists.  Absent also is any indication

that defendant bothered to personally notify any of the other applicants of their non-selection for

the positions.  Defendant appears to wrongly impugn to Ms. Hughey knowledge of all of its

hiring announcements and decisions.    Absent such proof of actual knowledge of the announcements, defendant's argument is flawed at its inception, and summary judgment should not be granted.

In further support of its complaints that Ms. Hughey's case should be dismissed, defendant argues that even if the date that Ms. Hughey's cause of action arose was February 21, 2006, her initial contact with the EEOC on July 10, 2006, was insufficient to put defendant on notice of her claim for the Strategic Policy and Communications positions.  By its own argument on this score, defendant concedes that Feldman's notice to Ms. Hughey on February 21, 2006, "started the clock" on her EEOC filing deadline. <u>Delaware State College v. Ricks</u>, 449 U.S. at 261.  Nevertheless,  defendant's insistence that summary judgment should be granted on these facts is plainly wrong.

It is now all too well-settled that the filing of a subsequent, verified charge of discrimination will relate back to the time of an initial contact with the EEOC for purposes of establishing timeliness. <u>Federal Express Corp. v. Holowecki</u>, 128 S.Ct. 1147 (2008); <u>Edelman v. Lynchburg College</u>, 535 U.S. 106 (2002).  Here, Ms. Hughey was notified on February 21, 2006, of her non-selection for the Strategic Policy and Communications positions.  The record is undisputed that she made an initial contact with the EEOC on July 10, 2006, well within the 180 day statutory time limit.  On that date, Ms. Hughey completed an Intake Questionnaire and submitted a written summary of her claims.  By that summary, Ms. Hughey specifically cited her internal WMATA complaint, referred to Lipman's discriminatory comments, specifically discussed the <u>three</u> positions that she had not been prompted to and expressed severe apprehension that the investigation was being mishandled. Exhibit S.  In short, Ms. Hughey clearly articulated facts at the time of her initial contact alleging discrimination in defendant's

promotion practices.  Finally, on September 6, 2006, Ms. Hughey supplemented her initial filing with an addendum further outlying her claims as to the three positions and even submitted the Office of Civil Rights' final determination supporting her claims discrimination.

Faced with these facts, defendant fails to articulate any basis for its contention that Ms. Hughey's initial contact or her subsequent filings as to the Communication positions should not relate back to her initial filing or somehow failed to put it on notice of the nature of Ms. Hughey's claims.  Defendant's failure on this score is, of course, not surprising.  Indeed, defendant was all too aware of the nature of Ms. Hughey's complaints relating to the hiring practices for the government relations positions in the fall and winter of 2005, and its complaint that Ms. Hughey's EEOC filings failed to provide defendant with notice of the nature of her claims because she did not list the specific job titles in her Intake Questionnaire is simply absurd.

In light of the overwhelming evidence adduced by Ms. Hughey, defendant's unsurprisingly efforts to distinguish the clear controlling precedent in Edelman and Carter v. WMATA, 503 F.3d 143 (D.C. Cir. 2007), must fail.  Contrary to defendant's wishes, these cases are both directive and dispositive.  Carter, in particular, could not be more similar where, in addition to involving the same defendant, an initial questionnaire failed to include information that was not in dispute and that this defendant had actual notice of from the employee's internal charge.  Here, Ms. Hughey, arguably, did not list the specific jobs in which she was alleging discrimination.  In both Carter and in this instance, however, both questionnaires contained sufficient information apprising WMATA of the alleged discriminatory practice which was the subject of protest.  Moreover, it is not in dispute, nor a secret to WMATA, that Ms. Hughey was complaining about not being promoted to any of the three new government relations positions.

23

In short, WMATA had notice from the outset. Having rejected defendant's utterly specious argument once before in <u>Carter</u>, this Court should do so once again.

Recently, and in the context of an Age Discrimination claim, the Supreme Court resolved the matter of whether an initial questionnaire can be construed as charge in the affirmative. <u>See</u>, <u>Federal Express Corp. v. Holowecki,</u> 128 S.Ct. 1147 (2008). In affirming the lower court's decision, the court reasoned:

> Documents filed by an employee with the EEOC should be construed, to the extent consistent with permissible rules of interpretation, to protect the employee's rights and statutory remedies. Construing ambiguities against the drafter may be the more efficient rule to encourage precise expression in other contexts; here, however the rule would undermined the remedial scheme Congress adopted. It would encourage individuals to avoid filing errors by retaining counsel, increasing both the cost and litigation.

<u>Id.</u> Here, Ms. Hughey supplemented her Intake Questionnaire with substantial written addenda in which she specifically protested the adverse employment decisions for all three positions. In short, defendant's contentions that it was not put on notice by Ms. Hughey's various filings with the EEOC of the nature of her complaints are unfounded.

     B.    <u>Equitable Tolling or Estoppel is Warranted for all of the Non-selected Positions Because of the Defendant's Misconduct in Their Internal Civil Rights Investigation</u>

It is well-settled that "the requirement of filing a timely administrative complaint is 'not a jurisdictional prerequisite to suit in federal court, but a requirement that, like a statue of limitations, is subject to waiver, estoppel, and equitable tolling.'" <u>Currier v. Radio Free Europe/Radio Liberty, Inc.</u>, 159 F.3d 1363 (D.C. Cir. 1998); <u>Sanders v. Veneman</u>, 131 F. Supp. 2d 225, 230 (D.D.C. 2001)(quoting <u>Ziper v. Trans World Airlines, Inc.</u>, 455 U.S. 385, 392 (1982)). Here, the undisputed record proffered by Ms. Hughey raises doubts about the integrity of defendant's internal investigation into Ms. Hughey's complaint which resulted in delays in its

completion that lulled Ms. Hughey into detrimentally relying on their word to conduct a fair, unbiased and timely investigation of her claims.  After all, it is undisputed that Devin Walker, the civil rights investigator, told Ms. Hughey that he had determined that the actions of defendant's managers and Human Resources division were to blame for the discriminatory hiring process in Ms. Hughey's matter, as well as the case of another complainant.  It is further undisputed that in an initial draft of Ms. Hughey's Report of Investigation, Walker named names and exposed the mismanagement in the Human Rights Division.  Nor is it disputed by defendant that Teresa Bailey instructed Walker to omit his broad indictment of WMATA management from Ms. Hughey's Report of Investigation not long before Walker was summarily removed from Ms. Hughey's investigation.  Finally, defendant does not dispute that, in response, Walker protested that he had been "retaliated against and subjected to intimidation for finding discrimination" in another matter. (Email from Devin Walker to Teresa Bailey, dated June 9, 2006, incorporated herein as Plaintiff's Exhibit AA).  Oblivious to its own mandated timelines and Ms. Hughey's persistent inquiries into the status of her case, defendant strung Ms. Hughey along for four months, insisting that the assignment of a second investigator was "customary" while all along it knew that a finding sustaining Ms. Hughey's claims on all scores had been made.

Most important, Walker led Ms. Hughey to believe that her complaint would be resolved in her favor and that his report was complete.  Based on that representation, Ms. Hughey awaited a final resolution that she believed would be in her favor.  By June, however, when it appeared that defendant would overturn Walker's favorable determination by redoing the investigation, Ms. Hughey went to the EEOC.  Based upon Walker's representations that he was about to rule in her favor, any reasonable employee, Ms. Hughey included, would be reluctant to file a

complaint with the EEOC for fear of jeopardizing her chances for positive relief.  Coupled with the proffered evidence that defendant was attempting to engineer a different result, defendant must be estopped from benefiting from what was, charitably, a misleading and unseemly investigation into Ms. Hughey's claims.  Currier v. Radio Free Europe/Radio Liberty, Inc., 159 F.3d at 1368.

Cast in any light, defendant's reliance on Washington v. WMATA, 160 F.3d 750 (D.C. Cir. 1998), is hopelessly misplaced.  Nothing in Washington supports defendant's argument that Ms. Hughey should not be entitled to equitable estoppel or tolling.  Washington cannot wipe clean the unclean hands of defendant or sanitize the misconduct of WMATA's Office of Civil Rights misleading Ms. Hughey about the results of the investigation.  In this case, a reasonable jury could more than find that WMATA management engaged in obstructive and intimidating measures to manipulate and hinder Ms. Hughey's investigation.  This misconduct resulted in Ms. Hughey missing the 180-day filing deadline for the Strategic Advocacy Position.

Moreover, none of the factors supporting the grant of summary judgment in Washington are remotely applicable here.  Ms. Hughey did not simply sit on her hands and watch the clock tick by.  Rather, she filed her internal complaint with WMATA's Office of Civil Rights, on February 22, 2006, just two months after being notified of the discriminatory non-selection  for the Strategic Advocacy Specialist Position and one day after being notified of the non-selection for the Strategic Policy and communications Specialist Position, where she clearly alleged discrimination in the Strategic Advocacy Specialist Position and the Strategic Policy and Communications Specialist Positions.   She submitted her Initial Intake Questionnaire with the EEOC on July 10, 2006, just seven months after the discriminatory non-selection where she listed the underlying facts surrounding her allegations of discrimination. Hughey Intake

Questionnaire, July 10, 2006. In the Initial Questionnaire, she listed the ground for her discrimination complaint and also expressed her concern about defendant's internal Civil Rights investigation, stating:

> Currently in current employer-based civil right claim and am being subjected to undue and unjustified second round of interviews…. [T]he Civil Rights Office Director, Ms. Teresa Bailey is attempting to defer making a final recommendation on my case for fear of management's response. (Exhibit S).

Additionally, on July 10, 2006, five (5) days later, Ms. Hughey submitted a lengthy, type-written Addendum, with attachments, to her Initial Intake Questionnaire, wherein she more fully explained her allegations and listed the positions of Strategic Advocacy Specialist and Strategic Policy and Communications Specialist positions as the jobs in which she as alleging discrimination. Exhibit R.  In that Addendum, Ms. Hughey also listed the actions she has taken in inquiring about the status of her investigation and complaining about the lack of action being taken:

> The first investigator was removed from he investigation over a month ago and advised that I contact the Director of Civil Rights as he had submitted his final report and recommendations and Ms. Bailey should be prepared to close the complaint soon thereafter.  After speaking with Ms. Bailey on June 23rd, she advised that a second investigator would be reviewing the complaint and after that occurred, she would contact me.  As of July 10, 2006, I have essentially been re-interviewed by the second investigator, revising the case and very emotional issues for the second time around. It has been over 120 days since filing my complaint and I am not confident in the Office of Civil rights to family and efficiently resolve my case.

Id.

In the timeline attachment accompanying the addendum, Ms. Hughey also listed the dates emails and calls she sent inquiring about her case and meetings she initiated to find out the status of her case. Exhibit T.  In sum, this is precisely the type of due diligence that the Supreme Court has held warrants equitable tolling when a defective pleading was filed or where the complainant

was induced by the opponent's misconduct into missing a filing deadline. Irwin v. Department of Veterans Affairs, 498 U.S. 89, 96 (1990).

Finally, unlike Washington, it is not disputed that Ms. Hughey was not represented by counsel during the filing period and had no legal guidance on the consequences of her reliance on WMATA's internal investigation and any affect it may have on her EEOC filing deadline. This case represents just the precise "extraordinary and carefully circumscribed instance" mandated by the Court in Smith-Haynie v. District of Columbia, 155 F.3d 575, 579-580 (D.C. Cir. 1998)(quotation omitted).  In short, the malfeasance of defendant in failing to conduct a forthright and lawful investigation of Ms. Hughey's meritorious complaints of discrimination more than justifies application of equitable tolling or estoppel.

## III.    Summary Judgment Is Inappropriate On Ms. Hughey's Claims of Intentional Discrimination under Title VII.

By her Complaint, Ms. Hughey alleged that defendant violated Title VII, without basis or justification, when it denied her promotion opportunities because of her race in 2005 and 2006. Plaintiff submits, therefore, that defendant denied to Ms. Hughey employment opportunities, perks and opportunities for advancement because of her race.

It is well established that in order to prevail in an action under Title VII, plaintiff bears the burden of establishing by a preponderance of the evidence a prima facie case of discrimination. Texas Dep't. of Community Affairs v. Burdine, 450 U.S. 248, 277 (1981); McDonnell Douglas v. Green, 411 U.S. 792, 802-804 (1973). Such a prima facie case can be established under circumstances, which give rise to an inference of unlawful discrimination. Texas Dep't. of Community Affairs v. Burdine, 450 U.S. at 253. "A plaintiff meets her initial burden of establishing a prima facie case by offering evidence adequate to create an inference that she was denied an opportunity on the basis of a discriminatory criterion." Id., at 254.

It is true, that to maintain an action under these statutes, Ms. Hughey must prove discriminatory intent. In cases brought under Title VII involving allegations of non-selection, a plaintiff establishes a prima facie case, thereby creating an inference of unlawful discrimination, by showing that: (1) she was a member of the statutorily protected group; (2) she was qualified for the position in question; (3) she was not hired or promoted to that position; and (4) a person not in a statutorily protected group was selected instead of her. Holcomb v. Powell, 443 F.3d 889 (D.C. Cir. 2006); Lathram v. Snow, 336 F.3d 1085, 1088 (D.C. Cir. 2003); Koger v. Reno, 98 F.3d 631, 633 (D.C. Cir. 1996).

Here, even defendant does not dispute that Ms. Hughey can establish a prima facie case of unlawful discrimination. After all, Ms. Hughey, at the time of her non-selections was an African-American female. Nor can defendant honestly protest that Ms. Hughey was not qualified for the position she was seeking. Further, white candidates, all of whom were external applicants, were promoted instead of her. Int'l Brotherhood of Teamsters v. United States, 431 U.S. 324, 358 n.44 (1977); Holcomb v. Powell, 443 F.3d 889 (D.C. Cir. 2006); Morgan v. Fed. Home Loan Mortgage Corp., 328 F.3d 647, 650-51 (D.C. Cir. 2003). Simply put, Ms. Hughey has firmly established a prima facie case of discrimination.

In sum, Ms. Hughey has produced overwhelming evidence that would permit a reasonable jury to find unlawful discrimination. Defendant has not even attempted to show that there exists an issue of material fact that Ms. Hughey non-selection was under circumstances giving rise to an inference of unlawful discrimination. Nor can it. In sum, defendant's motion for summary judgment must be denied.

## CONCLUSION

WHEREFORE, Plaintiff Tomika Hughey respectfully requests that defendant's meritless Motion for Summary Judgment be denied.

Respectfully submitted,

_____/s/ Lisa Alexis Jones
Lisa Alexis Jones
1200 G Street, N.W. Suite 800
Washington, D.C. 20005
(202) 434-4507
(202) 434-8707 Fax
orbitcv@erols.com

Counsel for Plaintiff

Dated: July 28, 2008

## CERTIFICATE OF SERVICE

I hereby certify that on this 28th day of July 2008, a true and correct copy of Plaintiff's Opposition to Defendant's Motion for Summary Judgment, Statement of Material Facts in Dispute, and accompanying Proposed Order was sent via ECF to:

David J. Shaffer, Esq.
Assistant General Counsel
WMATA
600 Fifth Street, N.W.
Washington, D.C.  20001

_____/s Lisa Alexis Jones_____
Lisa Alexis Jones

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| TOMIKA HUGHEY | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civil Action No. 07 CV 01513 |
| | ) (RJL) |
| | ) |
| WASHINGTON METROPOLITAN | ) |
| AREA TRANSIT AUTHORITY | ) |
| | ) |
| Defendant. | ) |
| _____ | ) |

**<u>PROPOSED ORDER</u>**

Upon consideration of Defendant's Motion for Summary Judgment, Plaintiff's

Opposition thereto and the record herein, it is this _____ day of _____ 2008, hereby

**ORDERED**,   that   defendant's   motion   be   and   hereby   is   **DENIED**.

_____
United States District Judge Leon

Copies to:

David J. Shaffer, Esq.

Lisa Alexis Jones, Esq.

# WMATA Performance Planning & Appraisal Program Portfolio

| Personal Information | | | |
|---|---|---|---|
| **Employee Name:** | Tomika Hughey | **Employee ID # :** | 005681 |
| **Position Title :** | Transit Economist | **Job Family :** | |
| **Market Range:** (Non- represented only) | | | |
| **If Position is Represented:** | Local 2 | **Grade:** TA-22 | **Step:** |
| **Department/Office:** PLJD/BPPD | | **Location:** JGB | |
| **Anniversary Date:** 3/06 | | | |
| **Organizational Performance Factor Role Profile:** 3 | | | |

## Performance Planning
### At the beginning of the Performance Year

- Identify what results are expected (Section 1)
- Review Performance Factors for the job (Sections 2 and Attachment A) and, as applicable, the employee's personal development plan from *Voices*
- Establish the employee's Development Plan (Section 3)
- Sign and date the form

## Mid-Year Discussion
### Near the middle of the Performance Year

- Employee prepares using Attachment B
- Discuss employee's performance relative to expected results (Section 1) and Performance Factors (Section 2 and Attachment A)
- Discuss progress toward achievement of the Development Plan; update as appropriate (Section 3)
- Sign and date the form (Section 6)

## Annual Performance Evaluation
### At the beginning of the Performance Year

- Assess results achieved (Section 1)
- Assess performance against the Performance Factors for the job (Section 2 and Attachment A)
- Review and update the Development Plan (Section 3)
- Employee provides comments as needed (Section 4)
- Assign an overall evaluation rating & provide a written explanation (Section 5)
- Sign and date the completed form (Section 6)



EXHIBIT

A

ALL-STATE LEGAL®

000009

**Section 1: Expected Results**
**(To be discussed during planning, mid-year and annual evaluation meetings)**

This section highlights the most important **results** expected of the position and may be comprised of: a) job standards taken from the job description, and/or b) performance goals developed for the performance period. This section is not meant to include every job duty, but rather, should include the most significant aspects of the job. A job will typically have 3-5 job standards/performance goals. (See Section 5 for a description of the performance ratings.)

| List the major job standards/ performance goals with measures.* *These should be specific, measurable, and time bound | Actual Results Review employee's performance in each standard/ or goal area. Make comments in the space provided, then indicate (X) your rating. | Outstanding | Exceeds Expectations | Competent | Needs Improvement | Unacceptable |
|---|---|---|---|---|---|---|
| **Organizational    Effectiveness:** Participate in Authority-wide and departmental organization change, career development activities and personal training. | Ms. Hughey has successfully participated in all departmental and Authority-wide organizational initiatives. She also helped sponsor a TCRP training course that was held at WMATA. Ms. Hughey has provided background information on the District of Columbia Alternatives Analysis and Anacostia Streetcar Project in support of WMATA's first Town hall Meeting. Ms. Hughey presented the extensive public participation process utilized for the Anacostia Streetcar Project at the 2005 Annual Rail~Volution Conference in Salt Lake City, UT. Ms. Hughey was the PAIT employee representative for the 2005 Annual PDEC Awards Ceremony. | ☐ | ✕ | ☐ | ☐ | ☐ |
| **Other:** *System Analysis and Corridor Development* Maximize opportunities for advancing the DC AA and Anacostia Demo Project and other reimbursable projects to improve transit operating efficiency, accommodate future ridership growth, and support local redevelopment initiatives. Proactively participate in transportation corridor planning studies and engineering studies, along with other opportunities to increase ridership through expansion of new systems. | Ms. Hughey has initiated analysis of residential, commercial and industrial development impacts on future transit services in the District of Columbia and identified opportunities for enhanced transit service in the New York Avenue Corridor in coordination with Bus Planning/Operations Staff. Tomika has also been instrumental in ensuring the inclusion of local jurisdictional planning studies and projects in the development of Station Area Vision and Access Plans for the Fort Totten, Brookland, Deanwood and New York Avenue Metrorail Stations. Ms. Hughey supports the Authority by providing background data on the intent and goals of the DCAA for DDOT and other agencies in the development of the Georgia Avenue Rapid Bus Service and continued development of the Anacostia Streetcar Project, now under the direction of DDOT's Office of Mass Transit. | ☐ | ✕ | ☐ | ☐ | ☐ |

000012

9.184 (02/01)

Tomika Hughey

August 25, 2006

| | | Outstanding | Exceeds Expectations | Competent | Needs Improvement | Unacceptable |
|---|---|:---:|:---:|:---:|:---:|:---:|
| **Other:**<br>_Alternative Analysis_<br>Participate in the development and analysis of the DC AA and Anacostia Demo Project and other corridor and service development projects in the District. | See comments above | ✗ | ☐ | ☐ | ☐ | ☐ |
| **List the major job standards/ performance goals with measures.***<br><br>*These should be specific, measurable, and time bound | **Actual Results**<br>**Review employee's performance in each standard/ or goal area. Make comments in the space provided, then indicate (X) your rating.** | | | | | |
| **Other:**<br>_Regional Coordination_<br>Represents the Authority and District of Columbia transit interests at various regional and subregional stakeholder groups concerned with promotion of new transit services and modes. Establishes working relationships with these groups and particularly DC agency staff to promote new transit services. | Ms. Hughey has represented the Authority as a member of the DCAA project team by providing status reports on the DCAA and Anacostia Streetcar Project at regional stakeholder meetings including the Anacostia Waterfront Interagency Coordination meetings, Sierra Club, and various D.C. neighborhood and business organizations. In FY05, she worked with D.C. Office of Planning and DDOT to incorporate the long-range transit plan components of DCAA into the update of the D.C. Comprehensive Plan and is currently conducting the Planning Office review of the Mayor's DRAFT of the Comp Plan. Ms. Hughey also officially represents the Authority for District of Columbia projects including the NoMA Vision Plan and Development Strategy; Industrial Lands Study; Kenilworth Avenue Study; Great Streets Initiative; South Capital Street; St. Elizabeth's Redevelopment; and 11th Street Bridges Studies. More recently, Ms. Hughey has begun representing the Office of Planning at several Transportation Planning Board Committee Meetings including State Technical Working Group; Program and Technical Committee Meetings on such issues including, but not limited to Human Services Transportation Coordination. | ☐ | ✗ | ☐ | ☐ | ☐ |

Tomika Hughey

August 25, 2006

## Section 2: Performance Factors
## (To be discussed during planning, mid-year and annual evaluation meetings)

Performance Factors describe skills and behaviors critical for employee and WMATA success.  Because jobs contribute differently, "roles" have been created that describe the distinct set of **skills and behaviors** that characterize jobs within the same performance profile.  For a specific description of the Performance Factors for your job, please refer to Attachment A.

| General Description of Performance Factor | Examples of Employee Behavior that Support the Evaluation (Required to be Completed by Rater) | Outstanding | Exceeds Expectations | Competent | Needs Improvement | Unacceptable |
|---|---|---|---|---|---|---|
| **Technical Excellence** "Developing and applying technical, professional and organizational knowledge" | Ms. Hughey has applied her expertise in community development and outreach in a manner that exceeds Authority standards. | ☐ | ✕ | ☐ | ☐ | ☐ |
| **Teamwork & Conflict Management** "Creating effective working relationships with others by sharing information, helping others, and demonstrating commitment to the team" | Ms. Hughey works well in a team setting and is an important member of the Planning office. | ☐ | ✕ | ☐ | ☐ | ☐ |
| **Interpersonal Skills** "Demonstrating behaviors that help get the job done such as good communication skills, information sharing, willingness to take action, and enthusiasm" | Ms. Hughey has good communication skills that have been demonstrated through oral presentations, briefings, memos, and meetings. She is always willing to share information about her projects with stakeholders and is proactive at project outreach. | ☐ | ✕ | ☐ | ☐ | ☐ |
| **Decision Making & Innovation** "Applying critical thinking skills to initiate new ideas, generate creative solutions, try different ways to solve problems and adjust effectively to new situations" | Ms. Hughey possesses the skills necessary to make decisions at her job level. She often suggests creative solutions to public outreach and planning issues that arise related to her work. She is flexible when faced with changes. | ☐ | ☐ | ✕ | ☐ | ☐ |
| **Integrity and Trust** "Maintaining and promoting the highest ethical and organizational/business standards, including WMATA's Standards of Conduct, in internal and external operational/business activities" | Ms. Hughey is extremely trustworthy and possesses a high degree of integrity and professional ethics. | ✕ | ☐ | ☐ | ☐ | ☐ |
| **Customer Focus** "Providing prompt, high quality service by effectively serving, managing and supporting our internal and external customers" | Ms. Hughey provides high quality support within the Authority and with external agencies and the public. | ✕ | ☐ | ☐ | ☐ | ☐ |

0000⌶⌶

Tomika Hughey

August 25, 2006

| Achievement & Performance Orientation<br>"Planning, monitoring and accepting responsibility for expected results, never confusing effort with accomplishment" | Ms. Hughey provides the correct amount of effort on each assignment to meet deadlines and produce results. | ☐ | ✕ | ☐ | ☐ | ☐ |
|---|---|---|---|---|---|---|

## Section 3: Development Plan
## (To be developed at the planning meeting, reviewed during the mid-year discussion and updated at the annual evaluation meeting)

| Areas Targeted for Development | Action Plan | Results Achieved |
|---|---|---|
| [Enter areas of focus] | [Enter training courses, special assignments, or other learning opportunities for the coming year] | [Enter the results/outcomes of the action plan items] |
| Station Access & Vision Plan Development<br><br>Bus Rapid Transit & Bus Operations Planning | NTI Context Sensitive Solutions in a Multi-Modal Environment; Transit Marketer Modules I-V; TRB 3rd Street Symposium: Designing Urban Streets that Work (2007); NTI BRT Course | Enhance transit planning knowledge and ability |

## Section 4: Employee Comments
## (To be completed as needed throughout the year)

This section is for the employee to provide written comments regarding the completed WMATA Performance Management Portfolio. Completing this section is optional. The comments will not change the supervisor/manager's comments or rating; however, employee comments will become part of the employee's performance record.

| Employee Comments |
|---|
| I would like to continue developing my skills in writing scopes of work for station access plans and vision plans. Additionally, continuing to work on bus rapid planning for District and other corridors is very interesting and engaging work. I also would like to continue working with identifying future demand for transit (alternative modes) around new and growing neighborhoods and the relationship between residential/commercial development and the types of transit services that can complement these new communities in the region. |

Tomika Hughey

August 25, 2006

## Section 5: Overall Evaluation
## (To be completed at the annual evaluation meeting)

The overall performance rating is a general summary of employee performance and accomplishment.  Check the box below which you feel best describes the employee's overall performance for the rating period. Please provide a written explanation to support the overall rating.  Additionally, an overall rating of Needs Improvement or Unacceptable must be accompanied by a Corrective Action Plan.

| **Overall Rating:** | | | | |
|---|---|---|---|---|
| ☐ *Outstanding* | ✗*Exceeds Expectations* | ☐ *Competent* | ☐ *Needs Improvement* | ☐ *Unacceptable* |

*OUTSTANDING-*
Results, skills and behaviors consistently and significantly surpass expectations.  Employee is often used as a role model.

*EXCEEDS EXPECTATIONS-*
Results, skills and behaviors are exceptional and often exceed expectations.

*COMPETENT-*
Results, skills and behaviors  fully meet expectations.

*NEEDS IMPROVEMENT-*
Results, skills and behaviors do not consistently meet expectations.  An action plan has been created to address development needs and areas requiring improvement.

*UNACCEPTABLE-*
Performance does not meet expectations.

Tomika Hughey

August 25, 2006

**Written Explanation in Support of Overall Rating:**

In recent months, Tomika has demonstrated on numerous occasions real acumen in assessing alternative approaches to preparing and delivering information for both executive decision-making and public presentation. She also has been very energetic in becoming involved with scoping of station area access planning efforts, and in doing stakeholder outreach as a precursor to scope preparation. Tomika also is beginning to absorb the information required to effectively manage WMATA's relationship with the TPB and to articulate WMATA's positions in that setting. Being effective in each of these areas will be of great value to BPPD as we aim to meet our office goals during the coming year.

Tomika Hughey
August 25, 2006

| NOTES: |
|--------|
|        |

## Section 6: Signatures and Dates
**(To be completed at the planning, mid-year and annual evaluation meetings)**

| Performance Plan Established | | |
|---|---|---|
| **Plan Period Covered July 2005 to June 2006** | | |
| Supervisor Signature/Date | Reviewing Manager Signature/Date | Employee Signature/Date |
| **Tom Harrington** | **Nat Bottigheimer** | **Tomika Hughey** |

| Mid-Year Performance Discussion Conducted | | |
|---|---|---|
| **Performance Period Covered July 2005 to January 2006** | | |
| Supervisor Signature/Date | Reviewing Manager Signature/Date | Employee Signature/Date |
| **Tom Harrington** | **Nat Bottigheimer** | **Tomika Hughey** |

| Annual Performance Evaluation Conducted | | |
|---|---|---|
| **Plan Period Covered July  2005 to June 2006** | | |
| Supervisor Signature/Date | Reviewing Manager Signature/Date | Employee Signature / Date (Signature does not imply agreement) |
| **Tom Harrington** | **Nat Bottigheimer** | **Tomika Hughey** |

If Employee is Probationary Indicate:
▫ Initial Probationary Appraisal     ▫ Final Probationary Appraisal       Local # 2      **(If Applicable)**

Page 1

1                UNITED STATES DISTRICT COURT

2                FOR THE DISTRICT OF COLUMBIA

3

4    TOMIKA HUGHEY

5            Plaintiff

6    vs.                         No. 07-cv-01513 (RJL)

7    WASHINGTON METROPOLITAN

8    AREA TRANSIT AUTHORITY

9            Defendant

10   _____/

11

12           The deposition of DEBORAH LIPMAN was held on

13   Friday, May 23, 2008, commencing at 10:18 a.m., at the

14   Law Offices of Lisa Alexis Jones, PLLC, 1200 G Street,

15   N.W., Suite 800, Washington, D.C. 20005, before Heather

16   Avalos, a Notary Public.

17

18

19

20

21   REPORTED BY:  Heather Avalos

```
                                                              Page 2
 1    APPEARANCES:

 2

 3              ON BEHALF OF THE PLAINTIFF:

 4            LISA ALEXIS JONES, ESQUIRE

 5                Lisa Alexis Jones, PLLC

 6                1200 G Street, NW, Suite 800

 7                Washington, D.C. 20005

 8                Telephone: 202-434-4507

 9                E-mail: orbitcv@erols.com

10

11              ON BEHALF OF THE DEFENDANT:

12            DAVID J. SHAFFER, ESQUIRE

13                Washington Metropolitan Area Transit Authority

14                600 Fifth Street, NW

15                Washington, D.C. 20001

16                Telephone: 202-962-2820

17                E-mail: dshaffer@wmata.com

18

19

20    Also Present:  Tomika Hughey

21
```

Page 3

1                        STIPULATION

2            It is stipulated and agreed by and between

3    counsel for the respective parties that the filing of

4    this deposition with the Clerk of Court be and the

5    same are hereby waived.

6                      - - - - - - -

7    Whereupon,

8                    DEBORAH LIPMAN,

9    called as a witness, having been first duly sworn to

10   tell the truth, the whole truth, and nothing but the

11   truth, was examined and testified as follows:

12               (Lipman Deposition Exhibit Numbers 1, 2,

13   3 & 4 were marked for purposes of identification.)

14               EXAMINATION BY MS. JONES:

15       Q    Good morning, Mrs. Lipman.

16       A    Good morning.

17       Q    My name is Lisa Jones.  And I am a lawyer

18   representing Tomika Hughey in a civil suit against the

19   Washington Metropolitan Transit Authority.

20               Could you state your name, for the record,

21   spelling your last name.

Page 4

```
 1        A     Sure.  Deborah Lipman, L-I-P-M-A-N.

 2        Q     Mrs. Lipman, have you -- well, let me go

 3   over some preliminary ground rules for the deposition.

 4              If you can't hear me or understand a

 5   question, feel free to ask me to repeat the question or

 6   to speak up or to have the court reporter read the

 7   question to you.  Okay?

 8        A     Uh-huh.

 9        Q     It's going to be important for you to

10   answer questions with a verbal yes or no as opposed to

11   an uh-uh or uh-huh or the head nodding or shaking so

12   that the court reporter can have a clean record.  Is

13   that okay?

14        A     Yes.

15        Q     If you have any need for any breaks or

16   anything, we can certainly take some time to do that.

17   The only thing that I will ask is that if there is a

18   question pending that you answer the question before we

19   take the break.  Is that okay?

20        A     Yes.

21        Q     Have you done anything in preparation for
```

Page 5

```
 1   your deposition this morning?

 2        A     Yes.

 3        Q     And what have you done?

 4        A     I talked to David yesterday.

 5        Q     And David is David Shaffer who is WMATA's

 6   counsel.  Is that right?

 7        A     Yes.

 8        Q     And did you review any documents or any

 9   materials?

10        A     Yes.

11        Q     And what did you review?

12        A     Just the materials that David had

13   collected.

14        Q     And sitting here today, you don't

15   necessarily recall what types of materials those were?

16        A     Materials related to the case.

17        Q     Do you recall -- withdrawn.

18              Well, let me ask you this.  Of the

19   materials that you reviewed yesterday, had you seen

20   those materials before?

21        A     Some of them.
```

Page 6

```
 1        Q      Have you ever read the investigation

 2   reports that were generated by WMATA in this case?

 3              MR. SHAFFER:  Are you saying reports

 4   singular or plural?

 5              MS. JONES:  Plural.

 6              THE WITNESS:  I read part of one.

 7        Q      And which one did you read?  Do you recall?

 8        A      One that was produced by -- I don't

 9   remember his full name -- the investigator.

10        Q      Would that have been Mr. Walker?

11        A      Yes.

12        Q      And Mr. Walker is Devon Walker?

13        A      Yes.

14        Q      Have you ever spoken to Terry Smith?

15        A      No.

16        Q      Do you know who Terry Smith is?

17        A      No.

18        Q      After Ms. Hughey lodged a complaint of

19   discrimination, WMATA embarked on an investigation, is

20   that correct, of her allegations?

21        A      That's what I understood.
```

1      Q      And were you asked to participate in that

2    investigation?

3      A      Mr. Walker interviewed me.

4      Q      Were you interviewed by anybody else other

5    than Mr. Walker during that investigation?

6      A      I received written questions from someone

7    named Ann Anderson.

8      Q      And who is Ann Anderson?

9      A      I don't know.

10      Q      You have no idea?

11      A      She was from the human resources

12    department.

13      Q      And did you respond to Ms. Anderson's

14    request for information?

15      A      Yes.

16      Q      Let's back up for a second, Mrs. Lipman.

17            What -- let me get a sense of your

18    educational background.  Not to go back to high school

19    or anything like that, but where and when did you

20    graduate from college?

21      A      I graduated from the University of

Page 8

1    Pennsylvania in 1975.

2        Q    And did you get any type of a -- did you go

3    to graduate school after that?

4        A    Yes.

5        Q    And where did you attend?

6        A    The University of North Carolina.

7        Q    And did you finish your postgraduate work?

8        A    Yes.

9        Q    At UNC?

10        A    Yes.

11        Q    And what did you get you postgraduate

12    degree in?

13        A    I have a master's in city and regional

14    planning.

15        Q    City and regional planning?

16        A    Correct.

17        Q    Any other postgraduate work after you got

18    your master's?

19        A    No.

20        Q    And when did you end up getting your

21    master's?

Page 9

```
 1        A      1977.

 2        Q      After you got your master's, what was the

 3   first professional employment you had as --

 4        A      I worked for the US Department of

 5   Transportation.

 6        Q      And do you recall generally -- I don't need

 7   precise dates, but generally how long --

 8        A      It was a four-month internship.  So it was

 9   from probably June to September, something like that,

10   of 1977.

11        Q      And there is one more rule that I forgot to

12   talk about.  Wait for me to finish my question before

13   you answer.  And I'll wait for you to answer my

14   question before I ask another question.  Is that okay?

15        A      Okay.

16        Q      So that we're not talking over each other.

17               After your stint at DOT, where did you go,

18   if you recall?

19        A      I worked for Ernst & Ernst.  It's now Ernst

20   and Young.

21        Q      What did you do for them?
```

Page 10

```
 1        A        Management consulting.

 2        Q        And how long was your employment with Ernst

 3   and Young?

 4        A        Approximately two years.

 5        Q        And after that?

 6        A        I worked for the US House of

 7   Representatives.

 8        Q        Did you work for any particular

 9   representative or --

10        A        I worked for the -- I don't remember the

11   exact name.  It was the subcommittee -- let me go back.

12   At that point, it was the committee on interstate and

13   foreign commerce.  It now has a different name.  It was

14   a subcommittee that dealt with railroad legislation.

15        Q        And approximately how long were you at the

16   House of Representatives working for that subcommittee?

17        A        Two years.

18        Q        And then where did you go?

19        A        For the -- I worked for the US Senate.

20        Q        And how long was your stint there?

21        A        Six years, I think.  From 1981 to '86.  May
```

Page 11

1    have been seven years.

2          Q      And then where did you work --

3          A      Then I went to work for Washington

4    Metropolitan Area Transit Authority.

5          Q      And you started there about what year?

6          A      1986.

7          Q      And when you started at WMATA, in what

8    department or what capacity did you start?

9          A      Director of government relations.

10         Q      And how long were you in that position?

11         A      Twenty-two years.

12         Q      Was that the position you were in when --

13   during the hiring process for Ms. Hughey?

14         A      Yes.

15         Q      Are you still in that position?

16         A      No.

17         Q      What position are you in now?

18         A      I'm in the chief of staff's office.

19         Q      And how long have you been in the chief of

20   staff's office?

21         A      I don't remember the effective date, but I

Page 12

1    think it was around March of this year.

2        Q     That would be March of 2008?

3        A     2008.

4        Q     After twenty-two years of being in the

5    government relations office, is there any reason why

6    you went over to the chief of staff's office?

7        A     I am eligible this year to retire.  And I

8    was -- I had made the decision that I was going to

9    retire.  The general manager asked me to work on a

10   special project.  So I have been working in that office

11   working on the special project.

12       Q     Let me ask you some questions about the

13   hiring process at WMATA generally and then we'll get

14   into the specifics about this hiring process relative

15   to Ms. Hughey.

16             Had you been in that position to have -- be

17   a selecting official or hiring official before

18   Ms. Hughey's employment decision?

19       A     Yes.

20       Q     About how many times?

21       A     About half a dozen.

1      Q    Half a dozen being about six or somewhere

2  in there?

3      A    Yes.

4      Q    And that was when you were either the

5  selecting official or hiring official.  Is that --

6      A    I don't understand the difference.

7      Q    Well, let me ask you this.  Is there a

8  difference in terminology at WMATA between the hiring

9  official and the selecting official?

10     A    I don't know.

11     Q    Other than the six times, had you

12  participated on any interview panels or things of that

13  sort at WMATA?

14     A    Yes.

15     Q    About how many times had you done that?

16     A    One or two.

17     Q    Can you describe for me generally what the

18  hiring process for a new position would be at WMATA,

19  starting from -- not necessarily from conception of the

20  job, but from after the job description has been

21  developed and finalized and a decision has been made to

Page 14

1   fund it and a decision has been made to advertise for

2   it.

3            MR. SHAFFER:  I object to the question as

4   vague as to time.  She can answer.

5       Q    Generally, within the last five years.

6       A    The position is posted.  Applications come

7   in.  They're -- the human resources department looks

8   through the applications for minimum qualifications.

9   Sometimes there is a screening panel, sometimes there

10  isn't.  Interviews are held.  The -- there is a

11  selection made after the interviews.

12      Q    And what would be a reason, if you know,

13  why a selecting panel would convene as opposed to not?

14      A    I think it's just a function of -- I guess

15  I don't know.

16      Q    And who would decide who the selecting

17  official would be in any particular hiring process?

18      A    I mean, it's the hiring manager.  But the

19  hiring manager might do it in consultation with the

20  supervisor.

21      Q    Well, when you say "hiring manager," what

Page 15

1    do you mean by that?

2        A      The personal person who is -- the office

3    manager for the position that's being filled.

4        Q      So, for instance, in the case of

5    Ms. Hughey, you were selected as -- you and Mr. Feldman

6    were selected as the selecting officials.  Is that

7    correct?

8        A      What do you mean selected?

9        Q      Well, that's what I'm trying to ask you.

10              Well, let me backtrack.

11              You were a selecting official in the hiring

12   process involving Ms. Hughey.  Is that right?

13       A      Correct.

14       Q      And Ray Feldman was a selecting official in

15   that process as well.  Is that right?

16       A      Yes.

17       Q      And why were you the selecting official in

18   Ms. Hughey's hiring process?

19       A      Because the position was in my office.

20       Q      And why was Mr. Feldman a co-selecting

21   official, so to speak?

1        A        He was my supervisor.

2        Q        After the selecting officials make their

3    selections or determinations, what happens after that?

4        A        A recommendation is sent to the human

5    resources department.

6        Q        And what do they do?  What does human

7    resources do with that?

8        A        I don't know.

9        Q        No idea?

10       A        I really -- I don't know.

11       Q        Do you know whether any process has to be

12   vetted with the office of civil rights at a point

13   where -- withdraw.

14                Let me clarify that.

15                While I think about it, Ray Feldman -- who

16   is Ray Feldman and what is his office?

17       A        Well, at that point in time, he was the

18   acting assistant general manager.  I don't remember the

19   exact title of the department.  But it was for -- I

20   think it was for communications.

21       Q        Is he still at WMATA?

```
 1       A       No.

 2       Q       When did he leave?  Do you recall?

 3       A       I don't remember.

 4       Q       Do you know to what extent the office of

 5   civil rights -- what role the office of civil rights

 6   has in the hiring process?

 7       A       No.

 8       Q       Do you know whether the office of civil

 9   rights has to vet or approve of a hiring process?

10       A       No.

11       Q       Once the recommendation is generally made

12   by the selecting official and sent to HR, are there any

13   circumstances where HR rejects that selection?

14       A       I don't know.

15       Q       Have any of your selections been rejected?

16       A       No.

17       Q       Are you involved as the selecting official

18   in any salary negotiations?

19       A       No.

20       Q       Are you involved as the selecting official

21   in any review of references and gathering of
```

1    references?

2        A      Yes.

3        Q      Are you, as the selecting official,

4    involved in the completion or preparation of any

5    personnel action reports for a new hire?

6        A      What's a personnel action report?

7        Q      You don't know what a personnel action

8    report is?

9        A      I don't know if you're referring to

10   something specific or something general.

11       Q      Well, let's take it generally -- withdraw.

12              WMATA -- when a personnel action is made at

13   WMATA, a personnel action report is generated.  Is that

14   correct?

15       A      There is something specifically called a

16   personnel action report.

17       Q      And when someone is hired -- let's

18   backtrack.

19              When someone is given a promotion within

20   WMATA, a personnel action report is generated for that

21   promotion, right?

1          A      Correct.

2          Q      And when someone is hired, a personnel

3    action report is generated.  Is that correct?

4          A      Correct.

5          Q      And as the selecting official, would you be

6    involved in generating the personnel action report for

7    that new hire?

8          A      I would sign it.

9          Q      The three positions that are the subject of

10   this lawsuit and the hiring process for Ms. Hughey,

11   these were new positions, correct?

12         A      Correct.

13         Q      New positions within your department.  Is

14   that right?

15         A      Correct.

16         Q      And what was the process for -- well,

17   withdraw.

18                There were -- there was one position --

19   well, there were two positions that were known as a

20   strategic policy and planning position.  Is that right?

21         A      I don't think that was the correct name.

1      Q      Do you recall what the correct name was?

2      A      No.

3      Q      If I told you that one of the positions was

4    strategic policy and communications specialist, does

5    that refresh your memory about what the name was?

6      A      Yes.

7      Q      And was that the name of one of the

8    positions?

9      A      Yes.

10      Q      And another position was strategic policy

11    communications specialist, right?

12      A      What was the first one?

13      Q      They were the same name.

14      A      Right.

15      Q      So there were two that the names were the

16    same.

17      A      Correct.

18      Q      But the job descriptions for each of those

19    were different.  Is that --

20      A      I don't think that the -- the job

21    description within the classification was different.  I

Page 21

1    think that was the same.

2        Q      So what was the difference between the two

3    positions, if you recall?

4        A      Are you asking me what the difference was

5    in what we were looking for or what the difference was

6    in terms of what we were -- I don't quite understand

7    the question.

8        Q      What were the differences between what each

9    of those two positions would be doing in your

10   department, if there was any difference?

11       A      We had a need for several skill sets.  And

12   the intention was that between those positions we would

13   end up getting all the skill sets covered.  So we were

14   looking for people that would fill those skill sets.

15       Q      And there was a third position as well that

16   you were looking for, correct?

17       A      Correct.

18       Q      And do you recall the name of that

19   position?

20       A      No.

21       Q      If I told you, Mrs. Lipman, that that

Page 22

1    position was a strategic advocacy specialist, would

2    that refresh your memory about what the position was?

3         A    I know it had the word advocacy in it.  I

4    don't know if that was the exact title.

5         Q    And what was -- well, withdraw.

6              Do you recall whether all of these

7    positions were posted at the same time, all three of

8    them?

9         A    I don't recall.

10        Q    Were you in -- who was the general manager

11   of WMATA at the time?

12        A    Richard White.

13        Q    And in terms of the chain of command, how

14   far down were you from Mr. White?

15        A    I reported to Mr. Feldman.  Mr. Feldman

16   reported to Mr. White.

17        Q    Were you in -- had you been in any

18   communications with Mr. White about these specific

19   positions and the hiring of these -- filling of these

20   specific positions?

21        A    Just to sort of say we were in the process

Page 23

1    or working on getting them filled.

2        Q      And these positions were -- well, withdraw.

3               You posted these positions when, if you

4    recall?

5        A      I don't recall the exact date.

6        Q      If I told you that it was sometime in the

7    summer of 2005, would that refresh your memory?

8        A      I don't know if that's correct.

9        Q      The fiscal year for WMATA is what?

10       A      June to July.

11       Q      And so these positions were already funded

12   for the budget 2005, 2006, is that correct, if you

13   know?

14       A      I believe so.

15       Q      I'm sorry?

16       A      I believe so.

17       Q      And what, if any -- well, let me withdraw

18   that.

19              Had you seen -- had you seen any of the

20   applications -- withdraw.

21              When the applications for these positions

Page 24

1    came in, who did they go to?

2         A     Human resource department.

3         Q     Was there anybody, if you know, in

4    particular that was tasked with receiving these

5    applications and organizing them in any fashion?

6         A     You mean in the HR department?

7         Q     In HR, yes.

8         A     Sandy Reed.

9         Q     Is she also known as Cassandra Reed?

10        A     I don't know.

11        Q     And in Ms. Hughey's -- the hiring process

12   relative to Ms. Hughey, there was an interview panel.

13   Is that right?

14        A     Correct.

15        Q     And who did that panel consist of, if you

16   recall?

17        A     Shiva Pant, P-A-N-T.  First name is

18   S-H-I-V-A.  Matt Greenwald and Candace Smith.

19        Q     And how was -- how did it come to be that

20   these people were selected to be on this panel, if you

21   know?

Page 25

1      A      I don't remember.

2      Q      And, if you recall, what was the process by

3  which the interview panel received the applications and

4  went about doing their interviews?

5      A      I don't recall.

6      Q      At what point did you start receiving

7  applications or copies of applications?

8      A      After the interview panel completed their

9  work.

10      Q      So up until that point, you had not seen

11  any applications.  Is that correct?

12      A      I don't recall.

13      Q      But at some point, obviously, you did see

14  the applications, correct?

15      A      I don't recall that I saw all of them but I

16  assume I saw some.

17      Q      Well, you saw -- well, the interview panel

18  completed initial interviews of some of the candidates.

19  Is that correct?

20      A      Correct.

21      Q      And how was it determined that some

Page 26

1    candidates would receive interviews and some other

2    candidates would not receive interviews?

3         A    Interviews by whom?

4         Q    By the panel.

5         A    I don't know.

6         Q    After the panel completed their work, how

7    did you determine -- of the people that they

8    interviewed, how did you determine who you would

9    interview and who you would not interview?

10        A    Based on their recommendations.

11        Q    Therefore if the panel -- well, can you

12   expound on that?

13             MR. SHAFFER:  Objection.  Calls for a

14   narrative.

15             You can answer.

16             THE WITNESS:  Pardon me?

17             MR. SHAFFER:  I just objected for the

18   record.

19             You can answer it.

20             THE WITNESS:  Could you repeat the

21   question?

Page 27

1      Q     The question was, how did the -- what was

2  the question?

3            (The reporter read back as requested.)

4      Q     Well, let me ask you some questions.

5            If the panel did not recommend the

6  candidate, you did not interview them.  Is that fair to

7  say?

8      A     I can't recall.

9      Q     Would there be an instance in which you

10 would interview a candidate that the panel did not

11 recommend for the job?

12           MR. SHAFFER:  Object to the form of the

13 question.

14           You can answer.

15           THE WITNESS:  Would --

16     Q     If the panel did not recommend a particular

17 candidate, would there ever be an instance in which you

18 would interview that candidate anyway?

19     A     I doubt it.

20     Q     Had you ever met Ms. Hughey before this

21 process?

Page 28

 1        A        Yes.

 2        Q        And how did you know her other than

 3   obviously generally through WMATA?

 4        A        Just generally through WMATA.

 5        Q        Had you ever had an opportunity to work

 6   with her?

 7        A        I don't believe so.

 8        Q        Did you know her well enough to speak in

 9   the hallway or in the elevator?

10        A        Yeah, I think.

11                 THE WITNESS:  Can we take a break.

12                 (There was a break in the proceedings.)

13        Q        Mrs. Lipman, we were talking a little bit

14   about the hiring panel.  Did you have any involvement

15   whatsoever in how they scheduled their interviews?

16        A        No.

17        Q        At some point, you got the hiring panel's

18   recommendations.  Is that correct?

19        A        Yes.

20        Q        Is it your recollection that you received

21   the panel's recommendations before you started your

Page 29

1    round of interviews?

2         A     I don't recall.

3         Q     Do you recall when you first interviewed

4    Mr. Potts?

5         A     No.

6               MS. JONES:  Off the record.

7               (Lipman Deposition Exhibit Number 5 was

8    marked for purposes of identification.)

9         Q     Mrs. Lipman, I've handed you what's been

10   marked as Exhibit 5.  Looking at that document, does

11   that refresh your memory as to when you first

12   interviewed Mr. Potts?

13        A     Yes.

14        Q     And what was the date of your first

15   interview with Mr. Potts?

16        A     Well, according to this, it was October 11,

17   2005.

18        Q     And, actually, that was not just your first

19   interview, that was your only interview with Mr. Potts.

20        A     Correct.

21        Q     When I say Mr. Potts, I mean Gregory Potts.

Page 30

1    Is that correct?

2          A      Yes.

3          Q      And Jeanine Black -- does that document,

4    Document Number 5, refresh your memory as to when you

5    interviewed Ms. Black?

6          A      Yes.

7          Q      And when was the date that you interviewed

8    Ms. Black?

9          A      October 21, 2005.

10         Q      And does that document, Document Number 5,

11    refresh your memory as to when you interviewed

12    Ms. Hughey?

13         A      Yes.

14         Q      And what was that date?

15         A      November 9, 2005.

16         Q      Do you know -- sitting here today, do you

17    know when the hiring panel first interviewed

18    Ms. Hughey?

19         A      No.

20         Q      Mrs. Lipman, you didn't interview -- you

21    didn't participate in the panel interview of

Page 31

1    Ms. Hughey.  Is that right?

2         A    Right.

3         Q    So you don't have a personal knowledge as

4    to when she was interviewed, do you, by the panel?

5         A    Correct.

6              (Lipman Deposition Exhibit Number 6 was

7    marked for purposes of identification.)

8         Q    I have handed you what's been marked as

9    Plaintiff's Exhibit Number 6.  Is there an

10   indication -- have you seen that document before?

11        A    No.

12        Q    And at the top of that document, what does

13   it say?

14        A    It says strategic advocacy specialist,

15   strategic policy communications specialist.

16        Q    And on that document, is there an

17   indication as to when Ms. Hughey was interviewed?

18        A    The document indicates November 1st, 2005.

19        Q    And would you dispute -- well, do you have

20   any evidence of -- I'm sorry.

21             Do you have any knowledge of anything that

Page 32

1    would allow you -- let you dispute whether that was the

2    correct date in which Ms. Hughey was interviewed by the

3    panel?

4         A    Can you repeat the question.

5              MS. JONES:  I'll let her read it back.

6              (The reporter read back as requested.)

7              THE WITNESS:  No.

8         Q    If Ms. Hughey was interviewed by the panel

9    on November 1st of 2005, it's fair to say that she was

10   interviewed by the panel after you did your

11   second-round interviews with Mr. Potts.

12        A    Correct.

13        Q    And she was interviewed after you did your

14   second-round interviews with Ms. Black.  Is that

15   correct?

16        A    Correct.

17        Q    Was Mr. Feldman in the interview with

18   Mr. Potts on October 11th?

19        A    Yes.

20        Q    And was he -- did he participate in the

21   interview with Ms. Black on October 21st?

Page 33

```
 1        A      Yes.

 2        Q      If you recall, when you received the

 3   interview panel's recommendations, did you receive them

 4   all in one packet or did you receive them piecemeal?

 5        A      I don't recall.

 6        Q      Do you recall whether you had received

 7   their recommendations before you interviewed Mr. Potts?

 8        A      I don't recall.

 9        Q      Had you known Mr. Potts before you

10   interviewed him?

11        A      No.

12        Q      Had you known Ms. Black before you

13   interviewed her?

14        A      Yes.

15        Q      How did you know Ms. Black?

16        A      Professionally.

17        Q      When you say "professionally," what do you

18   mean?

19        A      She had worked in the rail transit industry

20   for quite sometime.  I had worked with her in meetings.

21        Q      At what point did you realize that
```

Page 34

1   Ms. Black had applied for the positions?

2        A    I don't recall.

3        Q    In your contact with her in the industry,

4   did you form any type of personal relationship with

5   her?

6        A    No.

7        Q    Did you have any contact with her when

8   these positions were being formulated?

9        A    I don't recall.

10       Q    Did you ever personally advise her that

11  these positions were being formulated by WMATA and

12  maybe that she should apply?

13       A    I don't recall.

14       Q    If that had happened, would that have been

15  something that you would recall?

16       A    I don't know.

17       Q    Ms. Black had been -- was not working at

18  the time that she was interviewed.  Is that correct?

19       A    Correct.

20       Q    Do you recall why she wasn't working?

21       A    I believe that she had been -- that she had

Page 35

1    been -- there had been a reduction of force at her

2    employer.

3        Q    And do you recall what that employer was?

4        A    Bombardier.

5        Q    And do you recall how long she had been out

6    of work by the time that you interviewed her?

7        A    No.

8        Q    It was some period of time though, correct?

9        A    I don't remember.

10        Q    How long -- withdraw.

11            When did you realize that one of the

12    applicants for the positions was someone that you were

13    already familiar with?

14        A    I don't remember.

15        Q    Well, do you recall how long before you

16    got -- or received Ms. Black's application that you

17    interviewed her?

18        A    I don't remember.

19        Q    By the time you interviewed her, you

20    realized that this was the Jeanine Black you knew from

21    the industry, correct?

Page 36

```
 1        A      I suppose so.

 2        Q      Well, certainly before she walked in the

 3   door for the interview, you already knew that you knew

 4   her.

 5        A      Yes.

 6        Q      After your interview with Mr. Potts, what,

 7   if any, conversations did you have with Mr. Feldman

 8   following up on that interview?

 9        A      We just generally discussed his interview.

10        Q      Well, was there any discussion with regard

11   to your impressions of him as a candidate?

12        A      I don't remember.

13        Q      At some point you decided to hire him or

14   decided to recommend his hiring, correct?

15        A      Correct.

16        Q      And at what point did that take place?

17        A      I don't remember.

18        Q      Was there any -- did you receive any

19   directive from Mr. White about any of these positions

20   being fast-tracked in terms of the hiring process?

21        A      I wouldn't call it a directive.  He was --
```

Page 37

1    he wanted to get them filled.

2        Q      And he wanted to get all three of them

3    filled or just the strategic policy position filled, if

4    you recall?

5        A      I don't recall.

6        Q      Almost two weeks after you -- well,

7    withdraw.

8               Do you recall who, if anyone else, you

9    interviewed for the strategic policy positions?

10       A      I don't recall, specifically.

11       Q      Did you interview more than -- any other

12   candidates other than Mr. Potts and Ms. Black for the

13   strategic policy position?

14       A      Yes.

15       Q      And about how many people do you think you

16   interviewed?

17       A      Five or six.

18       Q      Could I see Exhibit Number 5.

19              So Exhibit 5 has -- there are ten names on

20   this list.  Is that correct?

21       A      There are nine.

1      Q      Okay.  And these were all of the candidates

2   that you and Mr. Feldman interviewed, correct?

3      A      Correct.

4      Q      And these candidates were -- some of them

5   were for just the strategic policy position, correct?

6      A      My recollection is that we interviewed for

7   the strategic policy positions -- those two

8   positions -- well, let me -- we were interviewing,

9   trying to find people who fit all these skill sets.  So

10  we interviewed for those positions.  And at some point

11  in the process when we felt that we had the skill sets

12  for those two positions, we then were -- we then

13  decided to look for people -- someone to fill the other

14  position.  But if -- but -- all right.  That was the

15  process.

16     Q      So Gregory Potts, were you interviewing him

17  for both positions, for strategic policy and the

18  advocacy position?

19     A      I don't recall.

20     Q      Well, we know that you were interviewing

21  him for the policy position because that's the position

Page 39

1    that he received, correct?

2        A      Correct.

3        Q      And that was -- you interviewed Mr. Potts

4    on October 11, correct?

5        A      Correct.

6        Q      About ten days later, you interviewed

7    Jeanine Black, correct?

8        A      Correct.

9        Q      After your interview with Mr. Potts, did

10   you and Mr. Feldman come to a determination that

11   Mr. Potts possessed some of the skill sets that you

12   were looking for for the policy position?

13       A      Yes.

14       Q      And did you do that before you interviewed

15   Ms. Black or after?

16       A      I don't remember.

17       Q      But in any event, you -- about ten days

18   later you interviewed Ms. Black, correct?

19       A      (Witness nodded head.)

20       Q      Was there any conversation with Mr. Feldman

21   about whether Ms. Black, after that interview,

Page 40

1   possessed the skill sets that you were looking for for

2   the policy position?

3        A    I don't remember the specifics of the

4   conversation.

5        Q    The same day, you interviewed Ms. Evelyn

6   Frazier.  Is that correct?

7        A    According to that piece of paper.

8        Q    Do you have any reason to believe that

9   that's not true?

10       A    No.

11       Q    And sitting here today, do you recall what

12  positions you were interviewing Ms. Frazier for?

13       A    I do not.

14       Q    And then about six days later you

15  interviewed Steve Strauss, correct?

16       A    Correct.

17       Q    Do you recall what positions you were

18  interviewing him for?

19       A    No.

20       Q    On November 4th, you interviewed Robert

21  Puentes and Sara Wilson.  Is that right?

Page 41

1        A        Correct.

2        Q        Do you recall what positions you were

3    interviewing those candidates for?

4        A        No.

5        Q        Sara Wilson, do you recall whether she

6    filed a complaint regarding this hiring process?

7        A        I don't know.

8        Q        A few days later you interviewed Horace

9    Jennings.  Is that right?

10        A        Right.

11        Q        Do you recall, sitting here today, what

12    positions you were interviewing him for?

13        A        No.

14                Excuse me.  Can we take a break.

15                MS. JONES:  Sure.

16                (There was a break in the proceedings.)

17        Q        Mrs. Lipman, we are looking at Plaintiff's

18    Exhibit Number 5 and looking at the schedule for

19    interviews by you and Mr. Feldman.

20                On November 9th, almost a month after you

21    interviewed Mr. Potts, you interviewed Ms. Hughey.  Is

Page 42

1    that right?

2        A    According to that piece of paper, yes.

3        Q    Do you have any reason to dispute the

4    accuracy of that?

5        A    No.

6        Q    Was there any -- do you recall who set up

7    the interview with Ms. Hughey in terms of time?

8        A    No.

9        Q    Did you have an assistant at the time?

10       A    Yes.

11       Q    Who was that?

12       A    Cassandra Barr, B-A-R-R.

13       Q    Would she have been responsible for -- or

14   have been delegated setting up times and dates for

15   interviews for the candidates?

16       A    She may have set some of them up or all of

17   them up.  I don't recall.

18       Q    Do you recall whether there was any reason

19   why Ms. Hughey was interviewed almost a month after

20   Mr. Potts?

21       A    I don't recall.

Page 43

1        Q     Do you recall how soon before the

2   interview -- the actual interview, did you see

3   Ms. Hughey's application and her supporting documents?

4        A     I don't recall.

5        Q     Mrs. Lipman, the candidates' applications

6   and supporting documents were fairly voluminous.   Is

7   that correct?

8        A     How do you define voluminous?

9        Q     A, the application wasn't just one page,

10  correct?

11       A     I don't remember.

12       Q     You weren't just reviewing their resume,

13  were you?

14       A     I believe I had their application, their

15  WMATA application and their resume.

16       Q     And you were trying to be thorough with

17  your analysis, correct?

18       A     How do you define thorough with your

19  analysis?

20       Q     You can't answer the question?   If you

21  can't answer the question, you can't answer the

Page 44

1    question or you don't know.

2        A    I mean I was trying -- yes.  I was trying

3    to get a good feel for the candidates.

4        Q    And in order to do that, you would take

5    time and review the application and the supporting

6    materials, correct?

7        A    Correct.

8        Q    Would it have been your practice to have

9    done that the day of the interview?

10       A    Yes.

11       Q    Do you recall what time you interviewed

12   Ms. Hughey?

13       A    No.

14       Q    Do you have any recollection whatsoever

15   whether it was in the morning or in the afternoon?

16       A    No.

17       Q    Had you had any conversations with

18   Mr. Feldman before Ms. Hughey's interview about the

19   strategic policy position?

20       A    You mean the one where there were two?

21       Q    Yes.

Page 45

1          A      Yes.

2          Q      What conversations did you have?

3          A      Let me rephrase that.  Yes.  But I don't

4    recall.  I mean I did have conversations with him, but

5    I don't recall specifically what they were.

6          Q      Do you recall any conversations about --

7    with Mr. Feldman about selecting Mr. Potts or Ms. Black

8    for those positions?

9          A      At some point in the process, yes.

10         Q      Do you recall when you started getting

11   references for Mr. Potts and Ms. Black?

12         A      No.

13         Q      Would anything refresh your memory about

14   that?

15         A      Possibly.

16               (Lipman Deposition Exhibit Number 7 was

17   marked for purposes of identification.)

18         Q      Mrs. Lipman, I've handed you what's been

19   marked as Exhibit Number -- Exhibits Number 7 and 8.  I

20   ask you to take a look at those.

21         A      Okay.

Page 46

1      Q      Do you recognize Exhibit Number 7?

2      A      Well, now that I refresh it, yes.

3      Q      I'm sorry?

4      A      I mean now that I see it, yes.

5      Q      And what is that document?

6      A      It looks like it's an exchange of e-mails

7   on references for Jeanine Black.

8      Q      Does that refresh your memory as to when at

9   least some of the references were received relative to

10  Ms. Black's application?

11     A      Yes.

12     Q      And what was the date of --

13     A      November 8, 2005.

14            (Lipman Deposition Exhibit Number 8 was

15  marked for purposes of identification.)

16     Q      And as to Exhibit Number 8, do you

17  recognize that document?

18     A      Yes.

19     Q      And what is it?

20     A      References related to Mr. Potts.

21     Q      Does that refresh your memory as to when

Page 47

1    you were receiving references for Mr. Potts?

2         A    Pardon me?

3         Q    Does that refresh your memory as to

4    when you were --

5         A    Yes.

6         Q    And when were those dates?

7         A    November 9th, 2005.

8         Q    Do you recall whether or not these were the

9    only references you received for -- let's take it one

10   applicant at a time -- for Ms. Black?

11        A    I don't recall.

12        Q    Do you recall whether these were the only

13   references you received for Mr. Potts?

14        A    I don't recall.

15        Q    On the day of your interview with

16   Ms. Hughey, you were receiving references for

17   candidates for the strategic policy position, correct?

18        A    Correct.

19        Q    And you were receiving references for those

20   positions because you had made a determination that

21   those candidates, that is Mr. Potts and Ms. Black,

Page 48

1   should be selected.  Is that right?

2       A     We were moving in that direction.

3       Q     When you say "moving in that direction,"

4   what do you mean?

5       A     I mean I was -- we wouldn't finalize until

6   we got all the references and everything, but yes.

7       Q     And so having been refreshed -- your

8   recollection having been refreshed about when you were

9   receiving references for Mr. Potts and Ms. Black, does

10  that refresh your memory as to approximately when you

11  had conversations with Mr. Feldman about these

12  candidates and their selection?

13      A     No.

14      Q     When you were interviewing Ms. Hughey, you

15  weren't considering her for the strategic policy

16  position, were you?

17      A     I don't believe so.

18      Q     When you say you "don't believe so," what

19  do you mean?

20      A     I believe that we told her that it was --

21  that she was being interviewed for the advocacy

Page 49

1    position.

2        Q      When you say you "believe," is that a

3    reference to that your recollection about that is not

4    perfect or --

5        A      Correct.

6        Q      How did Ms. Hughey do in the interview?

7        A      What do you mean by how?

8        Q      How did she do?

9        A      She did fine.

10       Q      Had you gotten the panel's recommendation

11   by that point?

12       A      The panel's recommendation for what?

13       Q      Their recommendation as to the candidates

14   and their evaluations.

15       A      I recall from the memorandum that -- yes, I

16   had received their memorandum.

17       Q      In fact, you received Mr. Pant's memorandum

18   that same day?

19       A      Correct.

20       Q      Do you recall whether you had reviewed that

21   memorandum before you interviewed Ms. Hughey?

Page 50

```
 1       A      Yes.

 2       Q      You had?

 3       A      Yes.

 4       Q      Did that recommendation -- or that report

 5   from Mr. Pant affect whether you were going to

 6   interview Ms. Hughey for the strategic policy position

 7   or not?

 8       A      The report stated that she was more

 9   interested in the outreach and that let me believe that

10   that might be a better fit.

11       Q      But you had already decided that you

12   weren't going to hire her for the strategic policy

13   position, correct?

14       A      Well, it was either a final decision or we

15   were close to that decision.

16       Q      Did you do any rankings of the candidates

17   for the policy position?

18       A      Did I personally?

19       Q      Yeah.

20       A      No.

21       Q      Did Mr. Feldman?
```

Page 51

1        A        I don't know.

2        Q        What would you have done if Mr. Potts had

3    or Ms. Black had rejected an offer from WMATA?

4        A        We would have kept looking.

5        Q        Would you have picked somebody from the

6    list of candidates that had already applied?

7        A        Possibly.

8                 MR. SHAFFER:  Objection.  Calls for

9    speculation.

10        Q        Possibly?  Is that a yes or no?

11        A        Yes.  Well, maybe.

12        Q        You can't look at --

13        A        Can I give a maybe?  I don't know.

14        Q        You can give me the truthful answer that

15    you have.

16        A        The truthful answer is, I don't know.

17        Q        Well, you certainly wouldn't have

18    considered Ms. Hughey, would you?

19        A        I don't know.

20        Q        Well, you didn't interview her for that

21    position, did you?

Page 52

1      A      At that time, no.

2             (Lipman Deposition Exhibit Numbers 9 & 10

3      were marked for purposes of identification.)

4      Q      Mrs. Lipman, I've handed you what's been

5      marked as Exhibit Numbers 9 and 10.

6      A      Correct.

7      Q      Do you recognize those exhibits?

8      A      Yes.

9      Q      And what are they?

10     A      They are the memorandums from Mr. Pant

11     about the recommended applicants for the positions.

12     Q      And you've seen this before?

13     A      Yes.

14     Q      Have you seen both of them before?

15     A      Yes.

16     Q      Are there any differences between the two

17     of them?

18            MR. SHAFFER:  Objection to the question.

19     It's a lengthy document.  Do you want her to compare

20     them side by side, word for word?

21     Q      Mrs. Lipman, I direct you to the dates of

Page 53

1    each document.  Is there a difference between the date

2    that's noted in Exhibit Number 9 and the date that's

3    noted in Exhibit Number 10?

4        A    Yes.

5        Q    And in Exhibit Number 9, what is the date

6    on that document?

7        A    November 9, 2005.

8        Q    And the date on Exhibit Number 10?

9        A    November 29, 2005.

10       Q    I'm going to direct your attention as well,

11   Mrs. Lipman, to the subject line on the first pages of

12   these documents.

13            In Exhibit Number 9, the subject line reads

14   recommended applicants for the two strategic policy and

15   communication specialist positions, in parentheses,

16   05-0727, closed parentheses.

17            In Exhibit Number 10, the subject line

18   reads applicants for the strategic advocacy specialist

19   position, parentheses, 05-0731, closed parentheses.

20            Other than the subject lines and the dates

21   of each of these respective documents, can you discern

Page 54

1    any difference in the substance of each of the

2    documents?

3            MR. SHAFFER:  I object.  The documents

4    speak for themselves.

5            She can review them and see what she sees.

6            THE WITNESS:  There don't appear to be any

7    other differences.

8       Q    Sitting here today, do you recall receiving

9    two separate reports from Mr. Pant on two separate

10   occasions?

11      A    I don't recall.

12      Q    Would there be any reason that you can

13   think of that Mr. Pant would generate two separate

14   reports on these positions on two separate days?

15           MR. SHAFFER:  Objection.  Calls for

16   speculation.

17           You can answer.

18      Q    If you know.

19      A    I don't know whether it's required by the

20   personnel process, the hiring process.

21      Q    Did you know that -- you've read the report

Page 55

1    of investigation by the Office of Civil Rights.

2        A      I've skimmed it.

3        Q      Did you know that there was an issue about

4    whether Mr. Pant had submitted his report on November

5    9th versus November 29th?

6        A      No.

7        Q      Nevertheless, for the policy position in

8    Document Number 9, Mr. Pant indicates that the panel

9    has recommended six candidates for the policy position.

10   Is that right?

11       A      That's correct.

12       Q      And prior to receiving this report, you

13   had -- you and Mr. Feldman had already decided that you

14   had received or interviewed two candidates in which you

15   wanted to select or recommend for selection.  Is that

16   right?

17       A      I don't know.

18       Q      What do you mean you "don't know"?

19       A      I don't remember the sequence of events.

20       Q      Well, Mrs. Lipman, if we know that Mr. Pant

21   has sent you a memorandum dated November 9th laying out

Page 56

1    the interview panel's recommendations and we know that

2    on November 8th you are soliciting references for

3    Mr. Potts and Ms. Black, is it not fair to say that you

4    and Mr. Feldman had made a determination with regard to

5    Mr. Potts' and Ms. Black's candidacy before you

6    received Mr. Pant's recommendations?

7         A     I don't think that's fair to say.

8         Q     Why not?

9         A     Because I don't know the timing.  I mean, I

10   don't remember when on November 9th I got this.

11        Q     But, Mrs. Lipman, on November 8th, you're

12   sending out e-mails trying to get --

13        A     Right.

14              MR. SHAFFER:  Let her finish the question.

15        Q     Then you can say anything you want.

16              But on November 8th, you're sending out

17   e-mails to folks at Bombardier and other places to get

18   Ms. Black's references, right?

19        A     Right.

20        Q     So how is it not fair to say -- that's

21   argumentative -- I'll withdraw that.

Page 57

1          Mrs. Lipman, I had asked you before how
2    Ms. Hughey did in her interview and you said fine.
3          Was there a determination by you and
4    Mr. Feldman after the meeting that Ms. Hughey would not
5    be hired for the advocacy position or selected for the
6    advocacy position?
7        A    Are you asking whether there was a
8    determination on that specific day?
9        Q    Yeah.
10        A    I don't recall.
11        Q    Before you interviewed Mr. -- how do you
12    pronounce his name, Craig --
13        A    Kwiecinski.
14        Q    When you interviewed Mr. Kwiecinski on
15    November 21st of 2005, had you made a determination as
16    to Ms. Hughey's candidacy?
17        A    I don't recall.
18          (Lipman Deposition Exhibit Number 11 was
19    marked for purposes of identification.)
20        Q    Mrs. Lipman, I've handed you what's been
21    marked as Exhibit Number 11.  Have you seen what's

Page 58

1    contained in this exhibit before?

2        A    No.

3        Q    Mrs. Lipman, I'm going to direct you to the

4    second page of the document, which is Bates stamped

5    637, the middle of the page.  Right smack in the middle

6    at the top of that portion it has Deborah S. Lipman

7    dated 11-09-05 at 1:47 p.m. and at the bottom your name

8    and your address and telephone information.

9            Is it fair to say that this is a copy of an

10   e-mail that you sent to someone?

11       A    Yes.

12       Q    Do you recall sending this e-mail?

13       A    No.

14       Q    No?

15       A    (Witness shook head.)

16       Q    I'm going to direct your attention to the

17   paragraph right above your signatory paragraph where it

18   states -- and it's kind of in bold.  I am requesting

19   this be done ASAP so we can complete the hiring process

20   for two very well qualified candidates.  We are in

21   grave jeopardy of losing the selected candidates.  So

Page 59

1    it is imperative that we move this on the fast track.

2              Do you see that language?

3    A    Yes.

4    Q    Do you recall writing an e-mail containing

5    that language at all?

6    A    No.

7    Q    Were you in great jeopardy of losing the

8    selected candidates?

9    A    I recall that in Greg's position he -- Greg

10   was working for the legislature.  And he wanted to get

11   a decision made because they were about to start the

12   budget process for the next year.  So I believe we

13   were in -- that one, there was some urgency.  I don't

14   recall on Jeanine.

15             (Lipman Deposition Exhibit Number 12 was

16   marked for purposes of identification.)

17   Q    Mrs. Lipman, I've handed you what's been

18   marked as Exhibit Number 12.  Do you recognize that

19   document?

20   A    Yes.

21   Q    What is it?

Page 60

1          A      It is the written responses I gave to Ann

2    Anderson in response to her questions.

3          Q      In question number, Ms. Anderson asks the

4    question do you have or did you have a friendship,

5    social relationship, or previous acquaintance with any

6    of the selectees, Mr. Potts, Ms. Black, and Mr.

7    Kwiecinski.  And your response was no.  Is that

8    correct?

9          A      That's what it says on the paper.  Yes.

10         Q      But that wasn't necessarily true, was it?

11         A      Well, this says this would include any kind

12   of friendship, social relationship, work-developed

13   friendship with their spouses.  So I did know Jeanine

14   Black but I didn't have any sort of social relationship

15   with her.

16         Q      But you did have --

17         A      She was a previous acquaintance.

18         Q      I want to direct your attention,

19   Mrs. Lipman, to the fifth question on the first page of

20   Exhibit 12 where it says if you were tasked with

21   filling the positions quickly why was the complainant

Page 61

1    interviewed November 9th and you waited to interview

2    the selectee until November 21st.  Explain this in

3    light of your previous statement that when you found

4    someone qualified you quickly filled the position since

5    Mr. White wanted them filled ASAP.

6              Response.  As I explained to Devon Walker,

7    Ray Feldman and I scheduled interviews as candidates

8    were forwarded to us as recommended by the screening

9    panel according to when we were available.  We filled

10   the two strategic planning and communications positions

11   once we found applicants that we thought were the most

12   well qualified.  We continued interviewing for the

13   strategic advocacy position until we found the best

14   candidate.

15             That was your response, correct?

16   A      Correct.

17   Q      Is it true, Mrs. Lipman, that once you

18   interviewed Mr. Potts and Ms. Black you were satisfied

19   with their qualifications and you looked no further?

20   A      No, that's not correct.

21   Q      Well, how do you know that?

Page 62

1        A     Because we did -- we continued to do -- we

2   interviewed other people for those positions.

3        Q     But earlier you testified that you didn't

4   know whether you had interviewed Ms. Frazier,

5   Mr. Strauss, Mr. Puentes, Mrs. Wilson, Mr. Jennings for

6   the policy position.

7        A     What I don't recall was when -- we were

8   interviewing at the beginning for the two positions.

9   And then somewhere in the process we began to narrow in

10  on that we felt we had found the people for the two

11  positions.  And then we -- this answer says and then we

12  started -- then we were starting to focus on the third

13  position.  But I can't recall exactly all of the

14  details of who we were interviewing for what position.

15       Q     But if you were trying to find the best

16  candidate for the policy position --

17       A     Correct.

18       Q     -- the fact that you did not interview

19  Ms. Hughey for the policy position -- let me withdraw

20  that and come back to that.

21              I'm going to direct your attention to the

Page 63

1    last question on the second page of the document,

2    Exhibit Number 12, Bates stamped 271.

3              And that question says, when did you

4    receive the panel's recommendations on the candidates

5    and what part did the recommendations play in making

6    the selections for the positions at issue.

7              Response.  I had meetings with Mr. Pant,

8    the chair of the screening panel, throughout the

9    process as the panel made recommendations on whom to

10   interview.  The panel's recommendations were taken into

11   account in the process.

12             That was the question that was asked and

13   the response that you gave, correct?

14        A    Correct.

15        Q    We earlier established, Mrs. Lipman, that

16   you received Mr. Pant's recommendation, at least as to

17   the policy position, on November 9th, 2005, right?

18        A    That was the date it was finalized.  I may

19   have seen it in draft before that.

20        Q    So, Mrs. Lipman, do you know that or are

21   you guessing?

Page 64

1       A       I'm guessing.

2       Q       Don't guess.

3       A       Okay.

4       Q       Did you have -- as indicated by your

5   response, did you have conversations with Mr. Pant

6   about --

7       A       Yes.

8       Q       -- about his recommendations?

9       A       Yes.

10      Q       Mrs. Lipman, when did you find out that

11  Ms. Hughey had complained about the hiring process?

12      A       I don't recall.

13      Q       How did you find out about it?

14      A       Mr. Walker said that he wanted to come and

15  talk to me.

16      Q       And did he tell you what he wanted to talk

17  to you about then or after you went and spoke with him?

18      A       I don't remember.

19      Q       Had you been accused of discrimination

20  before?

21      A       No.

1      Q      And that's something that you would have

2  remembered pretty well.  Isn't that fair to say?

3      A      Yes.

4      Q      And you don't recall when Mr. Walker -- not

5  the date, but when Mr. Walker told you about the

6  allegations relative to whether he told you in that

7  first conversation or after you met with him?

8      A      I don't recall.

9      Q      What was your reaction when he told you?

10     A      Concern.

11     Q      Concern about what?

12     A      Concern that an issue had been raised.

13     Q      Were you offended?

14     A      No.  I think I was just more upset.

15     Q      You were angry, weren't you?

16     A      I don't think so.

17     Q      You weren't concerned about your reputation

18  around the office?

19     A      Well, I mean, I -- it's just not who I am

20  and I didn't feel it was justified.

21     Q      You didn't feel the allegation was

Page 66

1    justified?

2        A      I didn't feel there was any -- there was

3    anything that had happened in the process that was -- I

4    mean, it just -- race hadn't entered my mind in the

5    process.

6        Q      Did Mr. Feldman express concern to you

7    about a statement that you made during Ms. Hughey's

8    interview?

9        A      I don't recall.

10       Q      You know, sitting here today, that there is

11   an issue about something that you said during the

12   interview, right?

13       A      Yes.

14       Q      You were disciplined as a result of this

15   process, correct?

16       A      Correct.

17       Q      And what was that discipline?

18       A      There was one day of unpaid leave.

19       Q      How did you feel about that?

20       A      I didn't feel it was justified, but I

21   understood the process.

Page 67

1        Q     And I think I've asked this a couple times,

2  but I think you testified that you have reviewed at

3  least one of the investigation reports generated by the

4  Office of Civil Rights.

5        A     I skimmed it.

6        Q     And what did you think of their findings?

7        A     I didn't agree with their findings.

8        Q     Why not?

9        A     I didn't think that there was any -- as I

10  said before, I mean, race just didn't -- it didn't come

11  into play in the decision-making process.

12        Q     Looking back on the events and how the

13  process was conducted and how it turned out --

14        A     When you say process, you mean the

15  investigation?

16        Q     The hiring process.

17              Is there anything that you would have done

18  differently?

19        A     Yes.  I probably would have kept better

20  records.

21        Q     Kept better records?

Page 68

1        A        Yeah.

2        Q        What types of records?

3        A        Just in terms of -- I mean, we -- just in

4     terms of when things happened and sequences and things

5     like that.

6        Q        Do you know who Katrina Wiggins is?

7        A        Yes.

8        Q        Who is she?

9        A        She used to be -- I don't remember what her

10    title was.  She used to be the head of human

11    resources -- or the office of human resources.

12       Q        And is she white or black?

13       A        She's black, I believe.

14       Q        Is she still with WMATA?

15       A        I don't believe so.

16       Q        Did you know that Mrs. Wiggins was

17    disciplined?

18       A        No.

19               (Lipman Deposition Exhibit Number 13 was

20    marked for purposes of identification.)

21       Q        Mrs. Lipman, I handed you what's been

1   marked as Exhibit 13.

2           MR. SHAFFER:  I think you're missing the

3   signature page, Lisa.

4           MS. JONES:  Which would be Bates number

5   1064?

6           MR. SHAFFER:  Yeah.

7           MS. JONES:  Okay.  I'll pull that out and

8   add it.

9           MR. SHAFFER:  I'm just not sure which

10  investigative report this is.

11          MS. JONES:  Frankly, I'm not sure that -- I

12  tell you what.  Let's take a break now and let me pull

13  the original just to make sure I have everything.

14  That's a good question.  Let's go off the record.

15          (There was a break in the proceedings.)

16     Q    Mrs. Lipman, I've handed you what's been

17  marked as Exhibit Number 13.  Have you ever seen this

18  document before?

19     A    I don't -- I saw -- David showed me

20  something yesterday.  I don't know whether it was this

21  or not.

Page 70

1          Q      Let me state for the record this is an

2     investigative report generated by Devon Walker from

3     WMATA, the WMATA investigator.

4                 Mrs. Lipman, I'm going to direct your

5     attention to page eighteen, which is Bates number 1063.

6     And I'm going to direct your attention specifically to

7     under subsection five, resolution number two, where it

8     says Katrina Wiggins should be suspended for one day

9     for violating WMATA's EEO policy by ignoring

10    recommendations made by CIVR -- which is civil

11    rights -- in a previous complaint of discrimination

12    which has created the climate for this complaint of

13    discrimination to occur, period.

14                 When the writer is talking about created

15    the climate for this complaint -- meaning Ms. Hughey's

16    complaint -- of discrimination to occur -- do you know

17    what he's talking about?

18         A      No.

19         Q      Was there a climate of discrimination at

20    WMATA generally?

21                 MR. SHAFFER:  Object to the form of

1   question.

2              You can answer.

3              THE WITNESS:  Say that again.

4        Q     Was there a climate that perpetuated

5   discrimination at WMATA, generally?

6        A     Not in my opinion.

7        Q     Was there a climate of discrimination

8   relative to this hiring process?

9        A     No.

10        Q     In addition to your suspension, what, if

11   any, other disciplinary remedies did WMATA have you do

12   as a result of this complaint and the findings?

13        A     Diversity training and having someone from

14   HR involved in the process for any subsequent

15   hirings -- more involved in the process.

16        Q     And when you say "diversity training," what

17   did that entail?

18        A     Diversity class.

19        Q     Well, what was taught in the class?  What

20   was the class about for the diversity?

21        A     Well, WMATA's diversity classes are about,

1    you know, how to deal with, you know, issues of

2    diversity in the work force.

3        Q    And does it offer you insights into

4    techniques for doing that, for ensuring diversity?

5        A    I don't recall the specifics of it.

6        Q    You don't recall the specifics of your

7    diversity --

8        A    Not all.  I mean, I don't recall all of it.

9    I recall some of it.

10       Q    Did you find it helpful?

11       A    Yeah.

12       Q    In what way?

13       A    I think that it -- when you have diversity

14   training, I think it makes you understand more how

15   someone can perceive something differently than you

16   might, I mean, if you say something or do something

17   that someone might perceive it different from the way

18   you portray it yourself.

19       Q    And from -- had you had a diversity class

20   before then?  Had you taken a diversity class before

21   then?

Page 73

1        A     I've taken diversity classes both at WMATA

2   and outside of WMATA.

3        Q     Had you taken -- before that, had you taken

4   classes relating to ensuring equal opportunity in the

5   hiring process?

6        A     I don't recall specifically what they were,

7   more general or more specific.

8        Q     Are you familiar with the term unconscious

9   bias?

10       A     Not really.

11       Q     Having had your diversity -- completed your

12  diversity class, did that give you any more insight

13  into how Ms. Hughey was viewing the selection process?

14       A     I mean, I had a lot of thoughts after

15  the -- I mean, I think it was a process of -- sort of,

16  after the complaint was filed, I think there was a

17  whole process of self-examination that went on

18  afterwards.

19       Q     And what did that self-examination lead to?

20       A     I concluded that there was no bias and

21  there was no racial discrimination on my part in the

Page 74

1    hiring process.

2        Q     And did you ever gain any appreciation for

3    how the process that was done would make someone

4    believe that that was not the case?

5        A     Say that again.

6        Q     You want me to repeat the question?

7        A     No.  I'll try to answer.  I think the

8    question is did I understand how someone might think

9    that there was bias in the process.

10       Q     Yes.

11       A     And I think the answer is yes.

12       Q     How so?

13       A     Well, just people perceive things

14    differently from the way people say things.

15       Q     And you're referencing Ms. Hughey's

16    reaction to your comment during --

17       A     I'm not referencing anything specifically.

18    I'm just referencing the way people perceive -- how

19    people perceive an event, a discussion, or whatever.

20    I'm not referencing anything specific.  That's just

21    what I took out of it.

Towson Reporting Company
410-828-4148

GORE BROTHERS
410-837-3027

Whitman Reporting-Rockville
301-279-7599

Page 75

1      Q     Mrs. Lipman, who was William Scott?

2      A     He was the former assistant general manager

3  for -- I don't remember the exact title of the

4  department.  I think it was work force development.

5      Q     In one of your letters to WMATA in protest

6  of the investigation, you referenced William Scott and

7  said you were going to talk to William Scott about the

8  investigation and how it was being handled.

9            Why did you want to do that?  Do you recall

10  that?

11      A     No, I don't recall that.

12      Q     What does the acronym COBN stand for?

13      A     I don't know.

14      Q     PASP?

15      A     That was -- I think it was -- I'm not a

16  hundred percent sure.  I think it was policy and

17  strategic planning.

18      Q     Is Mr. Potts still employed with WMATA?

19      A     Yes.

20      Q     And Ms. Black?

21      A     Yes.

Page 76

1    Q    And Mr. Kwiecinski?

2    A    Yes.

3         MS. JONES:  I don't have anything further.

4         MR. SHAFFER:  Okay.

5         (Deposition concluded at 12:58 p.m.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

Page 77

1                    CERTIFICATE OF DEPONENT

2

3            I hereby certify that I have read and examined

4    the foregoing transcript, and the same is a true and

5    accurate record of the testimony given by me.

6

7            Any additions or corrections that I feel are

8    necessary, I will attach on a separate sheet of paper

9    to the original transcript.

10

11                         _____

12                              Deborah Lipman

13

14

15

16

17

18

19

20

21

Page 78

1   District of Columbia, to wit:

2           I, Heather L. Avalos, a Notary Public of the

3   District of Columbia, do hereby certify that the

4   within-named proceedings took place before me at the

5   time and place herein set out.

6           I further certify that the proceedings were

7   recorded stenographically by me and this transcript

8   is a true record of the proceedings.

9           I further certify that I am not of counsel

10  to any of the parties, nor an employee of counsel,

11  nor related to any of the parties, nor in any way

12  interested in the outcome of this action.

13          As witnessed my hand and notarial seal this

14  9th day of June, 2008.

15

16                          _____

17                          Heather L. Avalos

18                          Notary Public

19

20  My commission Expires:

21  September 14, 2006

Page 79

```
1                        INDEX

2            Deposition of Deborah Lipman

3                    May 23, 2008

4

5    Examination by:                        Page

6    Ms. Jones                                 3

7    Exhibit No.                            Marked

8    1     Applicant evaluation form          3

9    2     Applicant evaluation form          3

10   3     Applicant evaluation form          3

11   4     Applicant evaluation form          3

12   5     Candidate interview dates         29

13   6     Document                          31

14   7     Series of e-mails                 45

15   8     Series of e-mails                 46

16   9     11-9-05 memo from Shiva Pant to witness    52

17   10    11-29-05 memo from Shiva Pant to witness   52

18   11    E-mail series                     57

19   12    Q & A series of Ms. Anderson and witness   59

20   13    Investigative report              68

21
```



# PROMOTION/TRANSFER OPPORTUNITY
# WMATA EMPLOYEES ONLY

Applications are now being accepted in the Office of Human Resource Management and Planning for the position listed below. Please submit your application to the Office of Human Resource Management and Planning, 600 5th Street, NW, Room 7F, Washington, DC 20001 or fax to 202-962-1180.

## APPLICATIONS MUST BE DELIVERED TO THE OFFICE OF HUMAN RESOURCE MANAGEMENT AND PLANNING NO LATER THAN 5:00 PM ON THE CLOSING DATE OF THE POSITION

| | |
|---|---|
| POSITION/JOB CLASS: | STRATEGIC ADVOCACY SPECIALIST/0204 |
| FLSA: | |
| DEPARTMENT/OFFICE: | PASP/GOVR |
| UNION/GRADE: | BO-14 |
| SALARY: | 72,836 |
| LOCATION: | Jackson Graham Building |
| POSTING NUMBER: | 05-0731-SR |
| OPENING/CLOSING DATE: | July 21 - OPEN UNTIL FILLED |



EXHIBIT

C

**JOB DESCRIPTION:** This is a senior level highly responsible professional strategic communications and advocacy position. It involves a combination of the following: developing and recommending strategic positions for the Authority and communicating those on behalf of the Authority; community/business/stakeholder outreach and coalition building; directing and performing research and analysis to support the Authority's communications both internally (e.g., Board presentations) and externally (e.g., presentations to outside groups, hearings and briefings), assist in the developing of policy. Employee works in close coordinating with other offices to assist in or lead in the preparation of strategic communications materials for the Board of Directors, Chief Executive Officer, external groups or others. Employee works in tandem with the Assistant General Manager, Director, Government Relations Officers, Board Liaison, media office and special events planners to ensure accurate, consistent and timely communications. Employee is responsible for managing projects, contracts, contract employees and represents the Authority with external government and other officials.

**QUALIFICATION REQUIREMENTS:** To be considered for the position, you must meet minimum qualifications. It is, therefore, very important for you to include on your application any education/experience you have had that is described in the minimum qualifications. Incomplete information may delay the assessment process. Newly hired and current non-represented employees must satisfy a one-year period from their hire date or latest promotion, reclassification, career series advance or lateral transfer date to be eligible for a promotion increase.

**MINIMUM QUALIFICATIONS:** A Master's Degree in public policy or administration, planning, law, economics, business administration, government, political

000132

science, communications or a related field and eight (8) years of experience in public or business administration, government relations, communications, financial or economic analysis or a related field. Or, a Bachelor's degree in public policy or administration, planning, law, economics, business administration, government, political science, communications or a related field and ten (10) years of experience in public or business administration, government relations, communications, financial or economic analysis or a related field. Or, a combination of post high school education and fourteen (14) years of the above experience.

## EVALUATION CRITERIA MAY INCLUDE ONE OR MORE OF THE FOLLOWING:

1) Education, training and experience
2) Personal Interview
3) Medical examination which may include alcohol and drug testing
4) Performance and attendance record

000130



# PROMOTION/TRANSFER OPPORTUNITY
# WMATA EMPLOYEES ONLY

Applications are now being accepted in the Office of Human Resource Management and Planning for the position listed below. Please submit your application to the Office of Human Resource Management and Planning, 600 5th Street, NW, Room 7F, Washington, DC 20001 or fax to 202-962-1180.

## APPLICATIONS MUST BE DELIVERED TO THE OFFICE OF HUMAN RESOURCE MANAGEMENT AND PLANNING NO LATER THAN 5:00 PM ON THE CLOSING DATE OF THE POSITION

| | |
|---|---|
| **POSITION/JOB CLASS:** | STRATEGIC POLICY & COMMUNICATIONS SPECIALIST/1207 (2 POSITIONS) |
| **FLSA:** | |
| **DEPARTMENT/OFFICE:** | PASP/GOVR |
| **UNION/GRADE:** | BO-14 |
| **SALARY:** | 72,836 |
| **LOCATION:** | Jackson Graham Building |
| **POSTING NUMBER:** | 05-0727-SR |
| **OPENING/CLOSING DATE:** | July 21 - OPEN UNTIL FILLED |

**JOB DESCRIPTION:** This is a highly responsible professional policy analysis position. It involves a combination of the following: analyzing, developing and recommending policy and strategic positions for the Authority and communicating those on behalf of the Authority; research and analysis to support the Authority's communications both internal (e.g., Board presentations) and externally (e.g., presentations to outside groups, hearings and briefings). Employee works in close coordination with other offices to assist in or lead the preparation of materials for the Board of Directors, Chief Executive Officer, external groups or others. Employee works in tandem with the Government Relations Officers, Board Liaison, media office and special events planners to ensure accurate, consistent and timely communications.

**QUALIFICATION REQUIREMENTS:** To be considered for the position, you must meet minimum qualifications. It is, therefore, very important for you to include on your application any education/experience you have had that is described in the minimum qualifications. Incomplete information may delay the assessment process. Newly hired and current non-represented employees must satisfy a one-year period from their hire date or latest promotion, reclassification, career series advance or lateral transfer date to be eligible for a promotion increase.

000161

**MINIMUM QUALIFICATIONS:** A Master's Degree in public policy or administration, planning, law, economics, business administration, government, political science, communications or a related field and eight (8) years of experience in public or business administration, government relations, communications, financial or economic

analysis or a related field. Or, a Bachelor's degree in public policy or administration, planning, law, economics, business administration, government, political science, communications or a related field and ten (10) years of experience in public or business administration, government relations, communications, financial or economic analysis or a related field. Or, a combination of post high school education and fourteen (14) years of the above experience.

## EVALUATION CRITERIA MAY INCLUDE ONE OR MORE OF THE FOLLOWING:

1) Education, training and experience
2) Personal Interview
3) Medical examination which may include alcohol and drug testing
4) Performance and attendance record

000165

# Internal Job Application

**SUBJECT: Application for Vacancy**

**Posting Opening Date:** July 21, 2005
**Posting Closing Date:** OPEN UNTIL FILLED
**Posting Number** 05-0731-SR

TO: HRMP – Employment Services
Enter Employee Number:  005681
FROM:     TOMIKA HUGHEY
HOME ADDRESS:   P O BOX 1618
            WASHINGTON DC 20013

Please consider me for the position of
in the Office of
Union

This is a Grade/Level
preferred shift



## My specific qualifications for this position are:

In my current capacity as the Assistant Planning Project Manager for the Anacostia Corridor Demonstration Project and the District of Columbia Alternatives Analysis (DCAA) in the Office of Business Planning Project Development, I am responsible for the management of the community development and outreach efforts in support of these projects. This includes drafting, editing and reviewing public participation media and correspondence to District of Columbia agencies, citizens and civic organizations throughout the District. In addition to these efforts, I develop, plan and coordinate public events, forums, workshops and discussions in an effort to educate the public about the ongoing DCAA Transit Study. I coordinated the first WMATA-led planning workshops with District of Columbia Office of Planning and Department of Transportation Planners in support of the DCAA Transit Study in the Spring of 2004. During this study, I have also presented more than 50 public presentations on the Anacostia Demonstration Project and the DCAA throughout the District of Columbia to civic, government and private organizations.

My current position requires attendance at Federal Transit Administration, local meetings, regular District Government Agency meetings and in-house WMATA meetings concerning WMATA's role in the overall DCAA project development process. As a Transportation Planner within WMATA, my role is to ensure that the project development and planning process articulated to the general public is reflected in the final design and engineering of transportation projects, specifically, the Anacostia Demonstration Project. This planning process involves the articulation and interpretation of Section 106 environmental requirements per the National Environmental Policy Act of 1971 (NEPA). Writing and responding to questions related to environmental issues surrounding proposed plans (i.e. Anacostia Light Rail Public Hearing) and final recommendation (Staff Summary Report)of the Board Action to the WMATA Board of Directors.

Additionally, in my current position I am responsible for understanding the current District of Columbia business, real estate (commercial, residential and industrial) climate in order to plan effectively for the proposed DCAA priority transit corridors which will receive enhanced transit service and amenities based on the recommendations we propose in the final DCAA Study. This requires attendance at Federal Transit Adminstration, DC Marketing Center, Office of Planning Economic Development, Office of Planning and District Department of Transportation meetings and workshops. Current knowledge of proposed neighborhood zoning overlays, increases in residential development, streetscape enhancement plans, ward transportation studies, and commercial corridor activity have a direct impact on my planning work. This knowledge helps to determine the scale, character and type of transportation enhancements necessary and feasible for neighborhoods and centers surrounding the proposed DCAA priority corridors. To supplement this knowledge, I have also attended several National Transit Institute (NTI) courses on Statewide Transportation Funding and Managing the Environmental Process and Metropolitan Transportation Planning.

Oversight of consultant and sub-consultant projects, budgets and work products is also a requirement of my current position with the Office of Business Planning Information Technology. This means ensuring that the final DCAA Study product presented to our client,

000136

DDOT, reflects the priorities outlined in the original scope of work and budget. Managing invoices received by our sub-consultants and reviewing the project budget all coincide with achieving the final study products within the project schedule.

Management of community outreach and advocating for the DCAA Study and the goals of WMATA requires that I use my knowledge of public outreach techniques and community participation skills to relate technical transportation data to the public. This involves gauging the appropriate products/mediums (i.e mailings, intercept surveys, Advisory Neighborhood Commission (ANC) meetings, venues, meeting style and information presented to convey and/ or receive the information necessary to achieving the overall project outreach goals. Developing strategies to achieve project goals requires constant oversight of the consultants' products to ensure appropriate use of project funding and the maximization of resources and manpower.

Under the direction of my Office Director and Project Manager, our outreach efforts resulted in an overwhelming community, District of Columbia Government and WMATA Board of Directors approval for the implementation of the Anacostia Light Rail Demonstration Project in the Fall of 2003. I have presented the planning public outreach process for the Anacostia Demonstration Project (more recently title the Anacostia Streetcar Project) and the District of Columbia Alternatives Analysis locally, regionally and nationally to organizations such as the Citizen Planning Housing Association of Baltimore, Empower Baltimore, National Black MBA Association (Washington, D.C. Chapter) and the Regional Planning Departments at Cornell University Florida State University.

My extensive community development background is the result of over ten years as a community/economic development and transportation planner for public, private and non-profit organizations in Los Angeles, California; Tallahassee, Florida; and since 2001, Washington, D.C.

Prior to my current position with the Office of Business Planning Information Technology, I was the Executive Director of the H Street Main Street Program in Northeast, Washington, D.C. As the Director of a National Main Street Program in the District of Columbia, I interacted daily with local merchants on the 1.5 mile, commercial corridor of H Street, NE. As the only employee of this non-profit organization, I set up its first office in 2003, managed the payroll, budget and volunteers for four, all-volunteer committees.

Much of my job was to identify ways to encourage merchant participation in activities to beautify the corridor, promote economic and financial resources to the merchants and also inform them of city services which could help them with daily business activities. Additionally, I attended community meetings to inform local residents of business services and activities on the corridor which they could support.

I developed a development package to be presented to interested developers and merchants who desired to purchase properties or relocate their businesses to the corridor. I attended National Main Street conferences to learn about resources available to help existing businesses on the corridor. Through a partnership developed with a local non-profit lender, we identified loan-ready businesses on the corridor to help them expand or improve their business. To promote the commercial corridor, I also participated in the Conference of Shopping Centers conference held in the District in 2003.

In this position I attended local Downtown Business Improvement District (BID) meetings and the D.C. Building Industry Association (DCBIA) meetings to promote the corridor and learn of other business initiatives throughout the city.

As the Ward Six Coordinator for Mayor Anthony Williams 2002 Re-Election Campaign, I developed outreach plans, primary and general election day logistics strategies and also identified opportunities for Mayor Williams to present his political platform in Ward Six which includes the neighborhoods of Capital Hill, NoMa, Chinatown, Southwest Waterfront and Near Northeast. Facilitation of community meetings and being responsive to constituent concerns was an important aspect of this position. As a result of my efforts, Mayor Willimas only lost at one voting precinct, Van Ness Elementary School in Southeast, DC, which was the community school for the Arthur Capper Carrollsburg Housing Project which was being demolished during the time of the re-election campaign.

While working as an airport planner for a private firm based in Alexandria, Virginia, I conducted financial, parking and route analysis for two major airports: Atlanta Hartsfield and Washington Dulles International Airports. In support of the "d2" capital program at Dulles International Airport, I developed the base calculations for the number of parking shuttle buses and routes necessary to support the phased capital improvements to the temporary, employee and public parking lots at the airport.

000137

For Hartsfield Atlanta Airport I wrote, edited and prepared the first RFP in almost 20 years for new airport contract transportation services. This required route analysis (actually riding the bus) for a fleet of over 30 buses during the peak periods, over a two month period. This analysis was used to support the minimum requirements for the RFP.

As a Transit Analyst for the FTA's National Transit Database I analyzed the financial and operations data of over 80 Federal Transit agencies in the U.S. and Puerto Rico. This involved assisting transit agencies with the completion of the National Transit Database Report which includes information on vehicle miles traveled, passenger miles/trip, number of accidents, funding sources and expenditures for transit agencies receiving urbanized area formula funds from the FTA. During my tenure as a National Transit Database Analyst, I attended my first NTI course on Metropolitan Transportation Planning in Birmingham, Alabama.

As a Transportation Planning Intern with the South Bay Area Team of the Los Angeles County Metropolitan Transportation Authority, I conducted community outreach throughout Los Angeles in support of the proposed southern extension of the Red Line. I established the first partnership with the Los Angeles Afro American Museum to host a public meeting on the Red Line Project. In planning for this event, the project team utilized direct mail and word of mouth advertising methods for the meeting which was attended by over 150 citizens and guests.

I also developed a transit workshop for the Los Angeles Neighborhood Initiative (LANI) communities to showcase alternatives for providing transit information in underserved communities. While working with LANI during its first pilot year, I assisted the community leaders during visioning workshops with Anton Nelesson and developed alternatives for managing transit stores designed to disseminate transit media, information and resources.

My other relevant experience follows in my attached resume:

TOMIKA R. HUGHEY, MSP
P.O. Box 1618, Washington, D.C. 20013-1618
202.486.0346
xeropholous@yahoo.com                                    Mobile:
            Residence: 202.289.8846                     Office: 202.962.2429

PROFESSIONAL EXPERIENCE

Assistant Planning Project Manager          November 2003 - Present
WASHINGTON METROPOLITAN AREA TRANSIT AUTHORITY (WMATA), Washington, D.C.

- Responsible for the management of environmental assessments, transportation planning, and public outreach tasks for the District of Columbia Transit Alternatives Analysis (DCAA) which includes the Anacostia Streetcar Project. The DCAA is a study of enhanced transit, local bus improvements, bus rapid transit (BRT) and streetcar for priority corridors throughout the District of Columbia.

- Provide community outreach guidance for Metrorail station access planning guidelines and identify methods to enhance pedestrian and transit-user accessibility around Metrobus and rail facilities

Executive Director          January 2003 - October 2003
H STREET MAIN STREET, Washington, D.C.

- Managed daily operations for the revitalization of the 13-block, neighborhood commercial corridor and Main Street District of H Street, Northeast, which was preparing for over $100 million of public and private commercial, residential and transportation investment

- Initiated the H Street Main Street Mobile Merchant Mixers and Clean-Up Day; Led the pilot "Expressive Sign" project which provided over 15 H Street businesses with new signage designed by local artists valued at up to $5,000 each; Established the first office management and administration systems and initiated efforts to publish the first business directory

- Provided direction to volunteers on the Main Street Approach®; managed community and program development; drafted and prepared marketing materials and articles to highlight corridor activities and events; and assisted businesses with activities to retain and promote their establishments

Ward Six Coordinator          June 2002 - November 2002
COMMITTEE TO RE-ELECT ANTHONY WILLIAMS, Washington, D.C.

000130

Managed Ward Six (Southwest, Capitol Hill, North Capitol Hill and Near Northeast neighborhoods) primary and general election day budget and strategies for transportation, food delivery and communication; coordinated and scheduled all Ward Six campaign events; identified neighborhood activities, events and meetings to promote candidate platform and agendas

**Airport Planner**    May 2001 - December 2001
HNTB CORPORATION, Alexandria, Virginia

- Performed site studies and data collection for airport landside planning projects including curbside and parking analysis for Washington Dulles International Airport and Hartsfield Atlanta International Airport

- Collected fixed route transportation data in support of a request for proposals (RFP) to provide transit service for Atlanta Hartsfield International Airport; drafted and edited final RFP

**Airport Planning Intern**    May 2000 - September 2000; December 2000 -January 2001
METROPOLITAN WASHINGTON AIRPORTS AUTHORITY (MWAA), Washington, D.C.

- Analyzed pay and benefits packages of all airport bus operators; analyzed revenue control systems, point-of-sales, and trip statistics for Washington Flyer Bus Operation to help develop marketing strategies

**Transit Analyst**    October 1997 - August 1999
SIGNAL CORPORATION, Fairfax, Virginia

- Validated financial and operational data of over 80 public transportation providers in the U.S. and Puerto Rico for the Federal Transit Administration's (FTA) National Transit Database (NTD) Project

- Reviewed and analyzed annual funding, expense and transit service data for transportation agencies with operating budgets in excess of $200 million

**Executive Assistant**    September 1996 - October 1997
GIS/TRANS, LTD., Silver Spring, Maryland

- Provided administrative support and office management for Chief Financial Officer and senior personnel engaged in performing Geographic Information Systems (GIS) analysis and development for transportation organizations in the United States, India and Africa

**Transportation Planning Intern**  June 1995 - January 1996
LOS ANGELES COUNTY METROPOLITAN TRANSPORTATION AUTHORITY, Los Angeles, California

- Coordinated the first partnership between the LACMTA and the Los Angeles Afro-American Museum to promote the proposed Red Line Project Light Rail Extension in the South Bay; Provided the Los Angeles Neighborhood Initiative (LANI) neighborhoods with project assistance for enhanced transit amenities in eight historically, underserved neighborhoods in South Central and East Los Angeles

EDUCATION

Master of Arts in American Studies (MA) - Historic Preservation Deg.Exp. May 2007
The George Washington University, Washington, D.C.
Master of Science in Planning (MSP) - Urban/Trans. Planning
Florida State University, Tallahassee, Florida                April 2001
Bachelor of Business Admin. (BBA) - Business Admin./Finance
Howard University, Washington, D.C.        May 1995

LECTURES/PRESENTATIONS/PANELS

Transportation Community Assets, Panelist.  Conference on Community Building for Wealth Creation, Empower Baltimore, April 1, 2005, Baltimore, Maryland.

"Anacostia Light Rail Demonstration Project: A Model of Citizen Participation", presented during the Spring 2005 Open House at Florida State University Department of Urban Regional Planning,  March 18, 2005, Tallahassee, Florida.

000130

Investing In Urban Communities, Panelist. Wealth Building Series, National Black MBA Association of Washington, D.C., February 19, 2005, Washington, D.C.

"Anacostia Light Rail Demonstration Project: A Model of Citizen Participation", presented during the Fall 2004 Lecture Series at Cornell University Department of City Regional Planning, November 19, 2004, Ithaca, New York.

"H Street Revitalization: Challenges and Opportunities", presented at the Annual Meeting of the Citizens Planning Housing Association (CPHA) of Baltimore, November 17, 2004, Baltimore, Maryland.

PROFESSIONAL DEVELOPMENT

Managing the Environmental Process and Statewide and Metropolitan Transportation Programming, National Transit Institute, Winter and Spring 2004, Miami, FL New Brunswick, New Jersey; Business Development Training, National Main Street Center, 2003, Washington, D.C. ; National Transit Database Reporting Seminar, Federal Transit Administration, 1998 1999 Washington, D.C.; Introduction to Metropolitan Transportation Planning, National Transit Institute, 1997, Birmingham, Alabama

HONORS, MEMBERSHIPS ACTIVITIES

Emerging Preservation Leader Scholar, National Trust for Historic Preservation, 2002 Outstanding Service Award, Florida State University Department of Urban Regional Planning (DURP), 2001

Board of Directors, Vice President (2004-Present)  Kid Power-DC, Inc., 2003 – Present
President, Synoptikos, Florida State University (DURP), Student Planning Organization, 2000-2001;
Member:  American Planning Association (APA), 1999 - Present; Smithsonian Institution, 2001-Present; 5th M Streets, N.E. Neighborhood Council, 2001-2003; National Trust for Historic Preservation, 2002- Present

Volunteer: H Street Main Street, Economic Restructuring Committee, 2003-Present; Campaign to Re-Elect Sharon Ambrose, 2002

## ──── PERSONAL DATA ────

**Employee Number** 005681

**Current Phone #'s:** 202–962–2429 **Home:** 202 832–6822

**Current Supervisor:** Joel R. Washington

**Current Position/Grade**     ASST PLNG PROJ MGR00

**Union** NRP

**HS Grde Comp** 12 **Col Deg** M

**Major:** Finance/Transportation Planning/Historic Preservation

**License(s) Held** District of Columbia Class D Driver's License

**Status**  **TYPE**
F         R

**Shift**                      D

**Date of Employment:**        Nov 03 2003

**Seniority Date:**

**Date:** Sep 01, 2005

000140

# Internal Job Application

**SUBJECT: Application for Vacancy**

**Posting Opening Date:** July 21, 2005
**Posting Closing Date:** OPEN UNTIL FILLED
**Posting Number** 05-0727-SR

**TO: HRMP – Employment Services**
Enter Employee Number: 005681
**FROM:** TOMIKA HUGHEY
**HOME ADDRESS:** P O BOX 1618
WASHINGTON DC 20013

Please consider me for the position of
in the Office of
Union

This is a Grade/Level
preferred shift

## My specific qualifications for this position are:

In my current capacity as the Assistant Planning Project Manager for the Anacostia Corridor Demonstration Project and the District of Columbia Alternatives Analysis (DCAA) in the Office of Business Planning Project Development, I am responsible for the management of the community development and outreach efforts in support of these projects. This includes drafting, editing and reviewing public participation media and correspondence to District of Columbia agencies, citizens and civic organizations throughout the District. In addition to these efforts, I develop, plan and coordinate public events, forums, workshops and discussions in an effort to educate the public about the ongoing DCAA Transit Study. I coordinated the first WMATA-led planning workshops with District of Columbia Office of Planning and Department of Transportation Planners in support of the DCAA Transit Study in the Spring of 2004. During this study, I have also presented more than 50 public presentations on the Anacostia Demonstration Project and the DCAA throughout the District of Columbia to civic, government and private organizations.

My current position requires attendance at Federal Transit Administration, local meetings, regular District Government Agency meetings and in-house WMATA meetings concerning WMATA's role in the overall DCAA project development process. As a Transportation Planner within WMATA, my role is to ensure that the project development and planning process articulated to the general public is reflected in the final design and engineering of transportation projects, specifically, the Anacostia Demonstration Project. This planning process involves the articulation and interpretation of Section 106 environmental requirements per the National Environmental Policy Act of 1971 (NEPA). Writing and responding to questions related to environmental issues surrounding proposed plans (i.e. Anacostia Light Rail Public Hearing) and final recommendation (Staff Summary Report)of the Board Action to the WMATA Board of Directors.

Additionally, in my current position I am responsible for understanding the current District of Columbia business, real estate (commercial, residential and industrial) climate in order to plan effectively for the proposed DCAA priority transit corridors which will receive enhanced transit service and amenities based on the recommendations we propose in the final DCAA Study. This requires attendance at Federal Transit Administration, DC Marketing Center, Office of Planning Economic Development, Office of Planning and District Department of Transportation meetings and workshops. Current knowledge of proposed neighborhood zoning overlays, increases in residential development, streetscape enhancement plans, ward transportation studies, and commercial corridor activity have a direct impact on my planning work. This knowledge helps to determine the scale, character and type of transportation enhancements necessary and feasible for neighborhoods and centers surrounding the proposed DCAA priority corridors. To supplement this knowledge, I have also attended several National Transit Institute (NTI) courses on Statewide Transportation Funding and Managing the Environmental Process and Metropolitan Transportation Planning.

Oversight of consultant and sub-consultant projects, budgets and work products is also a requirement of my current position with the Office of Business Planning Information Technology. This means ensuring that the final DCAA Study product presented to our client,

000160

DDOT, reflects the priorities outlined in the original scope of work and budget. Managing invoices received by our sub-consultants and reviewing the project budget all coincide with achieving the final study products within the project schedule.

Management of community outreach and advocating for the DCAA Study and the goals of WMATA requires that I use my knowledge of public outreach techniques and community participation skills to relate technical transportation data to the public. This involves gauging the appropriate products/mediums (i.e mailings, intercept surveys, Advisory Neighborhood Commission (ANC) meetings, venues, meeting style and information presented to convey and/ or receive the information necessary to achieving the overall project outreach goals. Developing strategies to achieve project goals requires constant oversight of the consultants' products to ensure appropriate use of project funding and the maximization of resources and manpower.

Under the direction of my Office Director and Project Manager, our outreach efforts resulted in an overwhelming community, District of Columbia Government and WMATA Board of Directors approval for the implementation of the Anacostia Light Rail Demonstration Project in the Fall of 2003. I have presented the planning public outreach process for the Anacostia Demonstration Project (more recently title the Anacostia Streetcar Project) and the District of Columbia Alternatives Analysis locally, regionally and nationally to organizations such as the Citizen Planning Housing Association of Baltimore, Empower Baltimore, National Black MBA Association (Washington, D.C. Chapter) and the Regional Planning Departments at Cornell University Florida State University.

My extensive community development background is the result of over ten years as a community/economic development and transportation planner for public, private and non-profit organizations in Los Angeles, California; Tallahassee, Florida; and since 2001, Washington, D.C.

Prior to my current position with the Office of Business Planning Information Technology, I was the Executive Director of the H Street Main Street Program in Northeast, Washington, D.C. As the Director of a National Main Street Program in the District of Columbia, I interacted daily with local merchants on the 1.5 mile, commercial corridor of H Street, NE. As the only employee of this non-profit organization, I set up its first office in 2003, managed the payroll, budget and volunteers for four, all-volunteer committees.

Much of my job was to identify ways to encourage merchant participation in activities to beautify the corridor, promote economic and financial resources to the merchants and also inform them of city services which could help them with daily business activities. Additionally, I attended community meetings to inform local residents of business services and activities on the corridor which they could support.

I developed a development package to be presented to interested developers and merchants who desired to purchase properties or relocate their businesses to the corridor. I attended National Main Street conferences to learn about resources available to help existing businesses on the corridor. Through a partnership developed with a local non-profit lender, we identified loan-ready businesses on the corridor to help them expand or improve their business. To promote the commercial corridor, I also participated in the Conference of Shopping Centers conference held in the District in 2003.

In this position I attended local Downtown Business Improvement District (BID) meetings and the D.C. Building Industry Association (DCBIA) meetings to promote the corridor and learn of other business initiatives throughout the city.

As the Ward Six Coordinator for Mayor Anthony Williams 2002 Re-Election Campaign, I developed outreach plans, primary and general election day logistics strategies and also identified opportunities for Mayor Williams to present his political platform in Ward Six which includes the neighborhoods of Capital Hill, NoMa, Chinatown, Southwest Waterfront and Near Northeast. Facilitation of community meetings and being responsive to constituent concerns was an important aspect of this position. As a result of my efforts, Mayor Willimas only lost at one voting precinct, Van Ness Elementary School in Southeast, DC, which was the community school for the Arthur Capper Carrollsburg Housing Project which was being demolished during the time of the re-election campaign.

While working as an airport planner for a private firm based in Alexandria, Virginia, I conducted financial, parking and route analysis for two major airports: Atlanta Hartsfield and Washington Dulles International Airports. In support of the "d2" capital program at Dulles International Airport, I developed the base calculations for the number of parking shuttle buses and routes necessary to support the phased capital improvements to the temporary, employee and public parking lots at the airport.

000167

For Hartsfield Atlanta Airport I wrote, edited and prepared the first RFP in almost 20 years for new airport contract transportation services. This required route analysis (actually riding the bus) for a fleet of over 30 buses during the peak periods, over a two month period. This analysis was used to support the minimum requirements for the RFP.

As a Transit Analyst for the FTA's National Transit Database I analyzed the financial and operations data of over 80 Federal Transit agencies in the U.S. and Puerto Rico. This involved assisting transit agencies with the completion of the National Transit Database Report which includes information on vehicle miles traveled, passenger miles/trip, number of accidents, funding sources and expenditures for transit agencies receiving urbanized area formula funds from the FTA. During my tenure as a National Transit Database Analyst, I attended my first NTI course on Metropolitan Transportation Planning in Birmingham, Alabama.

As a Transportation Planning Intern with the South Bay Area Team of the Los Angeles County Metropolitan Transportation Authority, I conducted community outreach throughout Los Angeles in support of the proposed southern extension of the Red Line. I established the first partnership with the Los Angeles Afro American Museum to host a public meeting on the Red Line Project. In planning for this event, the project team utilized direct mail and word of mouth advertising methods for the meeting which was attended by over 150 citizens and guests.

I also developed a transit workshop for the Los Angeles Neighborhood Initiative (LANI) communities to showcase alternatives for providing transit information in underserved communities. While working with LANI during its first pilot year, I assisted the community leaders during visioning workshops with Anton Nelesson and developed alternatives for managing transit stores designed to disseminate transit media, information and resources.

My other relevant experience follows in my attached resume:

TOMIKA R. HUGHEY, MSP
P.O. Box 1618, Washington, D.C. 20013-1618
202.486.0346                                                          Mobile:
xeropholous@yahoo.com
            Residence: 202.289.8846                      Office: 202.962.2429

PROFESSIONAL EXPERIENCE

Assistant Planning Project Manager        November 2003 - Present
WASHINGTON METROPOLITAN AREA TRANSIT AUTHORITY (WMATA), Washington, D.C.

- Responsible for the management of environmental assessments, transportation planning, and public outreach tasks for the District of Columbia Transit Alternatives Analysis (DCAA) which includes the Anacostia Streetcar Project. The DCAA is a study of enhanced transit, local bus improvements, bus rapid transit (BRT) and streetcar for priority corridors throughout the District of Columbia.

- Provide community outreach guidance for Metrorail station access planning guidelines and identify methods to enhance pedestrian and transit-user accessibility around Metrobus and rail facilities

Executive Director        January 2003 - October 2003
H STREET MAIN STREET, Washington, D.C.

- Managed daily operations for the revitalization of the 13-block, neighborhood commercial corridor and Main Street District of H Street, Northeast, which was preparing for over $100 million of public and private commercial, residential and transportation investment

- Initiated the H Street Main Street Mobile Merchant Mixers and Clean-Up Day; Led the pilot "Expressive Sign" project which provided over 15 H Street businesses with new signage designed by local artists valued at up to $5,000 each; Established the first office management and administration systems and initiated efforts to publish the first business directory

- Provided direction to volunteers on the Main Street Approach®; managed community and program development; drafted and prepared marketing materials and articles to highlight corridor activities and events; and assisted businesses with activities to retain and promote their establishments

Ward Six Coordinator        June 2002 - November 2002
COMMITTEE TO RE-ELECT ANTHONY WILLIAMS, Washington, D.C.

- Managed Ward Six (Southwest, Capitol Hill, North Capitol Hill and Near Northeast neighborhoods) primary and general election day budget and strategies for transportation, food delivery and communication; coordinated and scheduled all Ward Six campaign events; identified neighborhood activities, events and meetings to promote candidate platform and agendas

Airport Planner    May 2001 - December 2001
HNTB CORPORATION, Alexandria, Virginia

- Performed site studies and data collection for airport landside planning projects including curbside and parking analysis for Washington Dulles International Airport and Hartsfield Atlanta International Airport

- Collected fixed route transportation data in support of a request for proposals (RFP) to provide transit service for Atlanta Hartsfield International Airport; drafted and edited final RFP

Airport Planning Intern    May 2000 - September 2000; December 2000 -January 2001
METROPOLITAN WASHINGTON AIRPORTS AUTHORITY (MWAA), Washington, D.C.

- Analyzed pay and benefits packages of all airport bus operators; analyzed revenue control systems, point-of-sales, and trip statistics for Washington Flyer Bus Operation to help develop marketing strategies

Transit Analyst    October 1997 - August 1999
SIGNAL CORPORATION, Fairfax, Virginia

- Validated financial and operational data of over 80 public transportation providers in the U.S. and Puerto Rico for the Federal Transit Administration's (FTA) National Transit Database (NTD) Project

- Reviewed and analyzed annual funding, expense and transit service data for transportation agencies with operating budgets in excess of $200 million

Executive Assistant    September 1996 - October 1997
GIS/TRANS, LTD., Silver Spring, Maryland

- Provided administrative support and office management for Chief Financial Officer and senior personnel engaged in performing Geographic Information Systems (GIS) analysis and development for transportation organizations in the United States, India and Africa

Transportation Planning Intern  June 1995 - January 1996
LOS ANGELES COUNTY METROPOLITAN TRANSPORTATION AUTHORITY, Los Angeles, California

- Coordinated the first partnership between the LACMTA and the Los Angeles Afro-American Museum to promote the proposed Red Line Project Light Rail Extension in the South Bay; Provided the Los Angeles Neighborhood Initiative (LANI) neighborhoods with project assistance for enhanced transit amenities in eight historically, underserved neighborhoods in South Central and East Los Angeles

EDUCATION

Master of Arts in American Studies (MA) - Historic Preservation Deg.Exp. May 2007
The George Washington University, Washington, D.C.
Master of Science in Planning (MSP) - Urban/Trans. Planning
Florida State University, Tallahassee, Florida    April 2001
Bachelor of Business Admin. (BBA) - Business Admin./Finance    May 1995
Howard University, Washington, D.C.

LECTURES/PRESENTATIONS/PANELS

Transportation Community Assets, Panelist.  Conference on Community Building for Wealth Creation, Empower Baltimore, April 1, 2005, Baltimore, Maryland.

"Anacostia Light Rail Demonstration Project: A Model of Citizen Participation", presented during the Spring 2005 Open House at Florida State University Department of Urban Regional Planning, March 18, 2005, Tallahassee, Florida.

000169

Investing In Urban Communities, Panelist. Wealth Building Series, National Black MBA Association of Washington, D.C., February 19, 2005, Washington, D.C.

"Anacostia Light Rail Demonstration Project: A Model of Citizen Participation", presented during the Fall 2004 Lecture Series at Cornell University Department of City Regional Planning, November 19, 2004, Ithaca, New York.

"H Street Revitalization: Challenges and Opportunities", presented at the Annual Meeting of the Citizens Planning Housing Association (CPHA) of Baltimore, November 17, 2004, Baltimore, Maryland.

PROFESSIONAL DEVELOPMENT

Managing the Environmental Process and Statewide and Metropolitan Transportation Programming, National Transit Institute, Winter and Spring 2004, Miami, FL New Brunswick, New Jersey; Business Development Training, National Main Street Center, 2003, Washington, D.C. ; National Transit Database Reporting Seminar, Federal Transit Administration, 1998 1999 Washington, D.C.; Introduction to Metropolitan Transportation Planning, National Transit Institute, 1997, Birmingham, Alabama

HONORS, MEMBERSHIPS ACTIVITIES

Emerging Preservation Leader Scholar, National Trust for Historic Preservation, 2002 Outstanding Service Award, Florida State University Department of Urban Regional Planning (DURP), 2001

Board of Directors, Vice President (2004-Present)   Kid Power-DC, Inc., 2003 - Present
President, Synoptikos, Florida State University (DURP), Student Planning Organization, 2000-2001;
Member: American Planning Association (APA), 1999 - Present; Smithsonian Institution, 2001-Present; 5th M Streets, N.E. Neighborhood Council, 2001-2003; National Trust for Historic Preservation, 2002- Present

Volunteer: H Street Main Street, Economic Restructuring Committee, 2003-Present; Campaign to Re-Elect Sharon Ambrose, 2002

## ——— PERSONAL DATA ———

**Employee Number** 005681

**Current Phone #'s:** 202-962-2429 **Home:** 202 832-6822

**Current Supervisor:** Joel R. Washington

**Current Position/Grade**      ASST PLNG PROJ MGR00

**Union** NRP

**IIS Grde Comp** 12 **Col Deg** M

**Major:** Finance/Transportation Planning/Historic Preservation

**License(s) Held** District of Columbia Class D Driver's License

**Status** **TYPE**
F      R

**Shift**                    D
**Date of Employment:**      Nov 03 2003
**Seniority Date:**

**Date:** Sep 01, 2005

000170

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

TOMIKA HUGHEY                                )
                                             )
            Plaintiff,                       )
                                             )
    v.                                       ) Civil Action No. 07 CV 01513
                                             ) (RJL)
                                             )
WASHINGTON METROPOLITAN                      )
AREA TRANSIT AUTHORITY                       )
                                             )
            Defendant.                       )

## DECLARATION OF TOMIKA HUGHEY

1.    I, Tomika Hughey, hereby declare:

2.    I am the plaintiff in the above matter.  I have personal knowledge of the facts set forth herein.

3.    In September 2005, I applied for a promotion for three newly created positions in the Department of Policy and Government Relations.  Two of the new positions were for Strategic Policy and Communications Specialists. ("Strategic Communications"). The job descriptions for both Strategic Communications positions were identical.  The third position was for a Strategic Policy Advocacy Specialist. ("Strategic Advocacy").

4.    I was interviewed by an initial screening panel on November 1, 2005.

5.    At the time of the second interview, I was employed with WMATA and my office was located in the same building where the interviews were conducted by Deborah Lipman and her supervisor, Ray Feldman.  Despite my close proximity to the interview site, however, I was not interviewed until November 9, 2005.  I believed and was prepared to be interviewed by Ms. Lipman and Mr. Feldman for all three vacant positions.

1

EXHIBIT

E

6.      At the start of the interview, Ms. Lipman did not inform me that the Strategic Communications positions were filled nor did she inform me that I was not being interviewed for either of the Strategic Communications positions.  Ms. Lipman told me that she thought my skills best fit the Strategic Advocacy position.  I did not take this statement to mean in any way that I was not being interviewed or no longer being considered for the Strategic Communication positions.  I also never received any written communication indicating that my application would only be considered for the Strategic Advocacy position.

7.      During the course of the interview, Ms. Lipman asked, "Help me to understand how I would send you to Virginia where the 'good old boys' are - how would you represent the Authority."

8.      Neither Ms. Lipman nor Mr. Feldman took notes during the interview, nor did they use any set questions.

9.      After the interview, Ms. Lipman informed me that she would make "a decision" by that next Friday.  On that Friday, I phoned Ms. Lipman and left a message on her voicemail requesting a status report.  She returned my call several weeks later on or about December 9, 2005, and informed me that I had not been selected for the Strategic Advocacy position.  Ms. Lipman did not tell me the name of the selected candidate nor did Ms. Lipman advise me about the status of the two positions for Strategic Policy & Communications Specialists.

10.      I have never received a formal letter, email or memorandum from WMATA stating that I had not been selected for the Strategic Communications positions or the Strategic Advocacy positions.

11.      On February 21, 2006, I met with Mr. Feldman at his request.  On that day, I told Mr. Feldman that I was considering filing a formal, internal complaint based on Ms. Lipman's

2

question about "good old boys," but that I wanted to confirm that he viewed her statement as inappropriate and directly related to my race. Mr. Feldman said that he felt Ms. Lipman's statement was inappropriate and it made him say to himself, "Is this 2005, did she just say that?" Mr. Feldman also said that he would confirm that he interpreted her statement to be inappropriate, racially motivated and that he supported my decision to file a complaint. Mr. Feldman also added that if a close friend had told him of my experience he would emphatically encourage that friend to file a complaint.

12.     I then asked Mr. Feldman who was selected for the two Strategic Policy & Communications Specialist positions and he told me those two vacancies were filled by Jeanine Black, a white female, and Gregory Potts, a white male. Both of these candidates I knew were hired from outside of WMATA.

13.     On February 22, 2006, I filed my formal complaint with the Office of Civil Rights alleging discrimination protesting WMATA's failure to consider me for all three positions.

14.     From the date of my complaint until his removal from my case in June, I was updated by Devin Walker, an investigator in WMATA's Civil Rights Office, and was told that the investigation would be completed within 90 days as set forth in WMATA's internal complaint procedures. During the course of Mr. Walker's investigation, he told me that the evidence in my case and another case that he was working on represented a negative course of conduct by WMATA Managers and Directors, and the Human Resources Department.

15.     Mr. Walker said that my case and the other one he was investigating could have been prevented had his superiors taken heed to his concerns raised earlier regarding the lack of adherence to WMATA interview, selection and hiring procedures by Managers and Directors at WMATA. He stated that he had warned of the inappropriate manner by which key selections

3

were made for vacancies and the lack of oversight by the Human Resources staff during the interview, panel selection and hiring process. Mr. Walker also advised me that the concerns he raised to his superiors regarding the Office of Human Resources' failure to provide oversight during my selection process would not have any impact on his investigation of my case and that he would submit to Teresa Bailey, Director of the Office of Civil Rights, his findings before the 90 day deadline.

16.    Mr. Walker advised me that typically what occurs after he has completed his investigation, he reviews the case findings with Ms. Bailey, she may have some edits, but more often than not, his findings are supported and agreed to by his superiors. WMATA's complaint procedures mandate 90 days from receipt of complaint to complete investigation.

17.    Although I had discussions with Mr. Walker, he never showed me a copy of his final report or any drafts of his report. I also was never notified that he ever filed a report until the litigation in this case began.

18.    Sometime in June 2006, I was notified by Ms. Bailey that Mr. Walker had been removed as the investigator on my case. Ms. Bailey told me to "follow-up" directly with her. Unbeknownst to me at the time, Mr. Walker had rendered a probable cause finding of unlawful discrimination and recommended punishment for Lipman and other WMATA officials, prior to his removal from the investigation. Notwithstanding repeated messages and e-mails to Ms. Bailey, I never received Mr. Walker's report of the investigation for my internal complaint.

19.    On June 23, 2006, I called Ms. Bailey for a status update. When Ms. Bailey did not respond, I sent an e-mail to Ms. Brender Gregory, the acting Assistant General Manager for Workforce Development, Ms. Bailey's supervisor.

4

20.    Ms. Bailey told me that Anne Anderson, another investigator, would be assigned to my case. I asked Ms. Bailey why was this second interview process occurring and she stated that it was customary for cases to be reviewed by other investigators. A few days later, Anderson contacted me and again interviewed me about my claims. Because I knew that Mr. Walker had completed his investigation, the assignment of a second investigation created increasing concern about the progress and integrity of WMATA's investigation into my complaint. Notwithstanding the delay in completing the investigation beyond WMATA's own 90-day time period, neither Ms. Bailey nor Ms. Gregory advised me to file an EEOC complaint while WMATA's investigation was pending.

21.    On July 10, 2006, I went to the Washington Field Office of the EEOC and completed an Intake Questionnaire. At that time, I believed and told the EEOC that the Office of Civil Rights was "dragging its feet" to make a final recommendation for "fear of management's response." I stated this on my intake questionnaire based on the information Mr. Walker had provided during the course of his investigation of my complaint. I feared for the integrity of the investigation because of the findings of Mr. Walker as to my case and his previous complaints to his superiors regarding WMATA Managers and Directors violating WMATA personnel policies and procedures would potentially have warranted the dismissal of several high-ranking Human Resources, Civil Rights and Governmental Relations staff members. Because of the lack of response from Ms. Bailey to my repeated requests for information on the status of my case, I did not believe I would receive a fair review or finding from WMATA's Office of Civil Rights and therefore felt the need to go to the EEOC.

22.    On that day, I also submitted to the EEOC a written summary of my complaint and complained that I was "not confident in WMATA to fairly and efficiently resolve my case."

23.     On July 20, 2006, I again requested information from Ms. Gregory about my complaint and protested WMATA's "lack of action." I met with Ms. Bailey about the status of the investigation on July 28, 2006.

24.     On August 16, 2006, I again contacted Ms. Gregory for information about the status of the investigation.

25.     On August 23, 2006, Ms. Gregory met with me and orally presented Ms. Anderson's findings which were submitted by her on August 7, 2006. In her report, Ms. Anderson once again found probable cause of unlawful race discrimination for WMATA's failure to promote me to any of the open positions.

26.     On August 2, 2006, I again met with Ms. Gregory regarding the status of the investigation. Gregory advised me that the internal investigation was not "fully completed."

27.     On September 5, 2006, I received a letter from Teresa Bailey, WMATA's Director of the Office of Civil Rights formally informing me of the results of the investigation into my complaints for my non-promotions to the Strategic Communications and Strategic Advocacy positions. The next day, I went to the EEOC and supplemented my initial contact with Ms. Bailey's report.

28.     The EEOC drafted the Charge of Discrimination based upon my previous submissions, and executed it on October 5, 2006.

29.     During the course of preparing for filing a federal court complaint in the spring of 2007, I was informed that on or about December 8, 2005, that WMATA had issued an announcement that the Strategic Policy Communications had been filled. I was never aware of any such announcement in December 2005 and have no firsthand knowledge that such an announcement was in fact made. I did not learn of nor inquire about the selection of Potts and

6

Black for the two Strategic Policy & Communications positions until my February 21, 2006, meeting with Mr. Feldman.

I declare that the foregoing is true and correct under penalty of perjury, this 28th day of July, 2008, in Washington, D.C.

/s/ Tomika Hughey

_____

# INVESTIGATIVE REPORT

**Complaint Number: 471-06**
**Complainant: Tomika Hughey**
**Date of Complaint:  February 22, 2006**

## I.    INTRODUCTION AND BACKGROUND

Tomika Hughey (hereinafter "Complainant"), Assistant Planning Project Manager, Business Planning and Project Development (BPPD), Planning and Information Technology (PAIT) alleges that she has been subjected to discrimination based on her race (black).  She states that she applied for the position of Strategic, Policy and Communications Specialist advertised under posting number 05-0727-SR, as well as the position of Strategic Advocacy Specialist advertised under posting number 05-0731-SR. and was not selected for either position.

Complainant applied, was found qualified, and was interviewed by a panel consisting of Shiva Pant, Government Relations Officer, GOVR; Candace Smith, Media Relations Officer, Media Relations, Events and Employee Programs (MREL); and Matthew Greenwald, Homeland Security, GOVR.   Each candidate was asked the same five questions and each question had two parts.   The panel screened the applications and selected fifteen (15) applicants for a second interview.   The panel recommended six (6) candidates for the two (2) Strategic, Policy, and Communications Specialist positions, among them was the Complainant.   The Complainant was not recommended by the panel for a second interview for the position of Strategic Advocacy Specialist.   The reason given was, "Her responses to the interview questions indicated that her professional interest lies in the area of communications and outreach, not in internal policy and analytical work."   Five candidates were recommended for the second interview for the position of Strategic Advocacy Specialist (four white and one black).

Although the panel recommended the Complainant for an interview for one of the Strategic, Policy, and Communication Specialist positions, the Selecting Official, Deborah Lipman, Director, GOVR, interviewed her for the Strategic Advocacy Specialist position.   Ms. Lipman and her supervisor, Ray Feldman, Acting Assistant General Manager, Department of Public Affairs and Strategic Programs (PASP) conducted the interviews without a set of written questions, took no notes, and no candidates were rated.

The Complainant was interviewed for the position of Strategic Advocacy Specialist November 9, 2005.  Prior to this interview, Complainant was notified that the two positions as Strategic, Policy and Communications Specialists had already been filled. She was told, at that time, she would only be interviewed for the Strategic Advocacy Specialist position.  Ms. Lipman had already selected Gregory Potts (white) and Jeanine Black (white) for the two Strategic, Policy and Communications Specialist positions.  She ultimately selected Craig J. Kwiecinski (white) for the Strategic Advocacy Position.



EXHIBIT

F

1

597

## II.    BASES AND ISSUES IN THE COMPLAINT

Complainant alleges that she was discriminated against when she was denied consideration for the position of Strategic, Policy and Communications Specialist because of her race, black. She also alleges that she was not selected for the position of Strategic Advocacy Specialist, because of her race, black. Complainant alleges that during an interview with the Selecting Official she was subjected to racial bias demonstrated by being asked an inappropriate question.

## III.    SUMMARY OF THE EVIDENCE

Complainant strongly asserts that she is well qualified for both of the positions at issue. Complainant explains that in her duties as the Assistant Planning Project Manager for the Anacostia Corridor Demonstration Project and the District of Columbia Alternatives Analysis (DCAA) in BPPD, she is responsible for the management of the community development and outreach efforts in support of these projects. She states this includes drafting, editing and reviewing public participation media and correspondence to District of Columbia agencies, citizens and civic organizations throughout the District. She further states that she develops, plans and coordinates public events, forums, workshops and discussions in an effort to educate the public about the ongoing DCAA Transit Study.

Complainant states that she is required to attend meetings at the Federal Transit Administration, local meetings, regular District Government Agency meetings and in-house WMATA meetings concerning WMATA's role in the overall DCAA project development process. She asserts that she has extensive coalition building experience through her current position. She states that under the direction of an Office Director and Project Manager, their outreach efforts resulted in an overwhelming community, District of Columbia Government and WMATA Board of Directors approval for the implementation of the Anacostia Light Rail Demonstration Project in the Fall of 2003.

Complainant was informed that for the Strategic Advocacy Specialist position, Ms. Lipman stated that they were looking for someone who has experience in building a coalition with elected officials. Complainant responded that she has those skills and experiences. She states that she has worked with the City Council of Tallahassee, Florida on underserved communities transit issues. She states she has also worked with Los Angeles, California local elected officials and community representatives on transit issues.

Complainant states that during the second interview, neither Ms. Lipman nor Mr. Feldman took any notes. She states that Ms. Lipman never explained what skill set was needed for someone with coalition building skills, nor did she mention anything about having legislative coalition building skills. Complainant states Ms. Lipman simply said that they were looking for someone to help build a coalition in light of the negative publicity WMATA was receiving. She states Ms. Lipman said they wanted someone to bring these different groups together to improve transit. Complainant contends there never was any distinction made between legislative and jurisdictional coalition work.

598

Complainant states that Ms. Lipman led her to believe that constituents would perceive her differently from a white counterpart when Ms. Lipman stated during the interview, "I am trying to understand how I would send you to Virginia where the "good old boys" are—How would you represent the Authority?"

Complainant was asked if Deborah Lipman had knowledge of her race prior to the November 9, 2005 interview. She responded in the affirmative, pointing out that her former supervisor and Ms. Lipman were colleagues at WMATA. She states they worked together at times during which she has been in Ms. Lipman's presence, and she has gone to lunch with them after D-Dot meetings.

**Deborah Lipman** (white) Director, GOVR, states that race was not a factor in the selection process for the three positions at issue. She states that all three positions were being filled together, therefore, the interview panel, headed by Shiva Pant, was responsible for recommending candidates for second interviews for all three positions. Ms. Lipman states that she and her supervisor, Ray Feldman, explored the issue of coalition building with all of the candidates (they interviewed). She explains that this was done because the Authority has many different stakeholders. At the same time, Ms. Lipman admits that there were no written questions and she did not take notes on what questions were posed to the candidates and what responses they made.

Ms. Lipman states there were nine to ten skill sets she was looking for in all three positions. She states that all three positions were open until filled. Ms. Lipman states that this allowed her to fill the positions immediately once they had a qualified candidate and without interviewing all the recommended candidates. As a justification, Ms. Lipman contends that former General Manager Richard White wanted the positions filled quickly so they were trying to fast track these positions.

Ms. Lipman states that by the time she met with the Complainant, she had already filled the two Strategic Policy and Communications Specialist positions and therefore only considered the Complainant for the Strategic Advocacy Specialist Position. Ms. Lipman states they were looking for someone who had experience in building a coalition with elected officials. She explained that coalition building means bringing different stakeholders together, especially elected officials and getting them to work together.

Ms. Lipman describes the Complainant as having no coalition experience and having limited skills in federal legislation. She states there is a difference between outreach and coalition building in that outreach could involve simply disseminating information about WMATA to stakeholders or organizing public meetings. Ms. Lipman states she selected Craig Kwiecinski (white) for the Strategic Advocacy Position because of his experience in drafting written communications, including speeches, acting as media spokesperson and directing Pittsburgh's legislative agenda. She states that his experience in building support for a major tax reform package is a terrific background for coalition building and advocacy work for the Authority. Ms. Lipman admits that Complainant received the same score as Mr. Kwiecinski and that she also received a more favorable write up from the panel. When asked why she did not write a justification for selecting Mr. Kwiecinski

599

over the Complainant, Ms. Lipman said she overlooked this detail because they were trying to get the position filled quickly.

Ms Lipman states she does not recall making the comment, "I am trying to understand how I would send you to Virginia where the "good old boys" are—How would you represent the Authority?" She also states she does not recall having a discussion about this comment with Mr. Feldman.

**Ray Feldman** (white) Acting Assistant General Manager, GOVR confirms that neither he nor Ms. Lipman had written questions for the interviews. He also confirms that they did not take any notes. He states they asked each candidate the same questions, such as why they were interested in the job and what their strengths and weaknesses were. He states at the time they interviewed Complainant they had already made two selections. Mr. Feldman states Complainant was only considered for the last position.

Mr. Feldman states he cannot say that Ms. Lipman said the exact words alleged by the Complainant, but he does recall Ms. Lipman saying something similar which caught him off guard. He states he understands how the Complainant could be offended by the comment in a racial way. Mr. Feldman states Ms. Lipman did not ask anyone else this question although she did ask someone a much broader question. Specifically, he asserts that Ms. Lipman asked Mr. Kwiecenski, "How would you overcome your lack of experience in the DC area?"

Mr. Feldman states he spoke with Mr. Lipman after the interview about her comment and asked her what she meant by it. He states her explanation was that she was simply asking a question about coalition building and how the Complainant would handle that on a day-to-day basis. Mr. Lipman states that based on her explanation he was convinced that the intent of her question was not racial in nature.

Mr. Feldman explains that after interviewing the Complainant, she was his top choice for the last position. He states, however, he and Ms. Lipman agreed to meet with Mr. Kwiecinski, who was a far more experienced candidate than the Complainant. Mr. Lipman states he does not feel that race played a part in the filling of these positions.

A Memorandum dated November 9, 2005 indicates that the positions of Strategic Policy and Communications Specialists were filled before the Complainant was interviewed. According to the listing of dates of interview and selection, Complainant was interviewed November 9, 2005 by Mr. Feldman and Ms. Lipman, but the selectee for the Strategic Advocacy position, Craig J. Kwiecinski, was not interviewed until November 21, 2005, after which time he was selected. The interview dates and recommendations from the panel for the fifteen candidates occurred from September 28, 2005 through to the last interview November 2, 2005. Second interviews of the nine candidates conducted by Deborah Lipman and Ray Feldman occurred from October 11, 2005 through November 21, 2005.

600

**Shiva Pant** (racial designation unknown) Government Relations Officer, GOVR, states he was the chairperson for the interview panel for the three positions at issue. Mr. Pant states that Ms. Lipman asked him to chair the interview panel. He states that together they went over the job descriptions because these were newly created positions. Mr. Pant states he drafted the (interview) questions and sent copies to Ms. Lipman and Cassandra Reed, Recruiter, Employment Services Branch (ESBR) for review. Mr. Pant states as Ms. Reed received applications, they were forwarded to him. He states in discussion with Ms. Lipman she mentioned that the Advocacy position centered on lobbying and coalition building, and this included going to the Chamber of Commerce and other outside stakeholders. Mr. Pant interprets this to mean they were looking for someone who was experienced in building coalitions. Mr. Pant states that all of the candidates were asked the same questions and the panel took turns asking questions. He states he did take notes and submitted them to Ms. Lipman. However, Mr. Pant states he is unable to find copies of the interview notes.

Mr. Pant states that in all of the interviews, each candidate was considered for all three positions and that after each interview, he would verbally advise Ms. Lipman as to whether the panel was recommending a particular applicant. He states he never advised Ms. Lipman of anything specific about any particular applicant's experiences. Mr. Pant states that he does not recall submitting any written memorandum to Ms. Lipman other than the November 29, 2005 memorandum. He states he does not know how Ms. Lipman could hold second interviews without a full understanding of the panel's recommendations. Mr. Pant was unable to offer an explanation as to how Ms. Lipman could make a selection prior to receiving his memorandum. The memorandum on the recommendations was created November 9, 2005, but Mr. Pant states he has no recollection of providing Ms. Lipman with a copy prior to November 29, 2005. Mr. Pant states the three positions in question; Strategic, Policy, and Communications Specialists (2 positions) and Strategic Advocacy Specialist were created for very specific reasons. He contends that Ms. Lipman never indicated to him that she wanted something specific for each position. He explains that these were new positions, so they had nothing to use as an example. Mr. Pant admits that selectee Craig Kwiecinski was one of the two least recommended candidates for the Strategic Advocacy Specialist position.

Mr. Pant confirms that the interviews of the applicants by the panel took place between September 29, 2005 and November 2, 2005 because the positions were open until filled and the panel interviewed candidates when they could. Mr. Pant admitted that Craig Kwiecinski, who resided in Pittsburgh, Pennsylvania at the time of the interview, was interviewed on September 29, 2005 and that the Complainant, a WMATA employee, was interviewed over one month later. He stated he has no idea why this occurred other than scheduling problems.

**Cassandra Reed** (racial designation unknown) Recruiter, ESBR, Human Resources Management Services (HRMS) states she was the Recruiter for the positions at issue. She states the positions were fast-tracked (to be filled ASAP) by former GM/COO, Richard White. Ms. Reed states she forwarded the applications directly to the hiring panel without screening them (this is inconsistent with HRMS policy). She states since

Mr. White wanted the positions filled quickly, she knew from past experience not to interfere with the selection process, even if it meant ignoring established policy. She states that Ms. Lipman was concerned that if they waited too long, they might lose the selected candidates. For these reasons, Ms. Reed states that she asked her supervisor, Tracye King, for authorization to proceed with offering positions to Gregory Potts and Jeanine Black without having a Personnel Authorization Request (PAR). Ms. Reed states that Ms. King gave her the authorization with the exception that she could not ask for verification of salary until the Office of Compensation and Benefits (COBN) completed their process.

**Tracye King** (racial designation unknown) Manager, ESBR, HRMS states she did not play an active role in the selection process for the positions at issue. Ms. King states there is no separate policy or procedure for handling postings with "Open Until Filled" status. She states that in these types of recruitments, applications are generally accepted throughout the process. Ms. King explains that in past cases, she has asked the recruiter to take the applications as they have been received up until a particular date and then begin the process of interviews. She states they will still accept other applications, but they are only considered after the cut off date for the first set of applicants. If a position has been filled using the first set of applicants, Ms. King states all the other applicants whose applications were received after the first cut-off date will receive a letter indicating that a selection has been made.

Ms. King states the role of the recruiter in the selection process varies depending on the relationship the recruiter has with the hiring manager. She states that in this recruitment/selection process, Ms. Lipman relied heavily on Ms. Reed for the initial screening of applicants. Ms. King states that it is possible for Ms. Lipman to have made a selection before considering every candidate who was ultimately interviewed by the panel, simply based on the timing of each interview. Ms. King states that in this recruitment/selection process, not all applicants were considered for all three positions. She states that Ms. Lipman should have prepared written notes on each candidate for the selections, and there should be notes from the panel members as well. She states she does not know why the interviews were spread out as much as they were because they usually all take place around the same time. Ms. King asserts that there is no written policy or procedure that says that Ms. Lipman has to provide a written statement as to why she selected Mr. Kwiecinski over the Complainant, even though they received the same score and the panel considered the Complainant to be a more qualified candidate than the selectee.

**Cassandra E. Barr** (racial designation unknown) Administrative Assistant, GOVR, states she is Ms. Lipman's Administrative Assistant. She states she assisted Ms. Lipman in the processing of some of the paperwork for the selections at issue. Ms. Barr states that she wrote the electronic message that was sent to Ms. Reed requesting her assistance to help speed the (recruitment/selection) process along, so that Ms. Lipman could hire the selectees (for the positions of Strategic, Policy, and Communications Specialists). She states that Ms. Reed was asked to start the salary negotiations with the selectee Gregory Potts in the November 9, 2005 email. The hope was expressed that this would be

6

completed prior to the issuance of a PAR. Ms. Barr states she informed Ms. Reed that she had placed in Ms. Lipman's office, the selection memorandum dated November 9, 2005; Mr. Pant's panel recommendation memorandum; references for selectee Jeanine Black and Gregory Potts' application evaluation forms; as well as the applicant flow chart. She asserts that on November 9, 2005, she possessed a copy of Mr. Pant's panel recommendation memorandum dated for that same day. Ms. Barr explains that she gave Deborah Lipman all the documents related to the selections and did not keep copies. She states she gave Ms. Lipman two separate folders, one for each selectee (Jeanine Black and Gregory Potts, selected for the Strategic, Policy and Communications Specialist positions) with all of the selection documentation enclosed.

**Katrina Wiggins** (racial designation unknown) Director, HRMP, was interviewed concerning a memorandum from the former Director, CIVR. As the result of a previous complaint, involving discriminatory recruitment, interviewing and selection practices by the Authority, CIVR made recommendations to HRMP about the process for filling vacancies. Ms. Wiggins was asked about the status of implementation of the recommendations. The recommendations were:

1.  HRMS was tasked with oversight of and control over the WMATA recruitment process and ensuring those inappropriate hiring practices do not recur. HRMS was at that time, reviewing and updating the Recruitment, Interviewing, and Selection Guidelines. It was strongly recommended that HRMS management as the HR experts for the Authority, ensure that Hiring Managers adhere to the HRMS policies and guidelines. HRMS managers were asked to support the recruiters when they brought violations (in recruitment, interviewing, and selection policies, practices and procedures) to management's attention. The outcome was for positions to be filled in a consistent, fair, and timely manner.

2.  CIVR agreed to provide training to HRMS staff involved in the interviewing and selection process for vacancies in the Authority. The training was to make sure that the Authority adhered to all relevant laws mandating non-discrimination in employment.

Ms. Wiggins responded that her office began working on updating the selection guidelines, but did not implement those updates because they were waiting for the implementation of PeopleSoft software. She states the Employment Services Branch was still expected to adhere to the guidelines that currently exist. As regards the second recommendation, Ms. Wiggins states the training occurred sometime in 2004, but she does not remember who in CIVR conducted it or who was in attendance.

## IV.    ANALYSIS AND CONCLUSIONS

The Complainant has established a *prima facie* case of race discrimination. She applied, was found qualified and was recommended for consideration for the position of Strategic, Policy, and Communications Specialist. Before Complainant was interviewed, two candidates not of her race were selected for the positions at issue. The Selecting Official

603

failed to articulate legitimate, non-discriminatory reasons for her selections. The information collected during the course of the investigation on how the process was conducted and the reasons for her selections were not credible. A panel interviewed, scored, and made recommendations on the candidates. The panel took an extraordinary amount of time given the statements made by Responding Management Officials that these positions had to be filled as quickly as possible. Interviews of the candidates by the panel took place from September 28, 2005 through to November 2, 2005. The last two candidates interviewed were the Complainant (November 1, 2005) and one other (also black) candidate (November 2, 2005). No credible reason was given for the failure to interview Complainant earlier since she was an internal candidate and located in the building where the panel was convening. Because of the claim that the positions were to be filled as soon as possible, no credible reason surfaces for the time it took to complete the interviews and why the Complainant was among the two last candidates to be interviewed. The candidates eventually selected for the positions of Strategic, Policy, and Communications Specialists were interviewed at the beginning of the process. Gregory Potts (white) was interviewed September 28, 2005 and Jeanine Black (white) was interviewed September 29, 2005.

The Selecting Official and her supervisor interviewed the candidates Mr. Potts and Ms. Black for a second time. Again, they were interviewed at the beginning of the process, Mr. Potts was interviewed October 11, 2005 and Ms. Black October 21, 2005. Ms. Lipman and her supervisor admit they had no prepared questions and took no notes. Ms. Lipman states there were nine to ten skill sets she was looking for in all three positions. Despite this, there is no evidence Ms. Lipman reviewed the candidates' applications or the recommendations made by the panel before conducting the interviews of the candidates she selected. Looking at the record as a whole in the most favorable light for the Selecting Official and all others involved in the process, it appears that Ms. Lipman did not review the applications and/or the panel's scoring and recommendations before conducting the interviews, she may have received oral information from Mr. Shiva Pant, Chairperson of the panel, about candidates being interviewed by the panel over a thirty-five day period, and may have received the panel's written scores and recommendations by November 9, 2005. But by November 9, 2005, according to Ms. Lipman, the selections had been made for the two positions as Strategic, Policy, and Communications Specialists.

Ms. Lipman, when asked why she selected Mr. Potts, stated that he has extensive Maryland State legislative experience, serving for the Maryland General Assembly's Department of Legislative Services. She states he has gained an excellent knowledge of Maryland transportation funding, including the State's Transportation Trust Fund. Ms. Lipman states that Ms. Black has very extensive federal legislative experience and used to work with Bombardier, before being laid off. Ms. Lipman was asked about the qualifications of the black candidate who was also judged as qualified for the position of Strategic, Policy, and Communications Specialist. She stated that while he has a pleasant personality, he does not seem to have a firm grasp of either the policy issues involved or how to go about building a coalition in support of WMATA. She contended that while the black candidate has a wide range of policy experience, both of the selected candidates

604

have more substantive knowledge of transportation policy matters. Ms. Lipman did not explain how she acquired this information and could recall it without reviewing the applications, the panel's scoring and recommendations and without asking specific questions that would elicit this information from candidates. She did not explain how she recalled this information, since no notes were taken.

Ms. Lipman was the selecting official, but present during the second interviews was her supervisor, Ray Feldman, Acting Assistant General Manager, GOVR. He confirms her testimony stating that they did not have written questions and did not take notes. Mr. Feldman states they basically asked each candidate the same questions, such as why they were interested in the job and what were their strengths and weaknesses. He states they were looking for three different skill sets for three different positions. Mr. Feldman has no documentation to show how each candidate met the skill sets he states they were looking for.

The panel's scoring of the candidates and the recommendations do not seem to be factors considered by Ms. Lipman. While Mr. Potts was one of two candidates with the highest average score of 86, two candidates (one white, score 86 and one black, score 83) had a higher average score than Ms. Black (score 81). The Complainant (score 79) was recommended for a second interview for the Strategic, Policy, and Communications Specialist positions, but was only interviewed after the white candidates were already selected and not for the position she was recommended for. In particular, given the Complainant's accessibility and the claim that the positions had to be filled as soon as a qualified candidate was found, there is no reason she would be among the last to be initially interviewed or among the last to be given a second interview or that the interview process would take so long.

After the selections, Complainant was interviewed for the remaining vacancy, the position of Strategic Advocacy Specialist, November 9, 2005. Complainant has established her *prima facie* case. She applied, was found qualified but was not selected. Ms. Lipman interviewed Craig Kwiencinski (white), November 21, 2005, and he was selected. Both Mr. Kwiencinski and Complainant received the same average score from the panel (79). Complainant received a more favorable recommendation from the panel though it was primarily for the communications position. Ms. Lipman claims that with all the candidates she explored the issue of coalition building. She states they were looking for someone who had experience in building a coalition with elected officials. Ms. Lipman asserts that Complainant has no coalition building experience and has limited skills in federal legislation. Complainant contends that Ms. Lipman is incorrect and she has experience working with elected officials to build coalitions to obtain transportation services for the underserved. Ms. Lipman as the selecting official articulated the following reasons for selecting Mr. Kwiencinski, she contends that Mr. Kwiencinski was selected because of his experience in drafting written communications including speeches, acting as a media spokesperson and directing Pittsburgh's legislative agenda. She states he has experience in building support for a major tax reform package and that is a terrific background for coalition building and advocacy work for the Authority. She does not explain why Mr. Kwiencinski's lack of federal legislative

experience did not limit her consideration of his application. She states that once they spoke with Mr. Kwiecinski they knew he was their candidate; therefore they ended the second interview process with Mr. Kwiecinski's interview. Ms. Lipman according to her testimony, confirmed by that of Mr. Feldman had no written questions and took no notes. The record supports the conclusion that a prior review of the panel's scores and recommendations had not been conducted, nor had the applications been reviewed.

During the course of her interview with the Complainant, Ms. Lipman allegedly said, "I am trying to understand, how would I send you to Virginia where the "good old boys" are—how would you represent the Authority?" Complainant interpreted the statement to mean that her race was a factor in whether or not she would be selected. Mr. Feldman was present and admits that something similar to the above quoted statement was said. He admits that the comment could have been racially offensive to the Complainant.

A claim of discrimination may be proven with a showing of mendacity on the part of an employer (primarily in the form of false statements), in combination with the Complainant's *prima facie* evidence. The adverse employment decisions (not considering the Complainant for the position of Strategic, Policy, and Communications Specialist and not selecting the Complainant for the position of Strategic Advocacy Specialist) unless otherwise explained are more likely than not based on impermissible discriminatory factors. The Selecting Official has not articulated legitimate, non-discriminatory reasons for its disputed actions and decisions. A violation is established when a complaining party demonstrates that race was a motivating factor for any employment practice, even though other factors also motivated the practice. The record as a whole, the undocumented, unstructured and untimely selections made in the first instance and the selection made in the second instance, the mendacity and non-credible statements made by the Selecting Official strongly indicate that Complainant's race was at least a factor in the failure to consider her for one of the first two positions and the failure to select her for the second position.

## V.    RESOLUTION

It is recommended that the finding be one of probable cause to believe discrimination based on race occurred in the failure to consider Complainant for the position of Strategic, Policy and Communications Specialist and in the failure to select Complainant for the position of Strategic Advocacy Specialist.

To remedy the situation requires that the recommendations made by CIVR concerning a previous complaint of non-selection be carried out and not just be considered. The actions the Authority should take are:

1. A three-day suspension be served by the Selecting Official in this matter, Deborah Lipman. The suspension is for failing to carry out WMATA's policy to provide a work environment free from unlawful discrimination in any form.

2. The Selecting Official for the positions at issue, as well as her supervisor who

606



assisted her in conducting the interviews, will be required to attend training on all the laws mandating non-discrimination in employment to include the Authority's policies as well as the Federal laws. For a three-year period thereafter, if the Selecting Official has an opportunity to make a selection for a vacancy, oversight in the form of a three-member panel will assist in making the selection (by majority vote on which applicant should be selected).

3.   Complainant is qualified for either a position as a Strategic Advocacy Specialist or a position as a Strategic, Policy, and Communications Specialist. Complainant will be immediately moved into her choice of either of these positions or a comparable title at an equivalent grade for which she qualifies. The Complainant will not be placed under the supervision of the Selecting Official for the position(s) at issue in this matter.

4.   HRMS be given oversight of and control over the WMATA recruitment process. The review and updating of the Recruitment, Interviewing, and Selection Guidelines are to be completed in accordance with non-discrimination requirements (CIVR will conduct the final review and approval of the Guidelines). This process is to be completed within one hundred eighty days (180) or six months from the date of the approval and signing off on the final report of investigation for the current complaint. HRMS management, as the HR experts for the Authority will be tasked with ensuring that Hiring Managers follow the HRMS policies and guidelines. HRMS managers will support the recruiters when they bring violations (in recruitment, interviewing, and selection policies, practices, and procedures) to management's attention.

5.   Written records will be kept timely for the entire process of filling vacancies that occur in WMATA to include date applications received, dates interviews conducted, questions asked, responses given, scoring, rating and ranking of applicants, and any problems or unusual situations that occur. These records will be turned over to HRMS after the process is completed and kept for at least 300 days unless HRMS is notified that the records be retained for a longer period.

6.   CIVR will conduct within one hundred eighty days (180) training for HRMP staff on all the relevant laws mandating non-discrimination in employment. Records will be kept on the agenda for the training and attendees will sign to indicate they actually attended the training and the dates they attended.

Action on these determinations should commence as soon as possible.


*Anne Anderson*
Anne Anderson
Investigator

*August 7, 2006*
Date

# M E M O R A N D U M



**SUBJECT:** Recommended applicants for the two Strategic Policy and Communications Specialist Positions (#05-0727)

**DATE:** November 9, 2005

**FROM:** GOVR - Shiva K. Pant *[signature]*

**TO:** GOVR - Deborah S. Lipman

The Interview Panel established for the three positions [#05-0727(**2 positions**) _Strategic and Policy and Communications Specialist_] and [#05-0731 (**1 position**) _Strategic Advocacy Specialist_] has completed the first round of interviews. The panel consisted of Candace Smith (MREL), Matthew Greenwald(GOVR) and me. The panel independently screened through the applications and selected applicants to be interviewed. Fifteen applicants were interviewed. The interviews were conducted in the context of making sure that the recommended applicants would meet the skill sets needed for these positions.

Attached for your information is the interview score sheet for these fifteen applicants. The table has highlighted the six applicants the panel is recommending to you for your consideration for the two Strategic Policy and Communications Specialist positions. These are:

- **Jeanine Black**
  - Ms. Black brings a very strong government relations and federal legislative experience; her experience is in the field of transportation including working with state policymakers as well. Her responses to all the questions were focused and to the point.

- **Gregory Potts**
  - The panel rated Mr. Potts highly in light of his experience working on the Maryland General Assembly's Department of Legislative Services. He has excellent analytical experience in the area of transportation and transit, is used to preparing analysis and presentations dealing with all transportation modes and represents and excellent choice for any of the three positions.

- **Tomika Hughey**
  - Ms. Hughey has limited skills in the area of federal legislative issues but has good background in the area of communications. Her response to the interview questions indicated that her professional interest lies in the area of communications and outreach, not in internal policy and analytical work.

**Washington Metropolitan Area Transit Authority**

**EXHIBIT**
G

9

- **Robert Puentes**
  - Most of Mr. Puentes' work experience has been with the Brookings Institution. He has limited legislative experience and his interest lies in the area of analysis at a macro level. He brings excellent policy analysis experience but may not find working on the day-to-day issues professionally satisfying.

- **Horace Jennings**
  - Mr. Jennings has excellent legislative, advocacy and communications background. His experience for the last fourteen years deals with the type of work that is expected of the three positions in GOVR. He brings skill sets that could meet either the advocacy or communications functions. Has good personality with significant experience in federal lobbying.

- **Sara Wilson**
  - Ms. Wilson's response to questions indicated a strong preference to working on an advocacy strategy involving the CEO so that WMATA's funding needs get proper exposure with external and influential stakeholders. It was somewhat unclear as to the professional change she was seeking compared to her current role. She does have good experience in working with internal agencies and preparing comprehensive presentations in support of GOVR's outreach efforts.

It is suggested that you consider interviewing these six recommended candidates towards selecting two of them for the Strategic Policy and Communications Specialist positions.

For the one position of Strategic Advocacy Specialist, the following applicants are recommended:

- **Horace Jennings**: already noted above

- **Steve Strauss**
  - Mr. Strauss brings a solid financial and project-related communications experience. He has extensive background in working with a large transit agency (New York MTA) and is a good candidate for internal analytical and coordination work. He has limited experience with legislative issues.

- **Evelyn Frazier**
  - Ms. Frazier brings substantial legislative and communications experience. Her eleven years of experience involved directly working on federal legislative issues for the Chicago Mayor's office or being the lead communications person for a Congressman. She has excellent writing and presentation skills.

10

- **Craig Kwiecinski** and **Tom Santaniello**
  - These two individuals bring good and extensive communications background. It is suggested that you consider them, if needed, after interviewing the other recommended candidates.

## Interview Score Sheet

| Name | Score* (CS) | Score* (MG) | Score* (SP) | Avg Score* | Comments |
|---|---|---|---|---|---|
| Jeanine Black | 88 | 80 | 75 | 81 | Strong external government relations experience in transportation issues, could backup Debbie well on congressional/agency issues. Good knowledge of federal legislative process |
| Barbara Moldauer | 73 | 55 | 50 | 59 | Lacked focus but pleasant personality |
| Yvonne Knight | 74 | 60 | 65 | 66 | Experience with community/gov relations in DC, but limited transporation/federal exposure, question interest in Metro |
| Thomas Hall | 70 | 50 | 55 | 58 | Just wants to write, did not come off as someone who would devote time to internal coordination issues |
| Gregory Potts | 87 | 85 | 85 | 86 | Strong analytical skills, potential for excellent internal coordination abilities, young and enthusiastic, review of work he currently does for Maryland Legislature makes him very suitable for one of the positions. Brings excellent analytical capability |
| Craig Kwiecinski | 88 | 80 | 70 | 79 | Good on big picture issues, very articulate, focus would be on external relationship/promotion, worked on a major tax reform campaign in Pittsburgh. |
| Steve Strauss | 70 | 85 | 75 | 77 | Sophisticated understanding of transit project management issues, strong on community relations, would help with internal coordination, limited federal congressional/agency experience. |
| April Chan | 70 | 70 | 70 | 70 | Solid general background in transit grant/capital mgmt issues, limited dealings with external players/constituent interaction, understands internal coordination challenges |
| Tomika Hughey | 87 | 80 | 70 | 79 | Solid communication/relation capabilities, strong familiarity with internal coordination challenges, but more than current focus but appears capable of handling multiple issues at a broader level ... internal analytical focus work |
| Robert Puentes | 100 | 75 | 70 | 79 | Strong presence and good policy background which would helpful in internal relation issues, but question whether he has sound political savvy and patience to deal broadly with local headaches. |
| Evelyn Frazier | 75 | 75 | 80 | 77 | Good on external relationship building at community level, plus has congressional experience, articulate and enthusiastic, writing skills, internal coordination less of a focus |

12

| Name | | | | | Comments |
|---|---|---|---|---|---|
| Claire Hefferman | | | | 0 | |
| Bob Adams | 80 | 60 | 55 | 65 | Lacked depth on policy issues, understanding of the region, high energy level, all prior experience with ideological causes |
| Thomas Santaniello | 85 | 78 | 75 | 79 | Probably would not want to focus on internal coordination issues, but has good local exposure and appears sound on external policy/congressional advocacy. Whitestone likes him |
| Horace Jennings | 86 | 78 | 80 | 83 | Articulate, wide range of policy experience (including transit), pleasant personality, significant congressional exposure, |
| Sara Wilson | 90 | 88 | 80 | 78 | Agree with Sara's suggestion of the need to raise Dick's external profile, but title 9 or that would involve questions what other tasks Sara wants to do in Dick does not buy in |

*/Base of 100

13

# M E M O R A N D U M



SUBJECT: Recommended applicants for the        DATE:    November 29, 2005
Strategic Advocacy Specialist
Position (#05-0731)

FROM: GOVR - Shiva K. Pant

TO: GOVR - Deborah S. Lipman

The Interview Panel established for the three positions [#05-0727(**2 positions**) *Strategic and Policy and Communications Specialist*] and [#05-0731 (**1 position**) *Strategic Advocacy Specialist*] has completed the first round of interviews.  The panel consisted of Candace Smith (MREL), Matthew Greenwald(GOVR) and me.  The panel independently screened through the applications and selected applicants to be interviewed.  Fifteen applicants were interviewed.  The interviews were conducted in the context of making sure that the recommended applicants would meet the skill sets needed for these positions.

Attached for your information is the interview score sheet for these fifteen applicants. The table has highlighted the six applicants the panel is recommending to you for your consideration for the two Strategic Policy and Communications Specialist positions. These are:

- **Jeanine Black**
  - Ms. Black brings a very strong government relations and federal legislative experience; her experience is in the field of transportation including working with state policymakers as well.  Her responses to all the questions were focused and to the point.

- **Gregory Potts**
  - The panel rated Mr. Potts highly in light of his experience working on the Maryland General Assembly's Department of Legislative Services.  He has excellent analytical experience in the area of transportation and transit, is used to preparing analysis and presentations dealing with all transportation modes and represents and excellent choice for any of the three positions.

- **Tomika Hughey**
  - Ms. Hughey has limited skills in the area of federal legislative issues but has good background in the area of communications.  Her response to the interview questions indicated that her professional interest lies in the area of communications and outreach, not in internal policy and analytical work.

Washington
Metropolitan Area
Transit Authority

# 10

14

- **Robert Puentes**
  - Most of Mr. Puentes' work experience has been with the Brookings Institution. He has limited legislative experience and his interest lies in the area of analysis at a macro level. He brings excellent policy analysis experience but may not find working on the day-to-day issues professionally satisfying.

- **Horace Jennings**
  - Mr. Jennings has excellent legislative, advocacy and communications background. His experience for the last fourteen years deals with the type of work that is expected of the three positions in GOVR. He brings skill sets that could meet either the advocacy or communications functions. Has good personality with significant experience in federal lobbying.

- **Sara Wilson**
  - Ms. Wilson's response to questions indicated a strong preference to working on an advocacy strategy involving the CEO so that WMATA's funding needs get proper exposure with external and influential stakeholders. It was somewhat unclear as to the professional change she was seeking compared to her current role. She does have good experience in working with internal agencies and preparing comprehensive presentations in support of GOVR's outreach efforts.

It is suggested that you consider interviewing these six recommended candidates towards selecting two of them for the Strategic Policy and Communications Specialist positions.

For the one position of Strategic Advocacy Specialist, the following applicants are recommended:

- **Horace Jennings**: already noted above

- **Steve Strauss**
  - Mr. Strauss brings a solid financial and project-related communications experience. He has extensive background in working with a large transit agency (New York MTA) and is a good candidate for internal analytical and coordination work. He has limited experience with legislative issues.

- **Evelyn Frazier**
  - Ms. Frazier brings substantial legislative and communications experience. Her eleven years of experience involved directly working on federal legislative issues for the Chicago Mayor's office or being the lead communications person for a Congressman. She has excellent writing and presentation skills.

15

- **Craig Kwiecinski** and **Tom Santaniello**
  - o    These two individuals bring good and extensive communications background.  It is suggested that you consider them, if needed, after interviewing the other recommended candidates.

## Interview Score Sheet

| Name | Score* (CS) | Score* (MG) | Score* (SP) | Avg Score* | Comments |
|---|---|---|---|---|---|
| Jeanine Black | 88 | 80 | [illegible] | 81 | Strong external/government relations experiences in transportation issues, could back up Debbie well on congressional agency issues. Good knowledge of federal legislative process [partially illegible] |
| Barbara Moldauer | 73 | 55 | 50 | 59 | Lacked focus but pleasant personality |
| Yvonne Knight | 74 | 60 | 65 | 66 | Experience with community/gov relations in DC, but limited transporation/federal exposure, question interest in Metro |
| Thomas Hall | 70 | 50 | 55 | 58 | Just wants to write, did not come off as someone who would devote time to internal coordination issues |
| Gregory Potts | 87 | 85 | 85 | 86 | Strong analytical skills, potential for excellent internal coordination abilities, young and enthusiastic, review of work he currently does for Maryland legislature makes him very suitable for one of the positions. Brings excellent analytical capability |
| Craig Kwiecinski | 88 | 80 | 70 | 79 | Good on big picture issues, very articulate, focus would be on external relationship/promotion, worked on a major tax reform campaign in Pittsburgh. |
| Steve Strauss | 70 | 85 | 75 | 77 | Sophisticated understanding of transit project management issues, strong on community relations, would help with internal coordination, limited federal congressional/agency experience. |
| April Chan | 70 | 70 | 70 | 70 | Solid general background in transit grant/capital mgmt issues, limited dealings with external players/constituent interaction, understands internal coordination challenges |
| Tomika Hughey | 87 | 80 | 70 | 79 | Split community relations capabilities, strong community, internal coordination challenges, a bit micro in her current focus, enough experience at handling multiple issues at a broader level [partially illegible] interest in communications and outreach, not internal [partially illegible] policy work |
| Robert Puentes | 80 | 80 | 80 | [illegible] | Strong presentation of policy background, which would be helpful for training on the issues, but question whether he has sound policy [partially illegible] patience to deal in time with our challenges [partially illegible] |
| Evelyn Frazier | 75 | 75 | 80 | 77 | Good on external relationship building at community level, plus has congressional experience, articulate and enthusiastic, writing skills, internal coordination less of a focus |

17

| Name | | | | 0 | Comments |
|---|---|---|---|---|---|
| Claire Heffernan | | | | | |
| Bob Adams | 80 | 60 | 55 | 65 | Lacked depth on policy issues, understanding of the region, high energy level, all prior experience with ideological causes |
| Thomas Santaniello | 85 | 78 | 75 | 79 | Probably would not want to focus on internal coordination issues, but has good local exposure and appears sound on external policy/congressional advocacy, Whitestone likes him |
| Horace Jennings | 85 | 78 | 80 | 85 | Articulates wide range of policy experience (including transit) ... pleasant personality, significant congressional exposure. |
| Sara Wilson | 90 | 88 | 89 | 80 | A real with Sara, suggestions on the need to raise Dick's external profile and the work that would involve, question is what other tasks Sara wants to do if Dick does not buy-in. |

*/Base of 100

18

Q. Did you have or do you have a friendship, social relationship, or previous acquaintence with any of the selectees (Gregory Potts, Jeanine Black, or Craig J. Kwiecinski)? This would include any sort of friendship, social relationship, work-developed friendship with their spouses, significant others, relatives, employers, supervisors, coworkers or any one who was a stakeholder, part of coalition, or working group involving the selectees?

Response: No

Q. Did you review the applications of the candidates before the second interview conducted by you and Ray Feldmann?

Response: Yes, assuming you mean only those candidates whose names were forwarded by the Panel

Q. What questions did you ask the Complainant?
Q. What questions did you ask Mr. Kwiecinski?

Response: Ray Feldmann and I jointly had a discussion with all the candidates primarily to determine their strengths and weakness, prior experience, and areas of interest

Q. If you were tasked with filling the positions quickly why was the Complainant interviewed November 9th and you waited to interview the Selectee until November 21st? Explain this in light of your previous statement that when you found someone qualified you quickly filled the position since Richard White wanted them filled ASAP?

Response: As I explained to Devin Walker, Ray Feldmann and I scheduled interviews as candidates were forwarded to us as recommended by the screening panel, according to when we were both available. We filled the two Strategic Planning and Communications Positions once we found applicants that we thought were the most well qualified. We continued interviewing for the Strategic Advocacy Position until we found the best candidate.

Q. Why wasn't the Complainant who works on the premises at WMATA and available to be interviewed, not interviewed before you filled the Strategic Planning and Communications positions? Did you have the panel's recommendations before filling the Strategic Planning and Communications positions? If you did not what did you have to determine that Mr. Potts and Ms. Black were the best selections?

Response: After interviewing Mr. Potts and Ms. Black, Mr. Feldmann and I decided that we had found excellent individuals to fill the Strategic Planning and Communications positions. The screening panel had communicated to me that Ms. Hughey's interests and experience were primarily in communications and

EXHIBIT

H

12

270

CONFIDENTIAL

outreach, not internal policy and analytical work, which is the focus of the Strategic Planning and Communications positions.

Q. What questions did you ask Mr. Potts?
Q. What questions did you ask Ms. Black?

Response: Ray Feldmann and I jointly had a discussion with all the candidates primarily to determine their strengths and weakness, prior experience, and areas of interest.

Q. What questions did you ask the unsuccessful candidates for the position?

Response: Ray Feldmann and I jointly had a discussion with all the candidates primarily to determine their strengths and weakness, and prior experience. This was the focus of our questions with all the candidates.

Q. Did you review the applications of the candidates you considered for the position of Strategic Planning and Communications before interviewing them?

Response: Yes, the ones that were forwarded to me by the Panel.

Q. When did you receive the panel's recommendations on the candidates and what part did the recommendations play in making your selections for the positions at issue?

Response: I had meetings with Mr. Pant, the Chair of the screening panel, throughout the process as the panel made recommendations on whom to interview. The panel's recommendations were taken into consideration in the process.

CONFIDENTIAL

**From:** Cassandra Barr
**To:** Reed, Sandy
**Date:** 11/9/2005 7:06:58 PM
**Subject:** GOVR New Hires - Fwd: PCN #'s - URGENT

\*\* Proprietary \*\*

Sandy,

The CEO would really like to have these positions filled before we lose the candidates.

Please see Debbie's e-mail below, sent to Bill Scott, Adrian Hendricks and Jim McKinney regarding the job description and the PCN's. We have three positions in the system, but they are all labeled "GOVR Rel Officer."

Debbie would like for you to give her a call by 10:00a.m. tomorrow (11/10/05) to discuss how to get this process moving forward. For it is imperative to start salary negotiations with candidate Gregory Potts on tomorrow. I spoke with Maria Sanchez in your office and she said this could be done along with background checks before the PAR is received.

I have left in Debbie's office (since HMRS was locked) Debbie's selection memo for the selection of two GOVR hires, Shiva's panel recommendation memo, references for Jeanine Black and Gregory Potts the most qualified applicants, applicant evaluation form and applicant flow chart.

I tried going into the system to complete the PARs, but I am locked out (I will be out of the office, returning on Monday). Loyal Snyder in ITSV said there were only two people that could unlock the system and give me access, but they were not here.

As always, any any all assistance you can provide in expediting this process would be much appreciated.

Thanks,


Cassandra E. Barr
WMATA
Office of Intergovernmental Relations
600 5th Street,NW
Washington, DC 20001

(202) 962-1456 (Office)
(202) 962-2466 (Fax)
cbarr@wmata.com



>>> Deborah S. Lipman 11/09/05 1:47 PM >>>

The Office of Policy and Intergovernmental Relations(GOVR) within the Department of Public Affairs and Strategic Programs (PASP) currently has three vacant positions under cost center 75100 with a job code of 1205 and a job description of GOVR Rel Officer in FirePlug.

We need to have these positions changed to reflect the following job codes along with their PCNs of 000874, 011067 and 016060:

#11

636

Thanks,


Cassandra E. Barr
WMATA
Office of Intergovernmental Relations
600 5th Street,NW
Washington, DC 20001

(202) 962-1456 (Office)
(202) 962-2466 (Fax)
cbarr@wmata.com


>>> Deborah S. Lipman 11/09/05 1:47 PM >>>

The Office of Policy and Intergovernmental Relations(GOVR) within the Department of Public Affairs and Strategic Programs (PASP) currently has three vacant positions under cost center 75100 with a job code of 1205 and a job description of GOVR Rel Officer in FirePlug.

We need to have these positions changed to reflect the following job codes along with their PCNs of 000874, 011067 and 016060:

Strategic Policy and Communications SpecialistBO-14Job Code No. 1207
PASP/GOVR(2 Positions)

Strategic Advocacy Specialist BO-14Job Code No. 0204
PASP/GOVR

**I am requesting that this be done ASAP so we can complete the hiring process for two very well qualified candidates. We are in grave jeopardy of losing the selected candidates, so it is imperative that we move this on a fast track.**

**Deborah S. Lipman**
**Director**
**Office of Policy and Intergovernmental Relations**
**Washington Metropolitan Area Transit Authority**
**600 5th Street, N.W.**
**Washington, D. C. 20001**
**dlipman@wmata.com**
**202/962-1003 (Office)**
**202/962-2466 (Fax)**

637

| | |
|---|---|
| **From:** | Tracye L. King |
| **To:** | Reed, Sandy |
| **Date:** | 11/10/2005 8:13:30 AM |
| **Subject:** | Re: GOVR New Hires - Fwd: PCN #'s - URGENT |

** Proprietary **

Sandy,
Please proceed with the exception that I do not want you to ask for verification of salary until COBN has moved the position.

Tracye L. King, SPHR
Manager, Employment Services Branch
Human Resource Management and Planning
tlking@wmata.com
─────────────────────────────────
Jackson Graham Building  7F13
     Phone: 202-962-2314 - JGB
     Fax:     202-962-1180 - JGB
Carmen Turner Facility     C100
     Phone: 301-618-7580 - CTF
     Fax:    301-618-1298 - CTF


>>> Sandy Reed 11/10/05 7:59 AM >>>
Tracye,

May I have the okay to talk to the applicants without a Par? Tks.

Sandy

>>> Cassandra Barr 11/09/05 7:06 PM >>>
Sandy,

The CEO would really like to have these positions filled before we lose the candidates.

Please see Debbie's e-mail below, sent to Bill Scott, Adrian Hendricks and Jim McKinney regarding the job description and the PCN's. We have three positions in the system, but they are all labeled "GOVR Rel Officer."

Debbie would like for you to give her a call by 10:00a.m. tomorrow (11/10/05) to discuss how to get this process moving forward. For it is imperative to start salary negotiations with candidate Gregory Potts on tomorrow. I spoke with Maria Sanchez in your office and she said this could be done along with background checks before the PAR is received.

I have left in Debbie's office (since HMRS was locked) Debbie's selection memo for the selection of two GOVR hires, Shiva's panel recommendation memo, references for Jeanine Black and Gregory Potts the most qualified applicants, applicant evaluation form and applicant flow chart.

I tried going into the system to complete the PARs, but I am locked out (I will be out of the office, returning on Monday). Loyal Snyder in ITSV said there were only two people that could unlock the system and give me access, but they were not here.

As always, any any all assistance you can provide in expediting this process would be much appreciated.

**CONFIDENTIAL**

| | |
|---|---|
| **From:** | "Lessley, Lucinda" <Lucinda.Lessley@mail.house.gov> |
| **To:** | "Deborah S. Lipman" <dlipman@wmata.com> |
| **Date:** | 11/9/2005 9:03:18 AM |
| **Subject:** | RE: Greg Potts |

Hi Deborah:

I am very pleased to be asked to provide thoughts on Greg Potts.

Greg and I worked together for two years (ending in January of 2005) at the Maryland General Assembly's Department of Legislative Services. During the 2004 legislative session, I served as lead transportation analyst and he was my colleague in the transportation unit, serving as transportation analyst. Over the course of that session, Greg was responsible for analyzing a number of budgets in the transportation arena, including the State Highway Administration, the Maryland Transportation Authority, and the Maryland Aviation Administration. Since my departure from DLS, Greg has also taken on responsibility for modeling the state's transportation trust fund and for analyzing state transit budgets as well as the Maryland Port Administration. I have continued to have professional contact with him since beginning my employment with Congressman Elijah E. Cummings, particularly as our office, the Department of Legislative Services, and the Maryland Department of Transportation have worked to understand all that the policy changes made in the SAFETEA-Lu bill mean for the state of Maryland.

Greg is an excellent analyst who has demonstrated his ability to work quickly and accurately in the fast-paced environment of the legislative session. His responsibilities have required him to develop complex written analyses of large budgets and then to present these analyses before legislative committees and subcommittees. He was particularly effective at 'boiling down' extensive written materials into a few key points and conveying these points to legislators during hearings that often involve consideration of multiple subjects.

In addition to his professional skills, Greg is a great colleague. He understands that in a policy environment, one must check and double-check information provided in response to legislative inquiries to be sure it is accurate. I also want to say that Greg is an extremely earnest and reliable person who brings a great sense of humor to any situation; he has a very positive and motivated attitude; and he is very willing to go the extra mile to help colleagues.

Greg has been involved in transportation throughout his entire professional career and I strongly recommend him for a position with WMATA. I am convinced that particularly at this time in WMATA's development, Greg's knowledge both of federal transportation policy and of the unique transportation funding structure of the state of Maryland will enable him to help advance WMATA's agenda.

Please do not hesitate to contact me if I can provide any additional information.

Lucinda Lessley
Office of Congressman Elijah E. Cummings
202-225-4741

**CONFIDENTIAL**

169

| From: | "Hampton, Matthew E." <Matthew.E.Hampton@oig.dot.gov> |
|---|---|
| To: | "'Deborah S. Lipman'" <dlipman@wmata.com> |
| Date: | 11/9/2005 8:37:00 AM |
| Subject: | RE: Greg Potts reference |

I can't recall how long he was with us but he did a an excellent job.  Super kid...Very good oral and written communication skills.  I wish we could have kept him.  I strongly recommend him for a position in your organization.

-----Original Message-----
From: Deborah S. Lipman [mailto:dlipman@wmata.com]
Sent: Tuesday, November 08, 2005 4:34 PM
To: Hampton, Matthew E.
Subject: Greg Potts reference


** Proprietary **

Matthew,

As I mentioned in my phone message, Greg Potts has given your name as a reference.  He is applying for a policy analyst position at WMATA.  I would greatly appreciate you sending me an email with your thoughts on Greg.  I am available at 202/ 962-1003 if you would like to discuss the position or if you have any questions.  Thanks so much for your help on this.

Debbie Lipman

Deborah S. Lipman
Director
Office of Policy and Intergovernmental Relations
Washington Metropolitan Area Transit Authority
600 5th Street, N.W.
Washington, D. C.  20001
dlipman@wmata.com
202/962-1003 (Office)
202/962-2466 (Fax)

CONFIDENTIAL

**From:** <jeff.boothe@hklaw.com>
**To:** <dlipman@wmata.com>
**Date:** 11/8/2005 4:57:57 PM
**Subject:** RE: Jeanine Black reference

Debbie:

I know Jeanine through her being the lobbyist for Bombardier for many years. She was always well informed and contributed regularly to the Working Group. She is very knowledgeable about transit and was a pleasant person to work with. I think very highly of her and would highly recommend her as a person that WMATA should hire. I think she would be a very solid addition to the team at WMATA.

Jeff


Holland + Knight

Jeffrey F. Boothe
Partner
Holland & Knight LLP

2099 Pennsylvania Avenue, Suite 100
Washington, DC 20006
Direct 202-828-1896
Fax 202-955-5564
Email jeffrey.boothe@hklaw.com

www.hklaw.com

NOTICE: This e-mail is from a law firm, Holland & Knight LLP ("H&K"), and is intended solely for the use of the individual(s) to whom it is addressed. If you believe you received this e-mail in error, please notify the sender immediately, delete the e-mail from your computer and do not copy or disclose it to anyone else. If you are not an existing client of H&K, do not construe anything in this e-mail to make you a client unless it contains a specific statement to that effect and do not disclose anything to H&K in reply that you expect it to hold in confidence. If you properly received this e-mail as a client, co-counsel or retained expert of H&K, you should maintain its contents in confidence in order to preserve the attorney-client or work product privilege that may be available to protect confidentiality.


-----Original Message-----
From: Deborah S. Lipman [mailto:dlipman@wmata.com]
Sent: Tuesday, November 08, 2005 4:13 PM
To: jeff.boothe@hklaw.com
Subject: Jeanine Black reference

** Proprietary **

We are in the final stages of selecting people for the new policy positions in my office. Jeanine Black is definitely a finalist and I am doing reference checks - she listed you as reference. Can you shoot me

CONFIDENTIAL

166

a brief email that will serve as a reference for her that I can send up
to our HR department?  Thanks

Deborah S. Lipman
Director
Office of Policy and Intergovernmental Relations
Washington Metropolitan Area Transit Authority
600 5th Street, N.W.
Washington, D. C.  20001
dlipman@wmata.com
202/962-1003 (Office)
202/962-2466 (Fax)

CONFIDENTIAL

CONFIDENTIAL

| | |
|---|---|
| **From:** | "Daniel Duff" <DDuff@apta.com> |
| **To:** | "Deborah S. Lipman" <dlipman@wmata.com> |
| **Date:** | 11/8/2005 5:04:27 PM |
| **Subject:** | RE: Jeanine Black reference |

I have known Jeanine from her days with Bombardier and was always impressed by her interpersonal skills and calm demeanor. From what I've seen and heard she is an excellent writer, able to synthesize material well. She should have an excellent grounding in rail issues from her Bombardier days. Unfortunately, our respective positions were such that we did not have much of an opportunity to discuss substantive transportation policy issues, so I simply can't comment in that regard. Again, I have known and liked Jeanine for many years and admire her professional manner.   Best, Dan Duff

-----Original Message-----
From: Deborah S. Lipman [mailto:dlipman@wmata.com]
Sent: Tuesday, November 08, 2005 4:18 PM
To: Daniel Duff
Subject: Jeanine Black reference

** Proprietary **

Dan,

As I indicated in my phone message, Jeanine Black is on our short list of candidates for a policy position in my office.  She listed you as a reference and I'd like you to provide me with some thoughts.  I am available if you have any questions (202/962-1003)  Thanks so much.

Debbie

Deborah S. Lipman
Director
Office of Policy and Intergovernmental Relations
Washington Metropolitan Area Transit Authority
600 5th Street, N.W.
Washington, D. C.  20001
dlipman@wmata.com
202/962-1003 (Office)
202/962-2466 (Fax)

CONFIDENTIAL

# M E M O R A N D U M



SUBJECT: Subject: Selection of Two GOVR Hires    DATE: November 9, 2005

FROM: GOVR - Debbie Lipman

TO: HMRS - Sandy Reed

The Interview Panel, headed by Shiva Pant, GOVR, recommended six candidates for Ray Feldmann and me to interview for the two Strategic Policy and Communications Specialist positions (see the attached memorandum from Mr. Pant). Ray and I jointly interviewed all recommended candidates.

Of the candidates interviewed, we selected Gregory Potts and Jeanine Black and want to move forward expeditiously to hire these two individuals for the positions of Strategic Policy and Communications Specialist. Both these candidates have excellent policy and communications skills, but bring different strengths to the positions.

Greg is currently a transportation analyst for the Maryland General Assembly's Department of Legislative Services. In that capacity he analyzes the Maryland transportation budget, and prepares materials for state legislators. He has acquired an excellent working knowledge of Maryland transportation funding, including the state's Transportation Trust Fund. Greg's references are excellent citing his thoroughness, dedication to transportation policy and ability to work with others.

Jeanine has worked for a number of years for Bombardier, before recently being laid off. She is extremely knowledgeable about rail and transit issues and the workings of Congress and the federal government. She has excellent contacts with congressional staff and works very hard to maintain good working relationships with her contacts. We view Jeanine as a "Jill of all trades". She is extremely versatile and willing to take on new challenges ranging from administrative matters, liaison with congressional, federal, state and local policymakers to preparing the CEO for a congressional or other hearing. Jeanine's references were very positive. In addition, I have worked with Jeanine professionally for several years and have consistently been favorably impressed.

We greatly appreciate your support for GOVR throughout this process and look forward to bringing these individuals on as expeditiously as possible.

Attachment

**Washington Metropolitan Area Transit Authority**

CONFIDENTIAL



136

CONFIDENTIAL

APPLICANT FLOW REPORT

SECTION 1

Position Title: Strategic Policy and Communications Specialist  Grade: BO-14  ☑ Non-union   ☐ Union :   Local _____

Dept./Off. PASP / GOVR   Hiring Manager: Deborah S. Lipman   Title: Director

Interview Panel: ☑ Yes   ☐ No   HRMS Representative: _____

Panel Members:  Shiva K. Pant _____
Candace Smith _____
Matthew Greenwald _____

SECTION 2   (FOR HRMS USE ONLY)

Job Posting No.: _____   Internal Posting:   ☐ No   ☐ Yes   Posting Dates: ____ to ____

External Recruitment:   ☐ No   ☐ Yes                    Advertised: ☐ No ☐ Yes

Affirmative Action Outreach:   ☐ No   ☐ Yes

Total Applicants: ____   Internal: ____   External: ____   Referred: ____   Interviewed: ____

SECTION 3                    CANDIDATES INTERVIEWED

| Applicant's Name | Gender M/F | *EEO Code | Source Internal/External | Disposition and Reason for Selection or Non-Selection |
|---|---|---|---|---|
| Jeanine I. Black | F | W | External | Most qualified |
| Gregory W. Potts | M | W | External | Most qualified |
| Robert S. Puentes | M | W | External | Too macro oriented |
| Tomika Hughey | F | B | Internal | May be considered for Advocacy Position |
| Horace Jennings | M | B | External | " " " " " |
| Steve Strauss | M | W | External | " " " " " " |
| Evelyn Frazier | F | B | External | " " " " " " |
| Sara P. Wilson | F | W | Internal | " " " " " " |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |

*EEO Code-White/Black/Asian/Hispanic/Native American        (Use additional Applicant Flow Reports if necessary)

Prepared By: _Deborah S. Lipman_        11/9/05
(print name)

CONFIDENTIAL

174

CONFIDENTIAL

# M E M O R A N D U M



SUBJECT: Selection of Strategic Advocacy          DATE: November 28, 2005
         Specialist

FROM: GOVR - Debbie Lipman

TO: HMRS - Sandy Reed

The Interview Panel, headed by Shiva Pant, GOVR, recommended five candidates for Ray Feldmann and me to interview for the position of Strategic Advocacy Specialist (see the attached memorandum from Mr. Pant). Ray and I jointly interviewed all recommended candidates.

Of the candidates interviewed, we selected Craig J. Kwiecinski and want to move forward to hire him for the position. He has excellent policy, communications and media skills. His references (attached) were extremely positive.

Craig has been employed since 1997 in the Office of the Mayor of the City of Pittsburgh as a Senior Policy Advisor. He has substantial experience including drafting written communications, including speeches, acting as a media spokesperson and directing Pittsburgh's legislative agenda. His experience in building support for a major tax reform package is terrific background for the coalition and advocacy work Craig will be doing for WMATA. He is very articulate and demonstrates an exceptionally positive attitude towards taking on new responsibilities and being a team player.

There are two candidates for the GOVR positions, Horace Jennings and Sara Wilson, who were scored higher by the panel than the candidates we selected. These candidates were not selected, despite their high scores from the initial round of interviews. Horace has a pleasant personality, but does not seem to have a firm grasp of either the policy issues involved or how to go about building a coalition in support of WMATA. While he has a wide range of policy experience, both of the selected candidates have more substantive knowledge of transportation policy matters.

**Washington
Metropolitan Area
Transit Authority**

We did not select Sara Wilson because of her narrow view of the potential position. When given an option of several responsibilities that could become part of her new position, if selected, Sara chose to very narrowly define what she would be interested in taking on. While we have great confidence that Sara can successfully tackle any project she is assigned, we did not perceive a great willingness on her part to assume many of the suggested projects. Given the range of projects GOVR is facing and the need for people to demonstrate versatility, we were disappointed in her unwillingness to pitch in as needed. Ray and I agreed that Sara's talents and abilities are not a good fit for any of the new positions for which she interviewed.

Many thanks for your excellent support throughout GOVR's hiring process. It was a pleasure to work with you.

Attachment

EXHIBIT
K

CONFIDENTIAL                                                    134

CONFIDENTIAL

APPLICANT FLOW REPORT

## SECTION 1

Position Title: _Strategic Advocacy Specialist_ Grade: _BO-14_ ☑ Non-union   ☐ Union :   Local_____

Dept/Off. _PASP / GOVR_   Hiring Manager: _Deborah S. Lipman_   Title: _Director_

Interview Panel: ☑ Yes   ☐ No   HRMS Representative: _Cassandra Reed_

Panel Members: _Shiva K. Pant_   _____

_Candace Smith_   _____

_Matthew Greenwald_   _____

## SECTION 2   (FOR HRMS USE ONLY)

Job Posting No.: _____   Internal Posting:   ☐ No   ☐ Yes   Posting Dates: ____ to ____

External Recruitment:   ☐ No   ☐ Yes         Advertised:   ☐ No   ☐ Yes

Affirmative Action Outreach:   ☐ No   ☐ Yes

Total Applicants: ____   Internal: ____   External: ____   Referred: ____   Interviewed: ____

## SECTION 3

CANDIDATES INTERVIEWED

| Applicant's Name | Gender M/F | *EEO Code | Source Internal/External | Disposition and Reason for Selection or Non-Selection |
|---|---|---|---|---|
| Craig J. Kwiecinski | M | W | External | Most Qualified |
| Bob Adams | M | W | External | Not qualified |
| April Chan | F | A | External | Not qualified |
| Thomas C. Hall | M | W | External | Not qualified - too oriented towards writing |
| Yvonne P. Knight | F | B | External | Not qualified |
| Barbara Moldauer | F | W | External | Not qualified |
| Thomas Santaniello | M | W | External | Generally qualified but too federal oriented |
| Sara Wilson | F | W | Internal | Qualified but not willing to take on all aspects of the position |
| Horace Jennings | M | B | External | qualified but not enough experience in lead level |
| Evelyn Frazier | F | B | External | Not qualified - lacks focus |
| Steve Strauss | M | W | External | Qualified but not very personable |
| Tomika Hughey | F | B | Internal | qualified but limited experience in coalition building |

*EEO Code-White/Black/Asian/Hispanic/Native American   (Use additional Applicant Flow Reports if necessary)

Prepared By: _Deborah Lipman_   _Director_
           (print name)              (title)

CONFIDENTIAL

176

Washington Metropolitan Area T    sit    hority

Formal Complaint No. _____ 4 7/-06

Office of Civil Rights
Formal Discrimination Complaint

I. Employee Filing Complaint

| | Last | First | Middle | |
|---|---|---|---|---|
| Name | Hughey | Tomika | | Employee ID Number 005681 |

Position        Assistant Planning Project Manager

Office          Business Planning and Project Developme     Department    Planning and Information Tech (PAIT)

Work Telephone #  962-2429          Home Telephone #   202-289-8846      Other Telephone #

Home Address    P.O. Box 1618 Washington, D.C. 20013

II. Information about the person against whom the complaint is made

Employee ID Number

| | Last | First | Middle | | |
|---|---|---|---|---|---|
| Name | Lipman | Deborah | | Position | Director of Government Relations |

Office          Government Relations                Department     GOVR

Work Telephone #              Supervisor                  Supervisor Work Tele. #

III. Description of Complaint

Complaint Description

Employee feels that based on interview questions during the second interview, Ms. Lipman's line of questions made me feel as though constiuents may perceive me differently because of my racial background than that of a white counterpart.  Particularly, she stated "I am trying to understand how would I send you to Virginia where good old boys are - how would you represent the Authority."  The interview was November 2005 for the position of Community Advocate.

I would like Ms. Lipton's record of employment to note her proclivity to engage in practices of discrimination based on an applicant's ethnic or racial background and her assumptions of their demographic background.

Date of most recent event contributing to complaint

Basis of Discrimination:

| | | | |
|---|---|---|---|
| ☐ Color | ☐ National Origin | ☐ Sex | ☐ Sexual Harassment |
| ☑ Race | ☐ Age | ☐ Religion | ☐ Retaliation |
| | | ☐ Disability | ☐ Other (Please Specify) |

**Please read carefully before signing:**

I affirm that I have read the information above and that it is true to the best of my knowledge, information and belief.  I am aware that pursuant to WMATA policy, I have an obligation to cooperate in the handling of this matter and that I may be disciplined for providing false and/or misleading information.

Signature of Complainant _____     Date: _2/22/06_

Print or Type Name of Complainant  _Tomika R. Hughey_

**Administrative Use Only**

Assigned EEO Officer _D. Walker_     Date _2/24/06_

EXHIBIT
L
ALL-STATE LEGAL®

000171

November 20, 2006

EEOC
WASHINGTON FIELD OFFICE

2006 NOV 27 P 5: 28

20507

**RETURN RECEIPT REQUESTED**



Ms. Tracy Smalls
Equal Employment Opportunity Commission
Washington Field Office - 570
Suite 100
1801 L Street, N.W.
Washington, D.C. 20507

RE: Tomika Hughey vs. WMATA
    EEOC Charge No. 570-2006-01517

Dear Ms. Smalls:

The following is the position of the Washington Metropolitan Area Transit Authority (WMATA) in the above-referenced charge.

The Charging Party is currently employed as a Transit Economist Analyst and has been employed with WMATA since November 3, 2003.

On February 22, 2006, the Charging Party filed an internal EEO complaint alleging that she was discriminated against based on her race when she was denied consideration for the Strategic, Policy and Communications Specialist position vacancy and not selected for the Strategic Advocacy Specialist position vacancy. Both positions were in the Office of Governmental Relations.

WMATA's Office of Civil Rights investigated this complaint and found sufficient evidence to support a probable cause finding of discrimination in the failure to consider the Charging Party for the Strategic, Policy and Communications Specialist position and failure to select her for the Strategic Advocacy Specialist position. However, the Charging Party did not contend at the time of her internal complaint that the selected candidates, who are both White, had less qualifying education and experience. WMATA denies this assertion.

However, in light of WMATA's probable cause finding, a remedy was proffered to resolve the internal complaint. Since the Charging Party indicated that she did not want to report to the responsible management official in this matter, an alternate, but comparable position was offered. A copy of the proposed resolution is enclosed as Attachment 1. To date, WMATA has not received the Charging Party's response to this offer.

It is WMATA's policy to provide a work environment free from unlawful discrimination in any form. Thus, every effort was made to make the Charging Party whole in this instance.

If you have any questions or need any additional information regarding this information, please do not hesitate to contact me at (202) 962-1082.

Sincerely,

Teresa R. Bailey
Director
Office of Civil Rights

Washington
Metropolitan Area
Transit Authority

600 Fifth Street, NW
Washington, DC 20001
202/962-1234

By Metrorail:
Judiciary Square—Red Line
Gallery Place-Chinatown—
Red, Green and
Yellow Lines
By Metrobus:
Routes D1, D3, D6. P6,
70, 71, 80, X2

A District of Columbia,
Maryland and Virginia
Transit Partnership

EXHIBIT
M
ALL-STATE LEGAL®

000194

## Washington Metropolitan Area Transit Authority
### PROCEDURES

| Procedure No. 1.3 | Title: Discrimination Complaints | Page 1 of 3 |

**Refer to Policy No. 1.3 within Section 1.0 GENERAL Policies.**

### I. INFORMAL DISCRIMINATION COMPLAINT PROCEDURE ALTERNATIVE DISPUTE RESOLUTION (ADR) PROGRAM

An employee is not required to participate in the informal review procedure and may proceed immediately to the formal complaint procedure.

| RESPONSIBILITY | ACTION | TIME LIMIT |
|---|---|---|
| Employee | 1. When it is believed that a discriminatory Act has occurred, contacts the Office of Civil Rights (CIVR). | Within 30 calendar days of alleged discriminatory act(s). |
| CIVR Staff | 2. Meets with and counsels employee regarding alleged act(s) of discrimination. | Within 5 calendar days of notification of complaint. |
| | 3. Attempts to resolve the complaint through Alternative Dispute Resolution (ADR) efforts (Empowerment, Intervention, Mediation and Special Intervention), if deemed appropriate. | Within 45 calendar days of meeting with employee. |
| | 4. If complaint is not resolved, the Complainant is notified and advised of his or her right to file a formal complaint with CIVR. | Within 5 calendar days of unsuccessful ADR efforts. |
| | 5. Documents action(s) taken to reach an informal resolution. | |

### II. FORMAL DISCRIMINATION COMPLAINT PROCEDURE

| RESPONSIBILITY | ACTION | TIME LIMIT |
|---|---|---|
| Employee | 1. Meets with and discusses complaint with CIVR staff, and provides the following information to the extent possible: | Encouraged to file within 30 calendar days of alleged discriminatory act(s). However, complaints must be filed no later than 180 days from the date of an alleged act of discrimination. |
| | a. Identification of EEO basis for the Complaint, e.g., race, sex, religion, age, disability, etc. (see policy 1.3 for categories). | |

| Revision: 3 | Approved by: General Manager /Chief Executive Officer | Date: December 23, 2005 |



EXHIBIT

N

000147

Washington Metropolitan Area Transit Authority
**PROCEDURES**

| Procedure No. 1.3 | Title: Discrimination Complaints | Page 2 of 3 |

Refer to Policy No. 1.3 within section 1.0 GENERAL Policies

| RESPONSIBILITY | ACTION | TIME LIMIT |
|---|---|---|
| | b. Name(s) and title(s) of the individuals who allegedly engaged in a discriminatory or sexually harassing act or behavior. | |
| | c. A detailed description of the alleged discriminatory or sexually harassing act(s) or behavior including all pertinent facts and circumstances. | |
| CIVR Staff | 2. Determines whether the allegations warrant investigation for violation of Title VII of the Civil Rights Act of 1964, as amended, WMATA policy, and/or other applicable laws. Provides written complaint to complainant to ensure accuracy and obtain signature. | Immediately. |
| CIVR Director | 3. Notifies Office Director or equivalent manager of the affected office. | Within 7 calendar days of the receipt of complaint. |
| CIVR Staff | 4. Commences investigation. Interviews alleged discriminating individuals and all pertinent witnesses. Gathers relevant documentation. Analyzes all information. | |
| | 5. Completes investigation report containing findings and resolution. Forwards to CIVR Director or designee. | Within 90 calendar days of receipt of complaint. Must notify the complainant and document to the file if investigative report is not completed within 90-day period. Complainant must be advised of the investigation status. |
| | All employees, supervisor/managers must fully and timely cooperate with the conduct of the investigation. Failure to do so will result in serious disciplinary action, up to and including termination. | |

| Revision: 3 | Approved by: General Manager /Chief Executive Officer | Date: December 23, 2005 |

000140

Washington Metropolitan Area Transit Authority
PROCEDURES

| Procedure No. 1.3 | Title: Discrimination Complaints | Page 3 of 3 |

Refer to Policy No. 1.3 within Section 1.0 GENERAL Policies

| RESPONSIBILITY | ACTION | TIME LIMIT |
|---|---|---|
| CIVR Director or designee | 6. Reviews investigative report. If a finding of probable cause is rendered, meets with Office Director or equivalent manager to discuss findings, identifies action that must be taken to immediately stop probable discriminatory or unacceptable behavior or act(s), and communicates settlement or resolution plan, if appropriate, to resolve complaint. | Within 10 calendar days of receipt of investigative report. |
| Appropriate Officer or Office Director | 7. Must take immediate action to stop probable discriminatory or unacceptable behavior or act(s). Concurs with settlement or resolution plan, if appropriate, designed to provide relief to complainant. | Immediate action required. |
| CIVR Director | 8. Notifies complainant, the alleged discriminating individual and the immediate supervisor or manager of the alleged discriminating individual of the determination and/or the resolution.<br><br>Findings and settlement agreement or resolution plan approved by the CIVR Director is administratively final. | Within 14 calendar days of approval of determination and/or resolution. |
| Complainant or alleged discriminating individual | 9. May submit any new information that was not available at the time of the investigation to CIVR Director. | Within 10 calendar days of the issuance of the final determination rendered by the Director of Civil Rights. |
| CIVR Director | 10. Determines whether information is sufficient to have a bearing on the outcome and warrants further evaluation. If yes, assigns to CIVR Staff. If no, notifies complainant in writing. | Within 10 calendar days. |

| Revision: 3 | Approved by: General Manager /Chief Executive Officer | Date: December 23, 2005 |

000140

## INVESTIGATIVE REPORT

**Complaint Number:** 471-06
**Complainant:** Tomika Hughey
**Date of Complaint:** February 22, 2006

## I. INTRODUCTION AND BACKGROUND

Tomika Hughey (hereinafter "complainant"), Assistant Planning Project Manager, Business Planning and Project Development (BPPD), Planning and Information Technology (PAIT), alleges racial discrimination due to comments allegedly made by Deborah Lipman, Director, Office of Intergovernmental Relations (GOVR), during an interview for a Strategic Advocacy Specialist position in November 2005. Complainant alleges that Ms. Lipman led her to believe that constituents would perceive her differently from a white counterpart when Ms. Lipman stated during the interview, "I am trying to understand how I would send you to Virginia where the good old boys are - how would you represent the Authority?" The Complainant was not selected for the position.

There were actually three different positions being filled at the same time by the same interview panel and hiring manager, Ms. Lipman. There were two vacancies for the Strategic, Policy and Communications Specialist position under posting number 05-0727-SR; and there was one vacancy under the Strategic Advocacy Specialist position under posting number 05-0731-SR. Both positions opened on July 25, 2005 and were opened until filled.

A panel was convened to conduct interviews for all three positions jointly. The panel consisted of three panel members, headed by Shiva Pant, Government Relations Officer, GOVR; Candace Smith, Media Relations Officer, Media Relations, Events and Employee Programs (MREL); and Matthew Greenwald, Homeland Security, GOVR. Interviews were spread out over a six week period, the earliest taking place on September 28, 2005 and the latest taking place on November 2, 2005. According to the selection memorandum submitted by Mr. Pant to the Office of Human Resource Management and Planning, the panel screened through the applications and selected 15 applicants to be interviewed. There were five questions listed in the selection package that the panel indicates that they asked each candidate, with each question having at least two parts to the questions.

The panel rated the applicants based upon the following matrix:

| Name (Race) | Score (CS) | Score (MG) | Score (SP) | Avg Score |
|---|---|---|---|---|
| Gregory Potts (White) *Selectee* | 87 | 85 | 85 | 86 |
| Sara Wilson (White) *Selectee* | 90 | 88 | 80 | 86 |
| Horace Jennings (Black) | 86 | 78 | 80 | 83 |
| Jeanine Black (White) | 88 | 80 | 75 | 81 |



#13

1046

| | | | | |
|---|---|---|---|---|
| Complainant (Black) | 87 | 80 | 70 | 79 |
| Craig Kwiecinski (White) *Selectee* | 88 | 80 | 70 | 79 |
| Thomas Santaniello (N/A) | 85 | 78 | 75 | 79 |
| Robert Puentes (White) | 90 | 75 | 70 | 78 |
| Steve Strauss (N/A) | 70 | 85 | 75 | 77 |
| Evelyn Frazier (N/A) | 75 | 75 | 80 | 77 |
| April Chan (N/A) | 70 | 70 | 70 | 70 |
| Yvonne Knight (N/A) | 74 | 60 | 65 | 66 |
| Bob Adams (N/A) | 80 | 60 | 55 | 65 |
| Barbara Moldauer (N/A) | 73 | 55 | 50 | 59 |
| Thomas Hall (N/A) | 70 | 50 | 55 | 58 |
| Claire Heffernan (N/A) | 0 | 0 | 0 | 0 |

The panel recommended six candidates for the two Strategic, Policy and Communications Specialist positions, with the following write up on each applicant:

1. **Jeanine Black** - Ms. Black brings a very strong government relations and federal legislative experience; her experience is in the field of transportation including working with state policymakers as well. Her responses to all the questions were focused and to the point.

2. **Gregory Potts** - The panel rated Mr. Potts highly in light of his experience working on the Maryland General Assembly's Department of Legislative Services. He has excellent analytical experience in the area of transportation and transit, is used to preparing analysis and presentations dealing with all transportation modes and represents and excellent choice for any of the three positions.

3. **Complainant** - Complainant has limited skills in the area of federal legislative issues but has good background in the area of communications. Her response to the interview questions indicated that her professional interest lies in the area of communications and outreach, not in internal policy and analytical work.

4. **Robert Puentes** - Most of Mr. Puentes' work experience has been with the Brookings Institution. He has limited legislative experience and his interest lies in the area of analysis at a macro level. He brings excellent policy analysis experience but may not find working on the day-today issues professionally satisfying.

5. **Horace Jennings** - Mr. Jennings has excellent legislative, advocacy and communications background. His experience for the last fourteen years deals with the type of work that is expected of the three positions in GOVR. He brings skill sets that could meet either the advocacy or communications functions. Has good personality with significant experience in federal lobbying.

6. **Sara Wilson** - Ms. Wilson's response to questions indicated a strong preference to working on an advocacy strategy involving the CEO so that WMATA's funding

2

1047

needs get proper exposure with external and influential stakeholders. It was somewhat unclear as to the professional change she was seeking compared to her current role. She does have good experience in working with internal agencies and preparing comprehensive presentations in support of GOVR's outreach efforts.

The panel further recommended the following applicants for the one Strategic Advocacy Specialist position:

1. **Horace Jennings** - Already noted above.
2. **Steve Strauss** - Mr. Strauss brings a solid financial and project-related communications experience. He has extensive background in working with a large transit agency (New York MTA) and is a good candidate for internal analytical and coordination work. He has limited experience with legislative issues.
3. **Evelyn Frazier** - Ms. Frazier brings substantial legislative and communications experience. Her eleven years of experience involved directly working on federal legislative issues for the Chicago Mayor's office or bring the lead communications person for the Congressman. She has excellent writing and presentation skills.
4. **Craig Kwiencinski and Tom Santaniello** - These two individuals bring good and extensive communications background. It is suggested that you consider them, if needed, after interviewing the other recommended candidates.

It should be noted that the Complainant was not recommended by the panel for an interview for the one Strategic Advocacy Specialist position, but only for the two Strategic, Policy and Communications Specialist positions. However, the Complainant did not receive a second interview for the two Strategic Policy and Communications Specialist positions, but was only considered by Ms. Lipman for the Strategic Advocacy Specialist position.

Ms. Lippman and her supervisor, Ray Feldman, Acting Assistant General Manager, Department of Public Affairs and Strategic Programs (PASP), conducted second interviews with nine candidates. The interviews were conducted between the period, October 11, 2005 to November 21, 2005. There were no set questions asked to each candidate, nor were the candidates rated. Ms. Lippman ultimately selected Gregory Potts and Jeanine Black for the two Strategic, Policy and Communications Specialist positions; and Craig J. Kwiecinski for the Strategic Advocacy position.

Based upon the fact that this complaint is filed against Ms. Lipman, the findings in this complaint would ordinarily be sent directly to Emeka Moneme, Chief of Staff. However, it should be noted that both the Complainant and Mr. Moneme contacted CIVR at the beginning of the investigation to acknowledge that they are good friends. Consequently, to avoid a conflict of interest, the findings of this complaint will be sent to Daniel Tangherlini, Acting General Manager, with a corresponding copy to Mr. Moneme.

## II. ISSUE

Whether Complainant was subjected to racial discrimination due to comments allegedly made by Deborah Lipman, Director, GOVR, during an interview for a Strategic Advocacy Specialist position in November 2005.

## III. SUMMARY OF EVIDENCE AND ANALYSIS

### Interview with Complainant

The Complainant alleges that she was interviewed by Ms. Lipman and Mr. Feldman on November 9, 2006. She states that this interview represented her second interview. She states that she was informed by Ms. Lipman, prior to the second interview, that the two Strategic and Policy and Communications Specialist positions were filled and that she was only being considered for the Strategic Advocacy position. She states that during the second interview, Ms. Lipman asked her, "I am trying to understand how would I send you to Virginia where the good old boys are - how would you represent the Authority?" She states that she felt that this comment was racially motivated because she is Black and the "good old boys" are white. She also states that she felt that it was inappropriate.

The Complainant states that she was well qualified for the position. She states that in her duties as the Assistant Planning Project Manager for the Anacostia Corridor Demonstration Project and the District of Columbia Alternatives Analysis (DCAA) in BPPD, she is responsible for the management of the community development and outreach efforts in support of these projects. She asserts that this includes drafting, editing and reviewing public participation media and correspondence to District of Columbia agencies, citizens and civic organizations throughout the District. She further states that she develops, plans and coordinates public events, forums, workshops and discussions in an effort to educate the public about the ongoing DCAA Transit Study.

The Complainant states that she met with Ray Feldman on or about February 21, 2006 about the comment made by Ms. Lipman. She states that Mr. Feldman said that he thought that Ms. Lipman's question was inappropriate and was taken aback by her question. She states that he said that it was one of those moments in his career that made him question himself and society. She states that Mr. Feldman told her that her response to the question was very professional and he commended her on her interview skills, stating that he felt that she would be a good match for the position. However, she asserts that he did say that someone else was selected and that he supported the selection. She further states that Mr. Feldman said that had he been a personal friend of hers from outside WMATA and she told him that such a question was posed to him during an interview, he would emphatically encourage her to make a complaint to the appropriate office. She states that after her conversation with Mr. Feldman, she decided to file her formal complaint with CIVR.

4

1049

The Complainant further states that she is required to attend meetings at the Federal Transit Administration, local meetings, regular District Government Agency meetings and in-house WMATA meetings concerning WMATA's role in the overall DCAA project development process. She maintains that she has extensive coalition building experience through her current position. She asserts that under the direction of her office Director and Project Manager, their outreach efforts resulted in an overwhelming community, District of Columbia Government and WMATA Board of Directors approval for the implementation of the Anacostia Light Rail Demonstration Project in the Fall of 2003.

The Complainant states that during the second interview, neither Ms. Lipman nor Mr. Feldman took any notes. Also, she states that Ms. Lipman never explained what skill set was needed for someone with coalition building skills, nor did she mention anything about having legislative coalition building skills. She simply said that they were looking for someone to help build a coalition in light of the negative publicity WMATA was receiving; and someone to bring these different groups together to improve transit. She states that there was never any distinction between legislative and jurisdictional coalition work.

## Interview with Deborah Lipman, Director, GOVR

Ms. Lipman states that her supervisor is Ray Feldman and that he participated with her in the second interviews of all candidates. She states that race was not a factor in the selection process for the three positions. She asserts that all three positions were being filled together, therefore, the interview panel, headed by Shiva Pant, was responsible for recommending candidates for second interviews for all three positions.

Ms. Lipman states that she does not recall making the comment, "I am trying to understand how I would send you to Virginia where the good old boys are - how would you represent the Authority?" She also states that she does not recall having a discussion about this comment with Mr. Feldman. She states that with all of the candidates, they did explore the issue of coalition building because they have many different stake-holders. She states that for the Strategic Advocacy Specialist position, they were looking for someone who has experience in building a coalition with elected officials. She states that the Complainant had no coalition experience and has limited skills in federal legislation. She states that there is a difference between outreach and coalition building in that outreach could involve simply disseminating information about WMATA to stake holders or organizing public meeting. On the other hand, she states, coalition building means bringing different stakeholders together, especially elected officials, and getting them to work together.

Ms. Lipman states that she met with the candidates on the following days:

1.    Gregory Potts - October 11, 2005
2.    Jeanine Black - October 21, 2005

1050

3.    Evelyn R. Frazier - October 21, 2005
4.    Steve Strauss - October 26, 2005
5.    Robert Puentes - November 4, 2005
6.    Sara Wilson - November 4, 2005
7.    Horace Jennings - November 7, 2005
8.    Complainant - November 9, 2005
9.    Craig Kwiecinski - November 21, 2005

Ms. Lipman states that there were no written questions, nor did she take any notes. She maintains that former General Manager Richard White wanted these positions filled quickly and they were trying to fast-track these positions. She states that there were about nine to 10 skill sets she was looking for in all three positions. She states that by the time she met with the Complainant, she had already filled the two Strategic Policy and Communications Specialist positions; therefore, the Complainant was only considered for the one Strategic Advocacy position. She maintains that all three positions were open until filled, which allowed her to fill the positions immediately once they had a qualified candidate and without interviewing all recommended candidates.

Ms. Lipman confirms that at the time that they advertised for the positions, the positions did not have a job code. However, she states that because of the urgency to fill these positions by the GM/COO, they started the process without them. She states that out of the nine applicants interviewed, three were black and six were white. She states that she hired Jeanine Black and Greg Potts for the first two positions. She states that Ms. Black has very extensive federal legislative experience and use to work with Bombardier, before being laid off. She states that Mr. Potts has extensive Maryland State legislative experience, serving for the Maryland General Assembly's Department of Legislative Services. She states that he has gained an excellent knowledge of Maryland transportation funding, including the State's Transportation Trust Fund.

Ms. Lipman states that she selected Mr. Kwiecinski for the Strategic Advocacy Position because of his experience in drafting written communications, including speeches, acting as a media spokesperson and directing Pittsburgh's legislative agenda. She states that his experience in building support for a major tax reform package is terrific background for coalition building and advocacy work for the Authority. She states that there were two candidates for the GOVR positions, Horace Jennings (Black) and Sara Wilson (White), who received a higher score by the panel than the candidates selected, but were not selected. She states that Mr. Jennings, who is Black, has a pleasant personality, but does not seem to have a firm grasp of either the policy issues involved or how to go about building a coalition in support of

6

WMATA. She states that while he has a wide range of policy experience, both of the selected candidates have more substantive knowledge of transportation policy matters.

Ms. Lipman states that she did not select Ms. Sara Wilson, who is White, because of her narrow view of the potential position. She asserts that when given an option of adding several responsibilities that could become part of her new position, if selected, Ms. Wilson chose to very narrowly define what she would be interested in taking on; therefore, she did not perceive a great willingness on her part to assume many of the suggested projects.

Ms. Lipman states that although the Complainant and Mr. Thomas Santaniello received the same score as Mr. Kwiecinski, she acknowledged that the panel made a distinction between the Complainant who received a more favorable write-up by the panel than the other two mentioned applicants. When asked why she did not write a justification for selecting Mr. Kwiecinski over the Complainant, she indicated that she overlooked that detail because they were trying to get this position filled quickly. She states that she did not choose to interview Mr. Santaniello because once they spoke with Mr. Kwiecinski, they knew that he was their candidate; therefore, they ended the second interview process with Mr. Kwiecinski's interview. Also, Mr. Santaniello was not interviewed because he worked for Congressman Wolf and she was not looking for someone with more Congressional experience, but coalition experience.

Ms. Lipman states that she does not know why her selection memorandums (dated November 8, 2005 and November 28, 2005, respectively) are dated prior to the November 29, 2005 recommendation memorandum from the interview panel. She states that she does recall Sandy Reed, Recruiter, asking for supporting documents and that they were trying to get things done quickly that some personnel actions may have proceeded the paper work. She states that she did not meet with Tracye King, Manager, Employment Services Branch (ESBR). She states that she and Pant spoke all of the time because as he interviewed people, he would forward to her those recommended candidates for second interview.

### Interview w/ Ray Feldman

Ray Feldman, Acting Assistant General Manager, GOVR, states that he and Ms. Lipman interviewed approximately 10 people for second interviews for the three positions. He asserts that they were looking for three different skill sets for the three different positions. He asserts that they did not have any written questions, nor did they take any notes. He states that while he deferred to the selections of Ms. Lipman, he agreed with each one of the selections and felt that she made the best selections for the position. He states that they basically asked each candidate the same questions, such as why were they interested in the job and what were their strengths and weaknesses. He states that by the time that they interviewed the Complainant,

they had already made two selections; therefore, she was only considered for the last position.

Mr. Feldman states that he cannot say that the Ms. Lipman said the exact words alleged by the Complainant, but he does recall her saying something similar, which caught him off guard. He states that he understands how the Complainant could be offended by the comment in a racial way. He states that she did not ask anyone else this question, although she did ask someone a much more broader question. Specifically, he states that Ms. Lipman did ask Mr. Kwiecenski, "How would you overcome your lack of experience in the DC area." He states that he spoke with Ms. Lipman after the interview about her comment and asked her what did she mean by it. He states that she said to him that she was simply asking a question about coalition building and how would the Complainant handle that on a day-to-day basis. He states that based upon her explanation, he was convinced that the intent of her question was not racial in nature.

Mr. Feldman states that after interviewing the Complainant, she was his top choice for the last position. However, he states that they agreed to meet with Mr. Kwiecinski, who was a far better experienced applicant than the Complainant. He does not feel that race played a part in the filing of these position.

**Interview with Shiva Pant, Government Relations Officer, GOVR**

Mr. Pant states that he was the Chairperson for the interview panel for the three positions and that the other panel members were Candace Smith, Media Relations Officer, Media Relations, Events and Employee Programs (MREP); and Matthew Greenwald, Homeland Security, GOVR.

Mr. Pant states that Ms. Lipman asked him to chair the interview panel and they went over the job descriptions because these were newly created jobs. He states that he drafted the questions, which he sent to Ms. Lipman and Cassandra Reed, Recruiter, for review. He states that as applications were received by Ms. Reed, she immediately forwarded them to him. He asserts that in some cases, some of them submitted two applications. He states that when he spoke with Ms. Lipman, she mentioned that the Advocacy position centered more around lobbying and coalition building, which includes going to the Chamber of Commerce and other outside stake holders. Therefore, he states that they were looking for someone who was experienced in building coalitions.

Mr. Pant states that he assessed the applications to determine who would be interviewed. He states that Ms. Reed separated the applications based upon the position for which they applied. He states that the interviews took place between

8

September 29, 2005 and November 2, 2005 because the positions were open until filled and they interviewed candidates when they could. He confirmed that Craig Kwiecinski, who resided in Pittsburgh, PA at the time of the interview, was interviewed on September 29, 2005 and the Complainant was interviewed on November 1, 2005. When asked why the Complainant, who is a WMATA employee, was interviewed over one month after Mr. Kwiecinski, Mr. Pant said that he had no idea other than scheduling problems. He states that in all of the interviews, each candidate was considered for all three positions and that after each interview, he would verbally advise Ms. Lipman as to whether the panel was recommending a particular applicant, but never anything specific about their experiences. He states that he does not recall submitting any written memorandum to Ms. Lipman other than the November 29, 2005 memorandum.

Mr. Pant states that all of the applicants were asked the same questions and that the panel took turns asking questions. He states that he does not recall whether the Complainant was asked anything about her budgeting experience during the interview. However, he states that since there was a question about budgeting on the list of questions, and that all applicants were asked the same questions, it is highly likely that they asked her about her experience in budgeting. He states that he did take notes and submitted them to Ms. Lipman; however, he also states that he checked with his secretary and he could not find copies of the interview notes.

Mr. Pant states that he does not know how Ms. Lipman could hold second interviews without the full understanding of the panel's recommendation. He states that his memorandum was dated November 29, 2005. He states that he could not explain how Ms. Lipman could make a selection prior to receiving his memorandum. (It should be noted that a few weeks after Mr. Pant's interview, the EEO/Dispute Resolution Officer asked Mr. Pant to go into his computer and identify the date that his November 29, 2005 memorandum was created. He states that it was created on November 9, 2005.) He states that he did not provide Ms. Lipman with a copy of the matrix prior to submitting his memorandum.

Mr. Pant states that when the three positions in question were established, they were created for very specific reasons. However, he asserts that she never indicated to him that she wanted something specific from each position. He states that these were new positions, so they had nothing to use as an example. He states that the panel indicated that Mr. Kwiecinski and Mr. Santaniello brought good and extensive communications background; however, they further wrote, "it is suggested that you consider them, if needed, after interviewing the other recommended candidates." He states that this does mean that they were the two least recommended candidates. Mr. Lipman states that he was never requested by Ms. Lipman or any other WMATA official, up to and including Richard White, GM/COO, to recommend a candidate based

9

upon a factor not related to their merit. He also maintains that race was not a factor the panel.

## Cassandra Reed, Recruiter, ESBR, HRMP

Ms. Reed states that she was the Recruiter for the three positions highlighted in this complaint. She states that the positions were fast-tracked by former GM/COO, Richard White; therefore, she was not as involved as she usually is in other selection processes. Specifically, she states that she was forwarding applications directly to the hiring panel without screening them, which is inconsistent with HRMP policy. She maintains that she took a hands-off approach to the selection process for fear of retribution by HRMP and WFDA management for delaying the process by performing her job. She states that Recruiters are consistently directed by HRMP management to ignore potential violations of HRMP policy to fill positions. In this case, she states that Mr. White wanted these positions filled quickly; therefore, she new from past experience not to interfere with this selection process, even if it meant ignoring established policy.

Ms. Reed states that at the time when the positions were advertised, there were no Position Control Numbers (PCN) for the positions, which is against WMATA's policy. She states that every position must have a PCN. She asserts that for most selection processes, HRMP gathers the applications together after the posting closes and then they have three days to input them into the computer system. However, in this case, she simply forwarded them to Ms. Lipman on a daily basis. She maintains that Mr. Lipman is very familiar with HRMP recruitment guidelines because she has worked with her in the past. She states that the initial interviews with the panel took place over a four to six week period.

Ms. Reed states that her supervisor, Tracye King, was involved in this complaint when she asked her for her permission to take certain actions. Specifically, she states that in her electronic mail message dated November 10, 2005, she asked Ms. King for her authorization to proceed with offering positions to Gregory Potts and Jeanine Black without having a Personnel Action Request (PAR). She states that Ms. King gave her the authorization with the exception that she does not ask for verification of salary until the Office of Compensation and Benefits (COBN) completed their process. She states that Ms. Lipman was concerned that if they waited too long, they may loose the selected candidates. She states that she does not know if Ms. Lipman was conducting interviews at the same time the panel was conducting interviews. She states that she has no reason to believe that the Complainant was discriminated against based upon her race.

## Interview with Tracye King, Manager, ESBR

Ms. King states that she did not play an active role in this selection process. She states that she relies on the Recruiters to handle the selection process and only gets involved if and when there is a question or problem. She asserts that there is no separate policy or

procedure in handling postings with "Open Until Filled!" status. She asserts that in these types of recruitments, applications are generally accepted throughout the process. She states that in past cases, she has asked the recruiter to take the applications that they have received up until a particular date and begin the process of interviews. She states that they will still accept other applications, but they will only be considered after the cut off date for the first set of applicants. She states that if a position has been filled using the first set of applicants, then all of the other applicants who applied after the first cut-off date will receive a letter indicating that a selection has been made.

Ms. King states that she is not familiar with the specifics of this complaint; however, the only way she could explain why the hiring manager's two selection memorandums are dated before the panel's recommendation letter is that Mr. Pant may have used the "Auto Date" function when he created the document. She explains that he could have submitted the original memorandum on or about the beginning of November, but was later asked by Ms. Reed to provide her with a copy of the memorandum. Upon printing out another copy of the memorandum, she contends that Mr. Pant may have printed out a new date based upon the "Auto Date" function. She states that she is not saying this did happen, but may be an explanation as to what happened.

Ms. King states that the role that Recruiters play in the selection process varies depending on the relationship the Recruiter has with the Hiring management. She states that in this complaint, Ms. Lipman relied heavily on Ms. Reed, with the initial screening of applicants. She asserts that sometimes, Recruiters sit on panels and prepare interview questions; however, their overall responsibility is to review the selection process and make sure everything is conducted consistent with WMATA policies and procedures. She states that often times, Recruiters are not able to do their job because of the culture at WMATA. She states that she has been trying to change this culture because hiring managers will use Recruiters as nothing more than employees who move paper for their offices. She asserts that some of the Hiring Managers want things done there way, even if it is in violation of WMATA's Recruitment Policy. She affirms that Recruiters have brought to her attention violations by hiring managers, but when she attempted to push back the Hiring Managers would contact her supervisors, who would support the hiring manager instead of her. For example, she states that P. Takis Salpeas, Deputy General Manager, is a very difficult hiring manager. She states that there was a selection in which the Employment Services Branch (ESBR) was following established policy, but Mr. Salpeas wanted someone else hired for the position. Therefore, he took the matter directly to William F. Scott, II, who then approve the action Mr. Salpeas wanted to take, even though it was a violation of HRMP policy. She states that HRMP generally caters to their customers, i.e., Hiring Managers over the ESBR staff.

Ms. King states that Recruiters generally screen the applications prior to submitting them to the Hiring Manager; however, there are times in the past when this is not done. She asserts that there is no policy or procedure that says that Ms. Lipman has to provide a written statement as to why she selected Mr. Kwiecinski over the Complainant, even though they received the same score and the panel considered the Complainant to be a

1056

more qualified candidate than the selectee. She states that it is not uncommon for hiring managers to have a different criteria for what they are looking for in an applicant.

Ms. King states that it is possible for Ms. Lippman to have made a selection before considering every candidate who was ultimately interviewed by the panel, simply based upon the timing of each interview. For example, she states that after interviewing the first few candidates, she could have determined early in the process who she was selecting for the first position; consequently, there would only be two positions left to fill. She states that in this complaint, not all applicants may be considered for all three positions. She maintains that Ms. Lipman should have prepared written notes on each candidate for this selection, and there should be notes from the panel members as well. She states that she does not know why the interviews were spread out as much as they were because usually, they all take place around the same time.

### Interview with Cassandra E. Barr, Administrative Assistant, GOVR

Ms. Barr states that she is the Administrative Assistant to Ms. Lipman and assisted her in the processing of some of the paper work for the selections at issue. She states that she did write an electronic message to Ms. Reed requesting her assistance to help speed the process along so that Ms. Lipman could hire the selectees. She states that in the November 9, 2005 email, to Ms. Reed asked her to start the salary negotiations with candidate Gregory Potts on the next day, hoping that this could get done prior to the issuance of a PAR. She states that she informed Ms. Reed that she left in Ms. Lipman's office her selection memorandum dated November 9, 2005; Mr. Pant's panel recommendation memorandum; references for Jeanine Black and Mr. Potts, application evaluation forms and the applicant flow chart. She confirms that on November 9, 2005, she had a copy of Mr. Pant's panel recommendation memorandum, dated the same day; but that she gave Ms. Lipman all of the documents related to the selection and did not keep copies. Furthermore, she states that she gave Ms. Lipman two separate folders for each candidate with all of the selection documentation enclosed.

### Katrina Wiggins, Director, HRMP

Ms. Wiggins states that she is familiar with the July 16, 2004, memorandum from Cynthia Myers, former Director, CIVR, regarding a probable cause finding of discrimination in the complaint filed by Helen Brown, Complaint number 360-04. Ms. Wiggins was asked to discuss what actions were taken regarding the recommendations the following recommendations made by CIVR:

1.    HRMP must take immediate action with regard to the oversight of, and control over, the WMATA recruitment process to ensure that such inappropriate hiring practices do not recur. It has been brought to the

attention of CIVR that HRMP is currently reviewing and updating its current Recruitment, Interviewing and Selection Guidelines. Until such review is completed, it is highly recommended that HRMP management, who are the Human Resource experts for WMATA, ensure that Hiring Managers adhere to the current HRMP policies and guidelines. It is also recommended that HRMP managers support the Recruiters when they bring violations to management's attention. This will ensure that positions are filled in a consistent, fair and timely manner.

2.    Training should be provided by the EEO Branch to all HRMP employees involved in the interviewing and selection process to discuss common EEO mistakes in the recruitment and selection process observed by CIVR over the last several years and the actions HRMP can take to ensure that WMATA's recruitment process is in compliance with EEO laws.

Ms. Wiggins states that regarding recommendation number one, her office began working on updating the selection guidelines, but did not implement those updates because they were waiting for the implementation of PeopleSoft software. However, she states that the Employment Services Branch was still expected to adhere to the guidelines that currently exist. Regarding the second recommendation, she states that the training was conducted sometime in 2004, but that she did not remember who from CIVR conducted the training, nor does she remember who was in attendance. She was hopeful that someone within CIVR could assist her with locating this information.

## IV. ANALYSIS AND CONCLUSION

There is sufficient evidence to support a probable cause finding of discrimination in this complaint. The evidence shows that Ms. Lipman made an inappropriate, racial comment during her interview with the Complainant. Specifically, the evidence shows that her comment was the same or similar to the comment, "I am trying to understand how I would send you to Virginia where the good old boys are - how would you represent the Authority." This comment constitutes direct evidence of discriminatory motive against the Complainant based upon her race. There is no evidence that this comment was made to any other applicant. The evidence further shows that her supervisor, Ray Feldman, who sat in on the second interviews, concurs that Ms. Lipman made an comment similar to the one alleged by the Complainant, which he considers to be inappropriate and understands how the Complainant can view it as being racial. The evidence also shows that he met with Ms. Lipman after the interview to understand what she meant by the comment.

13

Although Ms. Lipman states that she does not recall making this comment, it is inconceivable that someone at Ms. Lipman's level would not remember making such a comment, nor recall meeting with her supervisor about the comment. Consequently, CIVR does not consider Ms. Lipman to be a credible witness because it appears that she was not forthcoming in this investigation.

The evidence also shows that although the Complainant, who is a WMATA employee, applied for all three positions on September 1, 2005, she was not interviewed by the panel until November 1, 2005. However, the two outside candidates selected for the Strategic Policy and Communications Specialist positions, Gregory Potts (White) and Jeanine Black (White), were interviewed on September 28, 2005 and September 29, 2005, respectively. The evidence also shows that Mr. Potts and Ms. Black had received their second interview with Ms. Lipman on October 11, 2005 and October 21, 2005, respectively, both of which are prior to the Complainant having her first interview. While scattered interviews are common in selections that are open until filled, there is no legitimate reason why the Complainant could not have been interviewed by the panel when the two selectees were interviewed, especially given that she had already submitted her resume and that she was an internal applicant; making her at least the same, if not more, accessible than the selectees, who were external candidates. This appears to have had an adverse affect on the Complainant because prior to her second interview, Ms. Lipman had already determined that she was selecting Mr. Potts and Ms. Black for the positions; therefore, not considering the Complainant for any of the two Strategic Policy and Communications Specialist positions. Additionally, there are no applications or resumes attached to the selection package for Mr. Potts and Mr. Black, which is necessary to be able to compare the dates in which they applied for the positions with that of the Complainant.

The evidence further shows that Ms. Lipman and Mr. Feldman did not prepare a set of interview questions nor did they take any interview notes during the second interview. Managers and supervisors at WMATA are taught during the Foundations for Supervision training course to keep accurate and objective records because this can be their best friend if a charge of discrimination is ever filed against WMATA based upon their employment decision. The evidence also shows that there are no interview notes for the interview panel in the selection package, although Mr. Shiva Pant, Panel Chair, indicates that notes were taken and submitted to Ms. Lipman. The absence of fair and accurate interview notes increases WMATA's liability in discrimination complaints and is inconsistent with WMATA's Recruitment, Interviewing and Selection Guidelines.

The evidence further shows that a different Black applicant, other than the Complainant, who received a higher rating than two of the selectees, was not selected by Ms. Lipman. Specifically, Horace Jennings (Black) had the third highest score out of all candidates. (There was also another candidate, who is White, who

14

was tied for the highest score, but was also not selected). Ms. Lipman selected Jeanine Black (White) for one of the positions, although she rated lower than Mr. Jennings. However, Ms. Lipman's November 9, 2005 memorandum, which addresses the two Strategic Policy and Communications Specialist positions under posting number 05-0727-SR, does not provide specific deficiencies with the panel's recommendation of Mr. Jennings, which is inconsistent with the Recruitment, Interviewing and Selection guidelines. The evidence further shows that the Complainant was not interviewed by Ms. Lipman for any of these two positions, against the recommendation of the panel, because she had already decided to hire Mr. Potts and Ms. Black.

The evidence further shows that regarding the Strategic Advocacy Specialist position (under posting number 05-0731-SR), Ms. Lipman selected Craig Kwiecinski (White) for the position, who was rated below Mr. Jennings, and received the same rating score as the Complainant and another applicant named Thomas Santaniello. The evidence does not show that Mr. Kwiecinski was demonstrably superior to Mr. Jennings or the Complainant. Moreover, the panel, who only recommended Mr. Kwiecinski for the one Strategic Advocacy Specialist position, also stated in their November 29, 2005 memorandum that Mr. Kwiecinski brings "good and extensive communications background," but recommended that Ms. Lipman consider him, "if needed, after interviewing the other recommended candidates." On the other hand, the panel stated that Mr. Jennings' "experience for the last fourteen years deals with the type of work that is expected of the three positions in GOVR." The panel also recommended the Complainant for the two Strategic Policy and Communications Specialist positions only, stating that she has "good background in the area of communications."

The evidence further shows that Ms. Lipman made her selections without receiving the full recommendation by the interview panel. Ms. Lipman's selection memorandums are dated November 9, 2005 for the two Strategic Policy and Communications Specialist positions; and November 28, 2005 for the one Strategic Advocacy Specialist position. The panel recommendation memorandum is dated November 29, 2005, after Ms. Lipman's selection memorandums. There is some evidence to suggest that the panel's recommendation memorandum was originally created on November 9, 2005; however, no official panel recommendation memorandum with this date was in the selection package nor could be produced by Mr. Pant or Ms. Lipman. However, even if there was evidence of a November 9, 2005 memorandum from the panel to Ms. Lipman, the evidence shows that Ms. Lipman began second interviews prior to this date; therefore, she could not have had the full recommendations by the panel. While Mr. Pant briefly advised Ms. Lipman of applicants who should be interviewed immediately after the first interview, the evidence also shows that he did not provide her with any specific details about their qualifications.

15

The evidence further shows that the Office of Human Resource Management & Planning is culpable in this complaint of discrimination for their failure to oversee and review the recruitment, interviewing and selection process in this complaint. Specifically, the evidence shows that the Employment Services Branch (ESBR) of HRMP did not comply with their established guidelines and procedures through the following examples:

    A.    They did not screen or review the applications before sending them to the hiring manager.

    B.    They did not manage the selection process, including the interview process; but allowed the hiring manager to conduct the process as she saw fit.

    C.    They did not ensure that all of the appropriate documentation, such as interview notes and applications, were in the selection package.

    D.    Selection offers were made by ESBR to two of the three selectees without a signed Personnel Action Request form.

    E.    ESBR did not provide appropriate advise and counsel to Ms. Lipman regarding the recruitment process.

The evidence also shows that ESBR's lack of oversight in the selection process of this complaint is directly related to the perception articulated by ESBR staff that they are not only intimidated by the senior level managers from doing their job, but are often directed to intentionally violate HRMP policies and procedures. Specifically, nine former and current ESBR employees state that they have either witnessed or been asked by Katrina Wiggins, Director, HRMP, and William F. Scott, II, Deputy General Manager, WFDA, either directly or indirectly (through their supervisor or team lead), to take a personnel action that was a violation of WMATA policy. Additionally, the overwhelming majority of them have said that they are not supported by management when they bring violations to the attention of their supervisors. Examples of such violations include:

    1.    Julio Santana, Recruitment Outreach Specialist, who is temporarily transferred from the position of Bus Operator, inappropriately administered a portion of the Bus Operator's exam to applicants who had failed the exam the week before and had been told by ESBR employees that per WMATA policy, they had to wait 90 days before retesting.

    2.    The hiring manager for the selection package number 05-0554-EY, who became frustrated with an ESBR employee who requested of him a more detailed selection memorandum consistent with HRMP procedures and guidelines, sent her an angry and hostile email expressing his displeasure with her request, and then went over her head to her superiors. The

16

ESBR employee was then directed by her supervisor to allow the hiring manager to submit a one-line selection memorandum that only stated, "I recommend (the selectee's name) be offered a salary consistent with a TA 10-1. Thank you."

3.   In 2005, ESBR employees were directed to forward an application for one of the apprenticeship programs to the hiring manager specifically because the applicant was referred by P. Takis Salpeas. According to the ESBR witnesses, the applicant did not meet the minimum qualifications, but was ultimately hired.

4.   Mr. Scott called a meeting in 2005 with ESBR staff, directing them to forward applications of those who list his name as a reference on their application to the hiring manager or to their immediate supervisor, whether the applicant met the qualifications for the position or not.

5.   At least two former ESBR employees indicated that they resigned from WMATA in part because of the lack of adherence to established HRMP policy and procedure. (One of the employees, who resigned in November 2005, was not interviewed as a part of this investigation, but provided her comments during an EEO counseling session in November 2005.)

This investigation does not make any determination as to whether any of the above comments by the nine ESBR employees are true or not. Such a determination can only be made through an independent investigation. However, the evidence above is supported by the fact that Ms. Wiggins took little to no action was taken regarding the recommendations by the former Director, CIVR, Cynthia Myers, in a memorandum dated July 16, 2004, concerning a probable cause finding of discrimination in the EEO complaint filed by Helen Brown, Complaint #380-04. CIVR made the following recommendations to Ms. Wiggins:

1.   HRMP must take immediate action with regard to the oversight of, and control over, the WMATA recruitment process to ensure that such inappropriate hiring practices do not recur. It has been brought to the attention of CIVR that HRMP is currently reviewing and updating its current Recruitment, Interviewing and Selection Guidelines. Until such review is completed, it is highly recommended that HRMP management, who are the Human Resource experts for WMATA, ensure that Hiring Managers adhere to the current HRMP policies and guidelines. It is also recommended that HRMP managers support the Recruiters when they bring violations to management's attention. This will ensure that positions are filled in a consistent, fair and timely manner.

17

1062

2.    Training should be provided by the EEO Branch to all HRMP employees involved in the interviewing and selection process to discuss common EEO mistakes in the recruitment and selection process observed by CIVR over the last several years and the actions HRMP can take to ensure that WMATA's recruitment process is in compliance with EEO laws.

The evidence shows that the only action taken by Ms. Wiggins regarding the two recommendations was to begin changing the recruitment, interviewing and selection guidelines. There is no evidence to show that any other action was taken with regard to the oversight of, and control over, the WMATA recruitment process nor any evidence to support Ms. Wiggins' assertion that the recommended EEO training was conducted. It was reported to this investigator in 2004 by Ms. Myers, former Director, CIVR, that she raised this matter to all appropriate levels within WMATA, but that her superiors were not going to implement the findings in this complaint. Additionally, in July 2004, CIVR did not have any authority to enforce its findings, therefore, only recommendations could be offered. Furthermore, there was no practice or procedure in place at that time that instructed investigators to follow-up on such recommendations.

## V.  RESOLUTION

Based upon this probable cause finding, the following is required as a resolution to this complaint:

1.    Deborah Lipman should be suspended for five (5) days for violating WMATA's EEO policy by making an inappropriate comment during the interview, not being forthcoming in this investigation and not following established recruitment guidelines. The discipline should be taken within 10 business days of the notification of this finding. Ms. Lipman's performance evaluation should also reflect this violation.

2.    Katrina Wiggins should be suspended for one (1) day for violating WMATA's EEO policy by ignoring recommendations made by CIVR in a previous complaint of discrimination, which has created the climate for this complaint of discrimination to occur. This discipline should be administered within 10 business days of the notification of this finding. Ms. Wiggins' performance evaluation should also reflect this violation.

3.    Ms. Lipman and Ms. Wiggins should also be required to sign-up and attend appropriate EEO and Foundations for Supervision refresher training coordinated through the Office of Organizational Development (ODEV). The training should be scheduled within 30 days of notification of this finding.

procedure by senior level managers within HRMP and WFDA, as it pertains to the recruitment, interviewing and selection guidelines.

5.  A Staff Notice to all managers and supervisors should be issued making it clear that the Employment Services Branch is empowered to administer and manage the recruitment, interviewing and selection process for the authority and that all hiring managers are to adhere to WMATA policy when filling vacancies.

6.  HRMP must take immediate action with regard to the oversight of, and control over, the WMATA recruitment process to ensure that such inappropriate hiring practices do not recur. It is also highly recommended that HRMP management, who are the Human Resource experts for WMATA, ensure that Hiring Managers adhere to the current HRMP policies and guidelines. It is also recommended that HRMP managers support the Recruiters when they bring violations to management's attention. This will ensure that positions are filled in a consistent, fair and timely manner.

7.  HRMP should contact CIVR to coordinate appropriate training to all HRMP employees involved in the interviewing and selection process to discuss common EEO mistakes in the recruitment and selection process observed by CIVR over the last several years and the actions HRMP can take to ensure that WMATA's recruitment process is in compliance with EEO laws.

8.  Please provide CIVR with written notification within 30 days of receipt of our findings regarding the fulfilling of these requirements.

Investigator:

_Devin L. Walker_                    5/8/06

Devin L. Walker                         Date
EEO & Dispute Resolution Officer
Office of Civil Rights

18

# TABLE OF CONTENTS

DATE: _2/23/06_

COMPLAINT NUMBER: _471-06_

TYPE OF INVESTIGATION:  INTERNAL _X_  EXTERNAL_____

ASSIGNED EEO/CULTURAL DIVERSITY: SPECIALIST _D. Walker_

## CASE FILE - CONTENTS

| TAB | CONTENTS |
|---|---|
| 1 | COMPLAINT (INTERNAL/EXTERNAL) |
| 2 | LETTER OF DETERMINATION/ CONCILIATION/AGREEMENT |
| 3. | EEO INVESTIGATIVE INFORMATION & ACTIVITY LOG |
| 4. | INVESTIGATIVE REPORT/POSITION STATEMENT |
| 5. | CORRESPONDENCE |
| 6. | DOCUMENT REQUESTS - INTERNAL/EXTERNAL |
| 7. | COMPLAINANT/WITNESSES STATEMENTS |
| 8. | EVIDENCE/EXHIBITS |
| 9. | MISC/NOTES |

546

*PARTIALLY REDACTED*

**From:**      Devin Walker
**To:**        Bailey, Teresa
**Date:**      Thu, May 4, 2006  4:25 PM
**Subject:**    EEO Question!

Teresa:

I should be turning in the Hughey complaint today. However, I needed to speak with Katrina Wiggins first and we did not do so until yesterday.

I needed to meet with her in relationship to the Hughey complaint because of what Sandy Reed and Tracye King mentioned to me about ESBR not being supported and at times, being asked to violate HR policy when it comes to recruiting. I also have a total of nine former and current ESBR employees who said the same thing (the details of which are in my ROI).

I faxed Katrina a copy of a July 16, 2004 memorandum from Cynthia Myers to Katrina notifying her of the outcome of the REDACTED Complaint, where we found REDACTED. Specifically, the memorandum stated the following: Therefore, to resolve this matter, the following is recommended:

1.       HRMP must take immediate action with regard to the oversight of, and control over, the WMATA recruitment process to ensure that such inappropriate hiring practices do not recur. It has been brought to the attention of CIVR that HRMP is currently reviewing and updating its current Recruitment, Interviewing and Selection Guidelines. Until such review is completed, it is highly recommended that HRMP management, who are the Human Resource experts for WMATA, ensure that Hiring Managers adhere to the current HRMP policies and guidelines. It is also recommended that HRMP managers support the Recruiters when they bring violations to management's attention. This will ensure that positions are filled in a consistent, fair and timely manner.

2.       Training should be provided by the EEO Branch to all HRMP employees involved in the interviewing and selection process to discuss common EEO mistakes in the recruitment and selection process observed by CIVR over the last several years and the actions HRMP can take to ensure that WMATA's recruitment process is in compliance with EEO laws.

I asked Katrina what actions, if any, did she take in response to our finding. She said that regarding the first point, they began working on updating the selection guidelines, but they did not implement those updates because they were waiting for the development of PeopleSoft. However, she did say that ESBR was expected to adhere to the guidelines that currently exist. Secondly, she said that training was conducted sometime in 2004, but she does not remember who from CIVR conducted the training, nor does she remember who was in attendance. She was hopeful that someone in our office could provide her with this information.

I checked with Ray, Sandy and Lisa, and they do not recall conducting this training, nor hearing about it. I was the investigator for the complaint and nothing was ever brought to my attention regarding it. Also, my last conversation with Cynthia about this, she told me nothing was done. Do you recall anything about this training?

Devin



EXHIBIT

P

received
5/2c/0x

# M E M O R A N D U M



SUBJECT: Results of Investigation                    DATE: May 10, 2006
         Complaint Filed by Tomika Hughey
         Complaint #471-05

FROM: CIVR - Teresa Bailey

TO: GM - Dan Tangherlini (Acting)

This is to inform you that the Office of Civil Rights (CIVR) has recently completed its investigation of the complaint of discrimination filed by Tomika Hughey (hereinafter "Complainant"), Assistant Planning Project Manager, Business Planning and Project Development (BPPD), Planning and Information Technology (PAIT). Specifically, she alleges racial discrimination due to comments allegedly made by Deborah Lipman, Director, Office of Intergovernmental Relations (GOVR), during an interview for a Strategic Advocacy Specialist position in November 2005. Complainant alleges that Ms. Lipman led her to believe that constituents would perceive her differently from a white counterpart when Ms. Lipman stated during the interview, "I am trying to understand how I would send you to Virginia where the good old boys are - how would you represent the Authority?" The Complainant was not selected for the position.

There is sufficient evidence to support a probable cause finding of discrimination in this complaint. The evidence shows that Ms. Lipman made an inappropriate, racial comment during her interview with the Complainant. Specifically, the evidence shows that her comment was the same or similar to the comment, "I am trying to understand how I would send you to Virginia where the good old boys are - how would you represent the Authority." This comment constitutes direct evidence of discriminatory motive against the Complainant based upon her race. There is no evidence that this comment was made to any other applicant. The evidence further shows that her supervisor, Ray Feldman, who sat in on the second interviews, concurs that Ms. Lipman made an comment similar to the one alleged by the Complainant, which he considers to be inappropriate and understands how the Complainant can view it as being racial. The evidence also shows that he met with Ms. Lipman after the interview to understand what she meant by the comment.

Although Ms. Lipman states that she does not recall making this comment, it is inconceivable that someone at Ms. Lipman's level would not remember making such a comment, nor recall meeting with her supervisor about the comment. Consequently, CIVR does not consider Ms. Lipman to be a credible witness because it appears that she was not forthcoming in this investigation.

The evidence also shows that although the Complainant, who is a WMATA employee, applied for all three positions on September 1, 2005, she was not

Washington
Metropolitan Area
Transit Authority



EXHIBIT

Q

Dan Tangherlini Memorandum re: Tomika Hughey Complaint, #471-05
Page 2

interviewed by the panel until November 1, 2005. However, the two outside
candidates selected for the Strategic Policy and Communications Specialist
positions, Gregory Potts (White) and Jeanine Black (White), were interviewed on
September 28, 2005 and September 29, 2005, respectively. The evidence also
shows that Mr. Potts and Ms. Black had received their second interview with
Ms. Lipman on October 11, 2005 and October 21, 2005, respectively, both of which
are prior to the Complainant having her first interview. While scattered interviews are
common in selections that are open until filled, there is no legitimate reason why the
Complainant could not have been interviewed by the panel when the two selectees
were interviewed, especially given that she had already submitted her resume and
that she was an internal applicant; making her at least the same, if not more,
accessible than the selectees, who were external candidates. This appears to have
had an adverse affect on the Complainant because prior to her second interview,
Ms. Lipman had already determined that she was selecting Mr. Potts and Ms. Black
for the positions; therefore, not considering the Complainant for any of the two
Strategic Policy and Communications Specialist positions. Additionally, there are no
applications or resumes attached to the selection package for Mr. Potts and Mr.
Black, which is necessary to be able to compare the dates in which they applied for
the positions with that of the Complainant.

The evidence further shows that Ms. Lipman and Mr. Feldman did not prepare a set
of interview questions nor did they take any interview notes during the second
interview. Managers and supervisors at WMATA are taught during the Foundations
for Supervision training course to keep accurate and objective records because this
can be their best friend if a charge of discrimination is ever filed against WMATA
based upon their employment decision. The evidence also shows that there are no
interview notes for the interview panel in the selection package, although Mr. Shiva
Pant, Panel Chair, indicates that notes were taken and submitted to Ms. Lipman.
The absence of fair and accurate interview notes increases WMATA's liability in
discrimination complaints and is inconsistent with WMATA's Recruitment,
Interviewing and Selection Guidelines.

The evidence further shows that a different Black applicant, other than the
Complainant, who received a higher rating than two of the selectees, was not
selected by Ms. Lipman. Specifically, Horace Jennings (Black) had the third highest
score out of all candidates. (There was also another candidate, who is White, who
was tied for the highest score, but was also not selected). Ms. Lipman selected
Jeanine Black (White) for one of the positions, although she rated lower than Mr.
Jennings. However, Ms. Lipman's November 9, 2005 memorandum, which
addresses the two Strategic Policy and Communications Specialist positions under

1069

Dan Tangherlini Memorandum re: Tomika Hughey Complaint, #471-05
Page 3

posting number 05-0727-SR, does not provide specific deficiencies with the panel's recommendation of Mr. Jennings, which is inconsistent with the Recruitment, Interviewing and Selection guidelines. The evidence further shows that the Complainant was not interviewed by Ms. Lipman for any of these two positions, against the recommendation of the panel, because she had already decided to hire Mr. Potts and Ms. Black.

The evidence further shows that regarding the Strategic Advocacy Specialist position (under posting number 05-0731-SR), Ms. Lipman selected Craig Kwiecinski (White) for the position, who was rated below Mr. Jennings, and received the same rating score as the Complainant and another applicant named Thomas Santaniello. The evidence does not show that Mr. Kwiecinski was demonstrably superior to Mr. Jennings or the Complainant. Moreover, the panel, who only recommended Mr. Kwiecinski for the one Strategic Advocacy Specialist position, also stated in their November 29, 2005 memorandum that Mr. Kwiecinski brings "good and extensive communications background," but recommended that Ms. Lipman consider him, "if needed, after interviewing the other recommended candidates." On the other hand, the panel stated that Mr. Jennings' "experience for the last fourteen years deals with the type of work that is expected of the three positions in GOVR." The panel also recommended the Complainant for the two Strategic Policy and Communications Specialist positions only, stating that she has "good background in the area of communications."

The evidence further shows that Ms. Lipman made her selections without receiving the full recommendation by the interview panel. Ms. Lipman's selection memorandums are dated November 9, 2005 for the two Strategic Policy and Communications Specialist positions; and November 28, 2005 for the one Strategic Advocacy Specialist position. The panel recommendation memorandum is dated November 29, 2005, after Ms. Lipman's selection memorandums. There is some evidence to suggest that the panel's recommendation memorandum was originally created on November 9, 2005; however, no official panel recommendation memorandum with this date was in the selection package nor could be produced by Mr. Pant or Ms. Lipman. However, even if there was evidence of a November 9, 2005 memorandum from the panel to Ms. Lipman, the evidence shows that Ms. Lipman began second interviews prior to this date; therefore, she could not have had the full recommendations by the panel. While Mr. Pant briefly advised Ms. Lipman of applicants who should be interviewed immediately after the first interview, the evidence also shows that he did not provide her with any specific details about their qualifications.

Dan Tangherlini Memorandum re: Tomika Hughey Complaint, #471-05
Page 4

The evidence further shows that the Office of Human Resource Management & Planning is culpable in this complaint of discrimination for their failure to oversee and review the recruitment, interviewing and selection process in this complaint. Specifically, the evidence shows that the Employment Services Branch (ESBR) of HRMP did not comply with their established guidelines and procedures through the following examples:

A.    They did not screen or review the applications before sending them to the hiring manager.

B.    They did not manage the selection process, including the interview process; but allowed the hiring manager to conduct the process as she saw fit.

C.    They did not ensure that all of the appropriate documentation, such as interview notes and applications, were in the selection package.

D.    Selection offers were made by ESBR to two of the three selectees without a signed Personnel Action Request form.

E.    ESBR did not provide appropriate advise and counsel to Ms. Lipman regarding the recruitment process.

The evidence also shows that ESBR's lack of oversight in the selection process of this complaint is directly related to the perception articulated by ESBR staff that they are not only intimidated by the senior level managers from doing their job, but are often directed to intentionally violate HRMP policies and procedures. Specifically, nine former and current ESBR employees state that they have either witnessed or been asked by Katrina Wiggins, Director, HRMP, and William F. Scott, II, Deputy General Manager, WFDA, either directly or indirectly (through their supervisor or team lead), to take a personnel action that was a violation of WMATA policy. Additionally, the overwhelming majority of them have said that they are not supported by management when they bring violations to the attention of their supervisors. Examples of such violations include:

1.    Julio Santana, Recruitment Outreach Specialist, who is temporarily transferred from the position of Bus Operator, inappropriately administered a portion of the Bus Operator's exam to applicants who had failed the exam the week before and had been told by ESBR employees that per WMATA policy, they had to wait 90 days before retesting.

2.    The hiring manager for the selection package number 05-0554-EY, who became frustrated with an ESBR employee who requested of him

Dan Tangherlini Memorandum re: Tomika Hughey Complaint, #471-05
Page 5

a more detailed selection memorandum consistent with HRMP procedures and guidelines, sent her an angry and hostile email expressing his displeasure with her request, and then went over her head to her superiors. The ESBR employee was then directed by her supervisor to allow the hiring manager to submit a one-line selection memorandum that only stated, "I recommend (the selectee's name) be offered a salary consistent with a TA 10-1. Thank you."

3. In 2005, ESBR employees were directed to forward an application for one of the apprenticeship programs to the hiring manager specifically because the applicant was referred by P. Takis Salpeas. According to the ESBR witnesses, the applicant did not meet the minimum qualifications, but was ultimately hired.

4. Mr. Scott called a meeting in 2005 with ESBR staff, directing them to forward applications of those who list his name as a reference on their application to the hiring manager or to their immediate supervisor, whether the applicant met the qualifications for the position or not.

5. At least two former ESBR employees indicated that they resigned from WMATA in part because of the lack of adherence to established HRMP policy and procedure. (One of the employees, who resigned in November 2005, was not interviewed as a part of this investigation, but provided her comments during an EEO counseling session in November 2005.)

This investigation does not make any determination as to whether any of the above comments by the nine ESBR employees are true or not. Such a determination can only be made through an independent investigation. However, the evidence above is supported by the fact that Ms. Wiggins took little to no action was taken regarding the recommendations by the former Director, CIVR, Cynthia Myers, in a memorandum dated July 16, 2004, concerning a probable cause finding of discrimination in the EEO complaint filed by Helen Brown, Complaint #380-04. CIVR made the following recommendations to Ms. Wiggins:

1. HRMP must take immediate action with regard to the oversight of, and control over, the WMATA recruitment process to ensure that such inappropriate hiring practices do not recur. It has been brought to the attention of CIVR that HRMP is currently reviewing and updating its current Recruitment, Interviewing

Dan Tangherlini Memorandum re: Tomika Hughey Complaint, #471-05
Page 6

and Selection Guidelines. Until such review is completed, it is
highly recommended that HRMP management, who are the
Human Resource experts for WMATA, ensure that Hiring
Managers adhere to the current HRMP policies and guidelines.
It is also recommended that HRMP managers support the
Recruiters when they bring violations to management's
attention. This will ensure that positions are filled in a
consistent, fair and timely manner.

2.    Training should be provided by the EEO Branch to all HRMP
employees involved in the interviewing and selection process to
discuss common EEO mistakes in the recruitment and selection
process observed by CIVR over the last several years and the
actions HRMP can take to ensure that WMATA's recruitment
process is in compliance with EEO laws.

The evidence shows that the only action taken by Ms. Wiggins regarding the two
recommendations was to begin changing the recruitment, interviewing and selection
guidelines. There is no evidence to show that any other action was taken with regard
to the oversight of, and control over, the WMATA recruitment process nor any
evidence to support Ms. Wiggins' assertion that the recommended EEO training was
conducted. It was reported to this investigator in 2004 by Ms. Myers, former Director,
CIVR, that she raised this matter to all appropriate levels within WMATA, but that her
superiors were not going to implement the findings in this complaint. Additionally,
in July 2004, CIVR did not have any authority to enforce its findings, therefore, only
recommendations could be offered. Furthermore, there was no practice or
procedure in place at that time that instructed investigators to follow-up on such
recommendations.

Based upon this probable cause finding, the following is required as a resolution to
this complaint:

1.    Deborah Lipman should be suspended for five (5) days for violating WMATA's
EEO policy by making an inappropriate comment during the interview, not
being forthcoming in this investigation and not following established
recruitment guidelines. The discipline should be taken within 10 business
days of the notification of this finding. Ms. Lipman's performance evaluation
should also reflect this violation.

Dan Tangherlini Memorandum re: Tomika Hughey Complaint, #471-05
Page 7

2.  Katrina Wiggins should be suspended for one (1) day for violating WMATA's
    EEO policy by ignoring recommendations made by CIVR in a previous
    complaint of discrimination, which has created the climate for this complaint
    of discrimination to occur. This discipline should be administered within 10
    business days of the notification of this finding. Ms. Wiggins' performance
    evaluation should also reflect this violation.

3.  Ms. Lipman and Ms. Wiggins should also be required to sign-up and attend
    appropriate EEO and Foundations for Supervision refresher training
    coordinated through the Office of Organizational Development (ODEV). The
    training should be scheduled within 30 days of notification of this finding.

4.  An independent investigation should be conducted into the serious allegations
    made by ESBR employees about the intentional violations of WMATA policy
    and procedure by senior level managers within HRMP and WFDA, as it
    pertains to the recruitment, interviewing and selection guidelines.

5.  A Staff Notice to all managers and supervisors should be issued making it
    clear that the Employment Services Branch is empowered to administer and
    manage the recruitment, interviewing and selection process for the authority
    and that all hiring managers are to adhere to WMATA policy when filling
    vacancies.

6.  HRMP must take immediate action with regard to the oversight of, and control
    over, the WMATA recruitment process to ensure that such inappropriate
    hiring practices do not recur. It is also highly recommended that HRMP
    management, who are the Human Resource experts for WMATA, ensure that
    Hiring Managers adhere to the current HRMP policies and guidelines. It is
    also recommended that HRMP managers support the Recruiters when they
    bring violations to management's attention. This will ensure that positions are
    filled in a consistent, fair and timely manner.

7.  HRMP must contact CIVR to coordinate appropriate training to all HRMP
    employees involved in the interviewing and selection process to discuss
    common EEO mistakes in the recruitment and selection process observed by
    CIVR over the last several years and the actions HRMP can take to ensure
    that WMATA's recruitment process is in compliance with EEO laws.

1074

Dan Tangherlini Memorandum re: Tomika Hughey Complaint, #471-05
Page 8


8.    Please provide CIVR with written notification within 30 days of receipt of our
      findings regarding the fulfilling of these requirements.


cc:    SCOC - Emeka Moneme
       PDEC - P. Takis Salpeas
       PASP - Ray Feldmann
       PAIT -  Edward Thomas

## 1. COMPLAINANT

Name:              Tomika R. Hughey
Mailing Address:   P.O. Box 1618, Washington, D.C. 20013-1618
Phone:             202-289-8846 (H)
                   202-486-0346 (C)
                   202-962-2429 (O)
e-mail:            xeropholous@yahoo.com

Physical Address:  515 L Street, NW
                   Washington, D.C. 20013-1618

## 2. COMPANY INFORMATION

Washington Metropolitan Area Transit Authority (WMATA)
600 Fifth Street, NW
Washington, D.C. 20001

Number of Employees:  10,000+

## 3. EVENT DESCRIPTION

During interviews (November 1st and 9th, 2005) for positions in the Government Relations Office, the Director, Ms. Deborah S. Lipman asked me to, "Help me understand how I would send you to Virginia where good old boys are; how would you represent the Authority." Based on Ms. Lipman's question, I believe her ability to evaluate my capabilities was impeded based on her assumptions about my race, political affiliation and appearance.

On February 22, 2006, I entered into a formal, internal WMATA complaint process. As a result of the ongoing investigation, information has surfaced within the Authority's investigation that reveals racial bias, lack of documentation during the interview and selection process, lack of oversight by the WMATA's Human Resource Office, and a course of conduct by Ms. Lipman and other WMATA staff that is in clear violation of WMATA guidelines, processes and procedures, and U.S. Equal Employment Opportunity Commission laws.

There were three positions advertised under two different postings. ( See attachments) The individuals selected for these positions were offered jobs and began employment with WMATA between the months of November 2005 and January 2006. In addition to myself another candidate was highly qualified and not selected for either of the advertised positions, according to the current ongoing, internal WMATA investigation.

The first investigator was removed from the investigation over a month ago and advised that I contact the Director of Civil Rights as he had submitted his final report and recommendations and Ms. Bailey should be prepared to close the complaint soon thereafter. After speaking with Ms. Bailey on June 23rd, she advised that a second

Tomika R. Hughey Complainant
July 10, 2006



000110

investigator would be reviewing the complaint and after that occurred, she would contact me.

As of July 10, 2006, I have essentially been re-interviewed by the second investigator, revisiting the case and very emotional issues for the second time around. It has been over 120 days since filing my complaint and I am not confident in the Office of Civil Rights to fairly and efficiently resolve my case.

**4. DATE OF EVENTS**

Panel Interview 1 – November 1, 2006
**Interview 2 – November 9, 2006 (Date of event)**

**5. NAMES, ADDRESSES, AND TELEPHONE NUMBERS OF ANY WITNESSES**

Mr. Ray Feldmann, Assistant General Manager (INTERVIEW WITNESS)
Department of Customer & Media Relations
WMATA
600 Fifth Street, NW
Washington, D.C. 20001
Phone: 202-962-1726

Ms. Deborah S. Lipman, Director (CHARGES FILED AGAINST)
Office of Intergovernmental Relations
WMATA
600 Fifth Street, NW
Washington, D.C. 20001
Phone: 202-962-1003

***

**WMATA OFFICE OF CIVIL RIGHTS STAFF**

Ms. Teresa Bailey, Director
Office of Civil Rights
WMATA
600 Fifth Street, NW
Washington, D.C. 20001
Phone: 202-962-1082

Mr. Devin Walker – 1st Investigator
Office of Civil Rights
WMATA
600 Fifth Street, NW
Washington, D.C. 20001
Phone: 202-285-1927

Ms. Ann Anderson – 2nd Investigator
EEO/Dispute Resolution Officer
Office of Civil Rights

WMATA
600 Fifth Street, NW
Washington, D.C. 20001
Phone: 202-962-2381

Ms. Saundra Johnson – Intake Investigator
EEO/Dispute Resolution Officer
Office of Civil Rights
WMATA
600 Fifth Street, NW
Washington, D.C. 20001
Phone: 202-962-2383

**6.  NO SIMILAR CHARGES HAVE BEEN FILED WITH A STATE OR LOCAL FAIR EMPLOYMENT PRACTICE AGENCY**

**7.  NAME, ADDRESS, AND TELEPHONE NUMBER OF A PERSON WHO ALWAYS KNOWS WHERE TO CONTACT THE PERSON WISHING TO FILE A CHARGE**



**U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**
**Washington Field Office**

1801 L Street, N. W., Suite 100
Washington, D. C.  20507
(202) 419-0700
TTY (202) 419-0702
FAX (202) 419-0740

# INTAKE QUESTIONNAIRE
(LOCAL USE FORM 283)
This form is covered by the Privacy Act of 1974.  See the Privacy Act
Statement on the last page of this document before completing this form.

*EEOC USE ONLY*
INQUIRY #:

570-2006-01577N

**Please print your answers to the following questions.  When finished, sign and date on Page 5.**

First Name: Tomika          MI: P          Last Name: Hughey

Address: P.O. Box 1618                    Apt.

City: Washington    State: DC    Zip Code: 20013-1618  County:

Telephone #:  Home (202) 289-8846          Cell  (202) 486-0346

           Work (202) 962-2429

Email: xeropholouga@yahoo.com

Date of Birth: 12/23/1971



RECEIVED
JULY JUN 1 0 2006
By EEOC - WFO

Gender: [  ] Male          [ X ] Female

Race:  [ X ] Black    [  ] White    [  ] Other Race _____

      [  ] American Indian or Native American      [  ] Asian or Pacific Islander

National origin: [  ] Mexican      [  ] Hispanic      [  ] Arab, Middle Eastern

            [  ] East Indian     [  ] Other _____

Provide the following information for a person we can contact if we are unable to reach you:

First Name: _____          MI: _____     Last Name:

Address: _____          __ Apt. _____

City: _____     State: _____  Zip Code: _____          __ County: _____

Telephone #:  Home          ___    Cell

           Work          ___

**EXHIBIT**
5
ALL-STATE LEGAL®

000120

## ORGANIZATION AGAINST WHICH CHARGE IS BEING FILED – (EMPLOYER/UNION/ EMPLOYMENT AGENCY/APRENTICESHIP PROGRAM)

Organization Name: _Washington Metropolitan Area Transit Authority_

Address of actual workplace: _600 Fifth Street, NW_

Suite # _6F-21_

City: _Washington_   State: _DC_   Zip Code: _20001_   County: _____

Telephone: ( 202 ) ~~762~~ 637- 7000

Type of business: _Quasi-gov't._

Number of employees: [  ] 15-100  [  ] 101-200  [  ] 201-500  [  ] 500+  [  ] under 15

## CORPORATE OFFICE INFORMATION

Company Name: _Washington Metropolitan Area Transit Authority_

Address: _600 Fifth Street, NW_   Suite # _2nd Floor_

City: _Washington_   State: _DC_   Zip Code: _20001_   County: _____

Telephone #: ( 202 ) _637-7000_

Name and Title of Employer Representative (President/Vice President/CEO/Human Resources Director/Manager, etc.): _Interim GM - Dan Tangherlini_

## OTHER EMPLOYER/ORGANIZATION – You want to include in the filing of this charge. (EMPLOYER/UNION/EMPLOYMENT AGENCY/APRENTICESHIP PROGRAM)

Company Name: _Same as above_

Address: _____   Suite # _____

City: _____   State: _____   Zip Code: _____   County: _____

Telephone #: (   ) _____

## EMPLOYMENT DATA

Date of hire: _11/03/03_ Job title: _Ast. Ping. Proj. Mgr_ Date of separation/termination: _N/A_

Earliest date of harm: _Nov. 1, 2005_   Latest date of harm: _June 2006_

-2-

000127

You believe you have been discriminated against because of: (*Check all that apply*)

[X] Race          [ ] Color          [ ] Religion          [ ] National Origin

[ ] Age (40 or above)          [ ] Disability          [ ] Sex          [ ] Pregnancy

[X] Retaliation for _Charges in question_

If you checked "retaliation," have you ever previously filed a charge with EEOC or another civil rights agency or complained to your employer about discrimination?

[ ] No [X] Yes –If yes, please explain: _Currently in current employer-based_ _civil rights claim and am being subjected to undue and unjustified_ _second round of interviews._

## COMPLAINT INFORMATION

For any block(s) that you checked above, describe the harm and how you feel you were discriminated against. Include names and job titles of all those involved, and the dates you were harmed.

_During an interview with Ms. Debbie Lipman, she asked_ _me to "Help her [me] understand how I [she] would send_ _me to represent the Authority in Virginia where there_ _are "good ole" boys."_

_Her assumptions regarding my race made her make_ _judgements about my abilities to perform the requirements_ _of the position, notwithstanding my qualifications and_ _experience._

_Currently, the Civil Rights Office Director, Ms. Teresa Bailey_ _is attempting to defer making a final recommendation on my_ _case for fear of managements response._

What reason(s) did your employer give for the action(s) taken against you? Or, what do you believe the employer will tell the EEOC?

_Employer will advise EEOC that current complaint is being_ _re-investigated to ensure accuracy of initial investigators_ _investigation._

-3-

Name others who were treated like you:

| NAME | JOB TITLE | RACE/NATIONAL ORIGIN/RELIGION | SEX | AGE |
|------|-----------|-------------------------------|-----|-----|
| None to my knowledge | | | | |

Who are your witnesses?

NAME                    JOB TITLE                    ADDRESS/PHONE#

1. Raymond Feldman , AGM     600 Fifth Street , NW, WDC 20001  962-1726

What will #1 tell us? He heard the comment during my interview with Ms. Lipman and was taken aback.

2. He advised her to be careful of how she questions applicants

What will #2 tell us? Ms. Debbie Lipman, Director, Office of Gov't. relations will say that she does not recall making the comment or Mr. Feldman's talk.

3. Devin Walker, EEO/Dispute Resolution Officer

What will #3 tell us? Teresa Bailey, Office of Civil Rights Director is attempting to delay a final recommendation on my complaint + discredit his investigation

Does the employer you named above require people to pass any of the following before hiring the person: (Check all that apply, if known)

a. A written test?          Do not know  Yes

b. A credit check?          Do not know  Yes

c. A background investigation?    ___X___  Yes

Have you sought help about this problem from any agency, union, attorney, or any other source?

[ ] No  [X] Yes – If yes, from whom and when?  WMATA , Office of Civil Rights

Have you filed a complaint about the action you think was discriminatory with any other federal, state, or local government anti-discrimination agency?

[X] No  [ ] Yes – If yes, name of agency _____  Date: _____

Results if any: _____

-4-

000120

*I declare under penalty of perjury that the information provided herein is true and correct to the best of my knowledge and understanding.*

X _____          X __July 10, 2006__
                Signature                                    Date

Privacy Act Statement:
This form is covered by the Privacy Act of 1974, Public Law 93-579. Authority for requesting and uses of the personal date are given below.

    1. Form Number/Title/Date: Form 283, Intake Questionnaire, 10/94.

    2. Authority: U.S.C. 2000(e)(9), 29 U.S.C. 201, 29 U.S.C. 621

    3. Principal purposes: Provides information from the Charging Party relevant to filing a charge of discrimination.

    4. Routine uses: This questionnaire is used to make an official determination whether facts exist to prepare a charge of discrimination.

    5. Whether disclosure is mandatory or voluntary and effect on individual for not providing information: Voluntary. Failure to provide this information may affect whether the Commission processes your claim further.

Revised 6/06

000136

## Complaint-related Events EEO Case # 570-2006-01517

| April 2006 | Inability to complete graduate school course due to stress; received an incomplete grade |
|---|---|
| June 9, 2006 | Drafted letter for GOVR Director at direction of BPPD Director on Human Services Transportation (HST) issue |
| June 23, 2006 | Called Teresa Bailey who advised that a second interviewer would be reviewing my case and she would get back to me with information on the status. |
| Week of June 26th | Second investigator calls to recount investigation; Craig Kwiecinski calls with a question on the District of Columbia CMAQ allocation. |
| June 21, 2006 | Attended TPB Meeting (D. Lipman Present); provided her with a copy of ridership figures for FAMPO issue (copy of Kristin Haldeman e-mail) |
| June 26, 2006 | Stress-related illness |
| June 28, 2006 | Migraine headache |
| June 28 – July 3, 2006 | Sore throat |
| June 30, 2006 | Doctor's visit (103 Fever); prescribed a Z-pack |
| July 5-10, 2006 | Drafted letter for GOVR Director at direction of BPPD Director on HST issue |
| July 8, 2006 | Migraine headache |
| July 10, 2006 | Filed Federal EEO Complaint |
| July 12, 2006 | Drs. Appointment |
| July 19, 2006 | Attended TPB Meeting (D. Lipman Present) |
| July 20, 2006 | E-mailed Brender Gregory regarding Complaint |
| July 26, 2006 | Received e-mail from Teresa Bailey re: June 20 e-mail |
| July 27, 2006 | Left Teresa Bailey voicemail message to return call |
| July 28, 2006 | Met with Teresa Bailey about status of the investigation |
| August 1, 2006 | Surgery (Out Sick afternoon) |

**EXHIBIT**

1

**Tomika R. Hughey Complainant**
**September 6, 2006 – Addendum for Case # 570-2006-01517 (Filed July 10, 2006)**

| | |
|---|---|
| August 2, 2006 | Met with Brender Gregory regarding investigation and she advised that she wanted to present all of the investigation findings and remedies at one time and would contact me when this was done. |
| August 16, 2006 | Phoned Brender Gregory to find out the status of investigation. (Left message) |
| August 17, 2006 | Left office early due to illness. (Brender Gregory left message) |
| August 17, 2006 | Sick |
| August 18, 2006 | Sick |
| August 20, 2006 | Surgery complications |
| August 22, 2006 | Follow-up on surgery complications |
| August 23, 2006 | Met with Brender Gregory on remedy and findings; advised that I was comfortable with it at 1:30pm and called to request remedies in writing for counsel to review at 5:00pm |
| August 24, 2006 | Spoke with Brender Gregory and advised that I was not comfortable with the remedies and wanted to discuss them; tentatively agreed to meet later in the day but did not. |
| August 25, 2006 | Left message for Ms. Gregory to contact me regarding remedies and findings. |
| August 28, 2006 | Discussed stress of case with Nat Bottigheimer, Director of Planning Office, who recommended that I take some time off due to the stress. |
| August 29, 2006 | Doctor's appointment (Dr. Panahy) for stress-related symptoms: lack of sleep, anxiety, headaches and emotional behavior.  Doctor prescribed meds for stress. Prescriptions filled @ CVS. |
| August 29 – September 11, 2006 | Stress-related sickness (out from work) |
| September 5, 2006 | Received letter from WMATA with findings of non-selection due to race. |

**Tomika R. Hughey Complainant**
**September 6, 2006 – Addendum for Case # 570-2006-01517 (Filed July 10, 2006)**

000087

Case 1:07-cv-01513-RJL    Document 10-10    Filed 07/28/2008    Page 3 of 14

**From:**    Tomika Hughey
**To:**      Gregory, Brender
**Date:**    7/20/2006 10:25:46 AM
**Subject:**  Re: Status of WMATA Complaint - Tomika Hughey

Ms. Gregory,

Thank you for your attention to this request.

Regards,

Tomika

Tomika R. Hughey
Deputy Project Manager
Office of Business Planning & Project Development
Washington Metropolitan Area Transit Authority
600 Fifth Street, N.W.
Washington, D.C. 20001
P: 202-962-2429
F: 202-962-1409
e-mail: thughey@wmata.com

>>> Brender Gregory 07/20/06 10:17 AM >>>
Ms. Hughey,

I will personally investigate the status of your complaint and advise as soon as I have a disposition.

>>> Tomika Hughey 7/20/2006 10:10 AM >>>
Hello Ms. Gregory,

My name is Tomika Hughey and I filed an internal WMATA complaint on February 22, 2006 as a result of non-selection for a position within GOVR.

To date, my complaint has not been finalized by the WMATA Civil Rights Office. The investigator who completed and submitted his findings to Ms. Bailey has been removed from my case and I have been re-interviewed by a new, temporary investigator. As a result of the lack of action with regard to my complaint, I subsequently entered into a formal US EEOC complaint process on Wednesday, July 12, 2006 (see attachement).

Moreover, since the filing of my complaint, my current position responsibilities have changed within BPPD necessitating engagement with the individual against whom I have filed a complaint. This has created a very stressful work environment for me and I respectfully request that this internal investigation be completed expeditiously so that I can move past this experience.

I would like to discuss my case with you at your convenience.

Thank you.

Regards,

Tomika Hughey


Tomika R. Hughey



EXHIBIT

y

000060

Deputy Project Manager
Office of Business Planning & Project Development
Washington Metropolitan Area Transit Authority
600 Fifth Street, N.W.
Washington, D.C. 20001
P:  202-962-2429
F: 202-962-1409
e-mail: thughey@wmata.com

CC:            Moneme, Emeka;  Thomas, Edward L.;  Walker, Devin

000065

**From:** Teresa Bailey
**To:** Hughey, Tomika
**Date:** 7/24/2006 12:55:40 PM
**Subject:** Status of WMATA Complaint

Ms. Hughey,

Ms. Gregory asked me to respond to your July 20, 2006 e-mail. I would like to meet with you upon your return to share the status of your internal EEO complaint and answer any questions you may have.

Please contact me at your earliest convenience at extension 1799.

Regards,

Teresa Bailey


**CC:** Gregory, Brender



000070

August 30, 2006

RETURN RECEIPT REQUESTED

Ms. Tomika Hughey
P. O. Box 1618
Washington, D.C. 20013

Dear Ms. Hughey:

This is to inform you that the Office of Civil Rights (CIVR) has completed its investigation of the complaint of discrimination you filed with our office. You alleged that you were discriminated against based on your race, black, when you were denied consideration for the position of Strategic, Policy and Communications Specialist. You also alleged you were discriminated against because of your race, when you were not selected for the position of Strategic Advocacy Specialist. You further alleged that during the interview with the Selecting Official, Deborah Lipman, you were subjected to racial bias, demonstrated by being asked an inappropriate question. Specifically, you alleged that during the November 9, 2005 interview with Ms. Lipman, she stated to you, "I am trying to understand how I would send you to Virginia where the 'good old boys' are—How would you represent the Authority?" You stated that Ms. Lipman led you to believe that constituents would perceive you differently from a white counterpart when she made that statement.

Our investigation found sufficient evidence to support a probable cause finding of discrimination in the failure to consider you for the Strategic, Policy and Communications Specialist position and failure to select you for the Strategic Advocacy Specialist position. Moreover, witness statements tend to give credence to your claim regarding Ms. Lipman making a statement that appeared to have racial overtones.

It is WMATA's policy to provide a work environment free from unlawful discrimination in any form. Therefore, the Department of Workforce Development and Administration will take the appropriate action to resolve this matter. Under separate cover, you will receive the specific terms proposed to make you whole. Additionally, you should know that Ms. Lipman's conduct will be subject to appropriate administrative action, including a requirement to attend diversity training.

This decision is final within WMATA. If you disagree with this finding, you have a right to file a complaint of discrimination with the U. S. Equal Employment Opportunity Commission (EEOC), Washington Field Office, 1801 L Street, N.W., Suite 100, Washington, D.C. 20507-1002.

Sincerely,

Teresa R. Bailey
Director,
Office of Civil Rights

**EXHIBIT**

V

000150

Washington
Metropolitan Area
Transit Authority

0 Fifth Street, NW
ington, DC 20001
202/962-1234

By Metrorail:
ry Square—Red Line
y Place-Chinatown—
Red, Green and
Yellow Lines
By Metrobus:
tes D1, D3, D6, P6,
70, 71, 80, X2

## 1. COMPLAINANT

Name:            Tomika R. Hughey
Mailing Address: P.O. Box 1618, Washington, D.C. 20013-1618
Phone:           202-289-8846 (H)
                 202-486-0346 (C)
                 202-962-2429 (O)
e-mail:          xeropholous@yahoo.com

Physical Address:  515 L Street, NW
                   Washington, D.C. 20013-1618

## 2. COMPANY INFORMATION

Washington Metropolitan Area Transit Authority (WMATA)
600 Fifth Street, NW
Washington, D.C. 20001

Number of Employees: 10,000+

EXHIBIT

W

ALL-STATE LEGAL®

## 3. EVENT DESCRIPTION

I feel that I have been discriminated against, based upon my race, when on February 21, 2006, I became aware that I was not selected for the positions of Strategic Policy and Communications Specialist (2 Vacancies) and Strategic Advocacy Specialist (1 Vacancy). All three of the aforementioned positions were interviewed and hired by the same panel process. On February 22, 2006, I filed a formal internal WMATA complaint upon receiving this information. As a result of the ongoing Authority investigation, information has surfaced that reveals racial bias, lack of documentation during the interview and selection process, lack of oversight by WMATA's Human Resource Office, and a course of conduct by Ms. Lipman and other WMATA staff that is in clear violation of WMATA guidelines, processes and procedures, and U.S. Equal Employment Opportunity Commission laws.

It is through the course of the formal WMATA investigation that I was made aware of the hiring dates, interviews, etc. of the incumbents for the positions in question.

The above information is important and critical to establishing that my complaint is within the 180-day filing period.

The first investigator, Mr. Devin Walker, was removed from the investigation on June 9, 2006 for unknown reasons. On June 15, 2006, Mr. Walker advised that I follow-up with Ms. Teresa Bailey, Director of Civil Rights, as he had submitted his final report and recommendations and Ms. Bailey should be prepared to close the complaint soon thereafter. After speaking with Ms. Bailey on June 23rd, she advised that a second investigator, Ms. Ann Anderson, a temporary employee, who has been with the Authority for just over a month, would be reviewing the complaint and after that occurred, Ms. Bailey would contact me.

Since June 28, 2006, I have been asked by Ms. Anderson to revisit issues related to my complaint that are the source of great emotional stress.    During these conversations with Ms. Anderson, I have also been provided more details about the egregious behavior of Ms. Lipman during the selection process for these positions.

As a result of my non-selection due to race and subsequently filing a complaint, I have constantly questioned my skills as a professional, leading to a loss of self-esteem and confidence.   Moreover, the lack of resolution on the part of the Civil Rights Office is distressing as my current position within the Authority requires me to work directly with Ms. Lipman.

It has been over 120 days since filing my complaint and I am not confident in the Office of Civil Rights to fairly and efficiently resolve my complaint.

## 4.  DATE OF EVENTS

February 21, 2006 - Knowledge of non-selection
February 22, 2006 – Filed Formal Internal WMATA Complaint

## 5.  NAMES, ADDRESSES, AND TELEPHONE NUMBERS OF ANY WITNESSES

Mr. Ray Feldmann, Assistant General Manager (INTERVIEW WITNESS)
Department of Customer & Media Relations
WMATA
600 Fifth Street, NW
Washington, D.C. 20001
Phone: 202-962-1726

Ms. Deborah S. Lipman, Director (CHARGES FILED AGAINST)
Office of Intergovernmental Relations
WMATA
600 Fifth Street, NW
Washington, D.C. 20001
Phone: 202-962-1003

***

## WMATA OFFICE OF CIVIL RIGHTS STAFF

Ms. Teresa Bailey, Director
Office of Civil Rights
WMATA
600 Fifth Street, NW
Washington, D.C. 20001
Phone: 202-962-1082

Mr. Devin Walker – 1st Investigator
EEO/Dispute Resolution Officer
Office of Civil Rights
WMATA
600 Fifth Street, NW
Washington, D.C. 20001
Phone: 202-285-1927

Ms. Ann Anderson – 2nd Investigator
EEO/Dispute Resolution Officer
Office of Civil Rights
WMATA
600 Fifth Street, NW
Washington, D.C. 20001
Phone: 202-962-2381

Ms. Saundra Johnson – Intake Investigator
EEO/Dispute Resolution Officer
Office of Civil Rights
WMATA
600 Fifth Street, NW
Washington, D.C. 20001
Phone: 202-962-2383

**6.  NO SIMILAR CHARGES HAVE BEEN FILED WITH A STATE OR LOCAL FAIR
EMPLOYMENT PRACTICE AGENCY**

**7.  NAME, ADDRESS, AND TELEPHONE NUMBER OF A PERSON WHO ALWAYS
KNOWS WHERE TO CONTACT THE PERSON WISHING TO FILE A CHARGE**

Ms. Alanna Phillips
Thomson Financial
195 Broadway
New York, New York 10007
Phone: 646-822-3302 (O)
          914-755-7441 (C )

Ms. Medina Foreman
100 Park Brooke Court
Stafford, Virginia 22554
Phone: 540-659-1460 (H)
          571-237-7073 (C)



**U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**
**Washington Field Office**

1801 L Street, N.W., Suite 100
Washington, D.C. 20507
(202) 419-0700
TTY (202) 419-0702
FAX (202) 419-0740

September 28, 2006

Ms. Tamika R. Hughey
P.O. Box 1618
Washington, DC 20013

Dear Ms.Hughey:

Enclosed please find six (6) copies of the charge of discrimination. In order for the Commission to investigate your allegations, you must sign and date these documents and return them to this office by either **mail, fax** or **hand deliver** as soon as possible. Please sign and date the charge in the lower left-hand corner only and keep one copy for your records.

Please be advised that the Equal Employment Opportunity Commission also offers a Mediation program which provides parties with an opportunity to resolve the issues of a charge prior to an investigation. Please indicate your desire on the Agreement to Mediate form of whether you would/would not like to participate.

Please return the completed charge along with the Agreement to Mediate form to me as soon as possible. The law requires that charges of discrimination be filed with us within 300 days (in some cases 180 days) from the date the alleged discriminatory action occurred.

Should you have any questions, please feel free to contact me at (202) 419-0731.

Sincerely,

Eugene T. Reed

Eugene T. Reed, Jr.
Intake Officer (ISA)

Enclosure(s):
EEOC Form 5, Mediation Fact Sheet, and
Agreement to Mediate



000150

EEOC Form 5 (5/01)

| CHARGE OF DISCRIMINATION | Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|---|
| This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form. | ☐ FEPA<br>☒ EEOC | 570-2006-01517 |

and EEOC

_State or local Agency, if any_

| Name (indicate Mr., Ms., Mrs.)<br>**Ms. Tamika R. Hughey** | Home Phone (Incl. Area Code)<br>**(202) 289-8846** | Date of Birth<br>**12-23-1971** |
|---|---|---|
| Street Address<br>**P.O. Box 1618** | City, State and ZIP Code<br>**Washington, DC 20013** | |

Named is the Employer, Labor Organization, Employment Agency, Apprenticeship Committee, or State or Local Government Agency That I Believe Discriminated Against Me or Others. *(If more than two, list under PARTICULARS below.)*

| Name<br>**WMATA** | No. Employees, Members<br>**500+** | Phone No. (Include Area Code)<br>**(202) 637-7000** |
|---|---|---|
| Street Address<br>**600 Fifth Street, N.W.** | City, State and ZIP Code<br>**Washington, DC 20001** | |
| Name | No. Employees, Members | Phone No. (Include Area Code) |
| Street Address | City, State and ZIP Code | |

DISCRIMINATION BASED ON (Check appropriate box(es).)

☒ RACE   ☐ COLOR   ☐ SEX   ☐ RELIGION   ☐ NATIONAL ORIGIN
☐ RETALIATION   ☐ AGE   ☐ DISABILITY   ☐ OTHER (Specify below.)

DATE(S) DISCRIMINATION TOOK PLACE
Earliest **02-21-2006**   Latest **02-21-2006**

☐ CONTINUING ACTION

THE PARTICULARS ARE (If additional paper is needed, attach extra sheet(s)):

I.  On 11/3/03, I commenced working for Respondent as an Assistant Planning Project Manager. In 9/05, I applied for a promotion to fill one of two vacancies for the position of Strategic Policy Analyst. My qualifications exceeded the minimal qualifications for this position. On 11/1/05, I was interviewed for this position by an interview panel. Thereafter, on approximately 2/21/06, I learned that I was denied selection to fill a vacancy for this position. By contrast, less qualified White applicants with less qualifying education and experience were selected to fill the two vacancies for this position. Presently, I am employed by Respondent as a Transit Economist Analyst.

II.  I believe that I have been discriminated against based upon my race, Black, in violation of Title VII of the Civil Rights Act of 1964, as amended.

**EXHIBIT**
Y
ALL-STATE LEGAL®

| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – When necessary for State and Local Agency Requirements |
|---|---|
| I declare under penalty of perjury that the above is true and correct. | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief.<br>SIGNATURE OF COMPLAINANT |
| _October 5, 2006_        _[signature]_<br>Date        Charging Party Signature | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE<br>(month, day, year) |

000118

## MEMORANDUM

**TO:**        Teresa Bailey, Director
               Office of Civil Rights

**FROM:**      Ray Feldmann, Acting Assistant General Manager
               Department of Customer and Media Communications

**DATE:**      Friday, November 17, 2006

**RE:**        EEOC Charge No. 570-2006-01517
               Filed by Tomika Hughey

This memo is my formal response to allegations filed by Tomika Hughey that she was not selected for a position in the Office of Policy and Government Relations on the basis of her race. I believe those allegations to be untrue and totally without merit.

In mid-2005, then GM and CEO Richard A. White authorized the hiring of three persons for a newly created Policy branch inside the Office of Intergovernmental Relations. Working closely with office director Deborah Lipman, position descriptions were developed and ads were placed in local newspapers seeking qualified applicants. We began those interviews in September 2005 and interviewed numerous candidates. As background, we interviewed a diverse mix of candidates, including African American males and African American females, as well as white females and males. We asked a series of questions that were consistent with every applicant.

Although all three positions were to be part of this new Policy branch office, we were seeking individuals with very different skill sets. We wanted one person with budget and power point presentation expertise, another with Federal government and Capitol Hill experience, and a third with stakeholder and advocacy group relationship building skills. It was clear from some of our initial interviews that Greg Potts met the qualifications for the budget and power point presentation person, and that Jeanine Black had the experience and qualifications to assist us with Federal government and Capitol Hill work.

As we sought to find a candidate with the skills necessary to be assigned responsibility for stakeholder and advocacy group relationship building, we interviewed Ms. Hughey. Both Ms. Lipman and I felt that Ms. Hughey had good background in this area, based on her work here at WMATA as well as her prior work experience. During the course of the interview with Ms. Hughey, Ms. Lipman asked a question along the lines of, "What would you do if you had to go into some parts of Virginia and meet with some of the good ol' boys?" Although I understood that with her question Ms. Lipman was trying to get a sense of how Ms. Hughey would work in unfamiliar territory with people she didn't know well, I was concerned that Ms. Hughey might interpret the question differently.

EXHIBIT
Z

542

When the interview with Ms. Hughey concluded, I expressed my concerns about that question to Ms. Lipman and cautioned her that questions of that nature should not be asked in any future interviews, either for this particular position or any other that may become available in the future. As we did with each candidate, following the interview Ms. Lipman and I discussed Ms. Hughey's qualifications and her answers to our questions. We both agreed that Ms. Hughey was a solid candidate and could possibly be selected for the third and final position we were seeking to fill, although we had one additional candidate left to interview.

Shortly after we interviewed Ms. Hughey, we interviewed Craig Kwiecinski. Both Ms. Lipman and I found him to be an excellent candidate with many of the skills we were seeking for this particular position. He had served for nearly 10 years in key staff positions for the Mayor of Pittsburgh, PA. Because he was not from this region, we asked Mr. Kwiecinski a question very similar to the question we asked of Ms. Hughey, along the lines of "How would you be able to mix with, and build relationships with, organizations and people in areas of this region you don't know very well?" His answer was thoughtful and impressive, as was Ms. Hughey's response to the similar question.

Following the interview with Mr. Kwiecinski, Ms. Lipman and I quickly agreed that he was our #1 candidate for the position based on his years of experience and the specific kind of work he had done. We agreed to inform the Department of Workforce Development and Administration (WFDA) that he was our preferred candidate and ask that he receive a formal offer for the position. He later accepted and came to work for WMATA in January 2006.

I can assure you that the selection of Mr. Kwiecinski over Ms. Hughey was based solely and exclusively on his experience, background, and qualifications, and had NOTHING whatsoever to do with the race or color of either Mr. Kwiecinski or Ms. Hughey. In all of the hiring decisions I have made since I came to WMATA in October 1999 as Director of Media Relations, I have always and consistently chosen the best possible person for the job from a pool of qualified candidates that was both gender and race diverse.

Mr. Kwiecinski has proven to be an excellent employee during the past 10 months. In a follow-up interview with Ms. Hughey, I expressed to her that the only thing which prevented her from being selected was that Mr. Kwiecinski had more practical experience than she did. I also encouraged her to continue to work at WMATA because I was sure with her talents and abilities, she would have many more promotional opportunities available to her in the future.

Please let me know if there is any additional information you need from me related to this complaint. I would be happy to discuss the details of this memorandum if you desire a face-to-face interview. I signed off on the selection of Mr. Kwiecinski over Ms. Hughey and I stand by it. That selection was made on the basis of the relative qualifications and experience of the two applications, and nothing more.

Thank you.

*PARTIALLY REDACTED*

**From:** Devin Walker
**To:** Bailey, Teresa
**Date:** Fri, Jun 9, 2006 11:45 AM
**Subject:** Re: Hughey Complaint!

Teresa:

I am making the changes to the ROI and documents per your instruction and should have them completed by next week.

However, I am asking to be removed from any further action with this case because I feel that I was retaliated against and subjected to intimidation for finding discrimination against Katrina, which is a part of my formal complaint to the Chief of Staff in May.  This represents one conflict of interest.

Another conflict centers around the changes you made by crossing out the recommended discipline against Katrina, whereas I requested a one day suspension.  Understanding that Katrina is resigning, I feel that we should at least acknowledge that we were considering discipline, but because of her termination, the issue was moot.  The conflict of interest in this instance is that I do not want anyone to think that I am persistent in my recommendation of discipline against Katrina simply because she is listed as an Alleged Discriminating Official in my complaint.  This is not the case.  I feel that based upon the facts in this complaint alone, such discipline is warranted.

Devin

>>> Teresa Bailey 6/8/2006 4:41 PM >>>
Devin,

If you review my changes again and recall my conversation correctly, I indicated that the complaints made by ESBR staff should not be included in the Hughey matter.  I never stated that your findings regarding HR should not be made a part of this complaint.  This specific statement is a misrepresentation of my verbal and written comments regarding your draft.  I agree that HRMS is culpable in this matter for their failure to oversee and review the recruitment and selection process appropriately.  My position on this has not changed.  If you notice, I did not indicate on your draft that your analysis and conclusion around this specific issue be deleted.  Further, I asked that you address HRMS management regarding their lack of adherence to pertinent guidelines under the resolution section.

I remain strongly opposed to the inclusion of complaints made by ESBR staff in this document when these issues were not raised as a result of this investigation, those accused were not given the opportunity to respond to the allegations, and any such response is not included in your evaluation of this matter.  In fact, you advised me during the investigation of *(REDACTED)* complaint that a number of ESBR staff complained about their inability to do their jobs.  I asked you at that time to document their complaints and I would ensure that it would be investigated and resolved properly. You sent me an e-mail sometime later indicating that you hadn't been able to get that information yet. I still believe this is the appropriate way to handle their concerns.

I am not certain to what you refer in the fourth paragraph of your e-mail.  What is the potential conflict of interest?  Are you asking to be removed from this case?  As you well know, case assignments are determined by me.

Please respond.  Also, please ensure that you answer all questions cited on your draft.

Teresa

>>> Devin Walker 6/8/2006 3:58 PM >>>
Teresa:



1066