**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| TOMIKA HUGHEY | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civil Action No. 07 CV 01513 |
| | ) (RJL) |
| | ) |
| WASHINGTON METROPOLITAN | ) |
| AREA TRANSIT AUTHORITY | ) |
| | ) |
| Defendant. | ) |

**CORRECTED MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY
JUDGMENT**

COMES NOW, Tomika Hughey, by and through her undersigned counsel, and hereby respectfully submits this opposition to defendant's Motion for Summary Judgment.

**STATEMENT OF MATERIAL FACTS IN DISPUTE**

Pursuant to Local Rule 7(h), plaintiff respectfully submits the following statement of material facts for which there exists a genuine dispute.

1.      Plaintiff admits the facts contained in paragraph 1 of defendant's Statement of Material Facts.

2.      Plaintiff *denies* that the facts contained in paragraph 2 of defendant's Statement of Material Facts to the extent that the hiring panel recommended Ms Hughey for the two Strategic Communications positions. (Exhibit G)**.**

3.      Plaintiff admits the facts contained in paragraph 3 of defendant's Statement of Material Facts.

4.      Plaintiff admits the facts contained in paragraph 4 of defendant's Statement of

¶Material Facts.

5.     Plaintiff admits the facts contained in paragraph 5 of defendant's Statement of Material Facts.

6.     Plaintiff *denies* the facts contained in paragraph 6 of defendant's Statement of Material Facts to the extent that she was never told by Lipman or Feldman during her that she was no longer under consideration for either of the two Strategic Communications positions. (Exhibit E at ¶ 6).

7.     Plaintiff admits the facts contained in paragraph 7 of defendant's Statement of Material Facts, but denies that the conversation between Lipman and Ms. Hughey took place "just after Thanksgiving 2005. (Exhibit E ¶ 9).

8.     Plaintiff admits the facts contained in paragraph 8 of defendant's Statement of Material Facts that she was informed on or about December 8, 2005, that she had not been selected for the Strategic Advocacy position. (Exhibit E ¶ 9). Plaintiff has no personal knowledge that a WMATA announcement was made on December 7, 2005, relating to the hiring of candidates for the Strategic Policy and Communications positions and therefore *denies* the allegations contained in defendant's Statement of Material Fact. (Exhibit E ¶ 29).

9.     Plaintiff *denies* the facts contained in paragraph 9 of defendant's Statement of Material Facts to the extent that Ms. Hughey protested her non-selection for the two Strategic Policy and Communications positions and the Strategic Advocacy position during her initial contact with the Washington Field Office of the EEOC on July 10, 2006. (Exhibit E ¶¶ 21 and 22; Exhibit R).

10.     Plaintiff *denies* the facts contained in paragraph 10 of defendant's Statement of Material Facts. (Exhibit E ¶¶ 21, 22 and 27; Exhibit R; Exhibit W).

11.     The screening panel recommended Black, Potts, Hughey, Robert Fuentes, a Hispanic, Horace Jennings, an African-American male, and Sara Jennings, a white woman, for the Strategic Communications positions.  For the Strategic Advocacy position, the panel recommended Jennings, Evelyn Frazier, an African-American woman, and Steve Strauss, a white male, for the position.  The panel recommended considering Craig Kwiecinski, a white male, only after interviewing the other candidates. (Exhibit G).

12.     According to Ms. Hughey, Lipman told her during the interview that she believed that Ms. Hughey's "skills best fit" the Strategic Advocacy position, but did not inform her that she was *not* being considered for the two Strategic Communications positions. (Exhibit E ¶ 6).

13.     During the course of her *own* investigation into defendant's illegal conduct in the Spring of 2007, Ms. Hughey learned that defendant had announced on or about December 7, 2005, that the positions for the Strategic Policy and Communications positions had been filled. Ms. Hughey had no actual or first-hand, contemporaneous knowledge of any WMATA announcement or that the positions had been filled until she was informed on February 21, 2006, when Feldman told her. (Exhibit E ¶¶ 12, 29; Exhibit "Z").

14.     On July 10, 2006, Ms. Hughey went to the Washington Field Office of the EEOC and completed an Intake Questionnaire. (Intake Questionnaire, incorporated herein as Plaintiff's Exhibit "S").  Ms. Hughey believed and told the EEO that the Office of Civil Rights was "dragging its feet" to make a final recommendation for "fear of management's response." (Exhibit E ¶ 21; Exhibit S).  On that day, Ms. Hughey also submitted to the EEOC a written summary of her complaint.  In addition to myself another candidate was highly qualified and not selected for either of the advertised positions, according to the current ongoing, internal WMATA investigation." (Exhibit R, p. 1).  Finally, Ms. Hughey complained that she was "not

confident in the [WMATA's] Office of Civil Rights to fairly and efficiently resolve my case."
(Exhibit R, p. 2).

## INTRODUCTION

Tomika Hughey filed suit against defendant, her former employer, for its willful and
maliciously discriminatory acts against her on the basis of her race when it denied her promotion
opportunities during the fall and winter of 2005 and 2006.  Ms. Hughey submits that defendant
violated Title VII of the Civil Rights Act of 1964 when it denied her promotion and other
opportunities on the same basis as non-statutorily protected individuals.  In short, defendant's
motion for summary judgment is baseless.

## FACTS

Tomika Hughey ("Ms. Hughey"), an African-American woman, had been employed with
Washington Metropolitan Area Transit Authority ("WMATA") in Washington, D.C. as an
Assistant Planning Project Manager since November 3, 2003.  Prior to arriving at WMATA, Ms.
Hughey had received a Bachelor's degree in Finance from Howard University, a Master's of
Science degree in Urban/Transportation Planning from Florida State University, and was
pursuing a second Master's of Science degree in Historic Preservation from the George
Washington University with an emphasis in the preservation of transportation systems and
resources.   At WMATA, Ms. Hughey was assigned to work in the Office of Business Planning
& Project Development.   Her duties in that office included, but were not limited to managing the
community outreach and environmental processes for the Anacostia Corridor Demonstration
Project and the multi-million dollar District of Columbia-funded District of Columbia Transit
Alternatives Analysis (DCAA).  Ms. Hughey also acted as a liaison and representative for
WMATA on all District of Columbia economic development, planning and transportation

projects and provided  analysis of future land development trends in the District of Columbia and their impact on existing and future Metrorail and Metrobus service.  Ms. Hughey was also assigned as a liaison to the Metropolitan Washington Council of Governments (MWCOG) and the Washington Metropolitan Area Planning Organization (MPO) to ensure WMATA's engagement with the regional jurisdictions. (Complaint at ¶ 6).

In her 2005 to 2006 performance review, Ms. Hughey was rated either outstanding or exceeds expectations on 10 out of 11 rating categories and an overall rating of "exceeds expectations." (Performance Review of Tomika Hughey, incorporated herein as Plaintiff's Exhibit "A").  Ms. Hughey's supervisor noted that she had "demonstrated on numerous occasions real acumen in assessing alternative approaches to preparing and delivering information for both executive decision-making and public presentation.  She also has been very energetic in becoming involved with . . . doing stakeholder outreach as a precursor to scope preparation." (Exhibit A at Bates Number 15).

On or about July 21, 2005, WMATA issued vacancy announcements for three new positions in the Department of Policy and Government Relations.  Two of the new positions were for Strategic Policy and Communications Specialists. ("Strategic Policy and Communications"). (Deposition Transcript of Deborah Lipman, pp. 19-20, incorporated herein as Plaintiff's Exhibit "B").  The job descriptions for both Strategic Policy and Communications positions were identical. (Exhibit B, pp. 20-21).  The third new position in the Government Relations Department was for a Strategic Advocacy Specialist. ("Strategic Advocacy"). (Exhibit B, pp. 21-22).

In September 2005, Ms. Hughey applied for a promotion to fill the vacancy for the Strategic Advocacy Specialist and the two vacancies for Strategic Policy and Communications

Specialists.  The minimum qualifications for each position were a Master's Degree in planning and eight years of experience in public administration and government relations.  The Strategic Advocacy Specialist, specifically, involved "developing and recommending strategic positions for the authority and communicating those on behalf of the Authority; communicating/business/stakeholder outreach and coalition building; directing and performing research and analysis to support the Authority's communications bother internally and externally; assist in the developing of policy."  The Strategic Policy and Communications Specialist positions involved "analyzing, developing  and recommending policy and strategic positions for the Authority and communicating those on behalf of the Authority; research and analysis to support the Authority's communications both internal and externally." (Complaint at ¶ 7; Job Descriptions, incorporated herein as Plaintiff's Exhibit "C").

Ms. Hughey not only possessed the minimum qualifications for each of these positions, but had extensive experience in urban planning with a specific expertise in building neighborhood planning capacity and public involvement and participation in urban transportation and economic development projects in small (up to 250,000 population) and large (over 500,000+ population) urban areas.  Her experience included engaging communities in Los Angeles, California for the proposed extension of the Red Line Metrorail for the Los Angeles County Metropolitan Transit Authority (LACMTA) and aided underserved Los Angeles communities in identifying methods to enhance their access to transit and transit information; conducting community outreach to support long range planning efforts of Tallahassee-Leon County, Florida;  the analysis of the capital and operating budgets of  Federally-funded transit properties in the United States as a former Transit Analyst for over 80 public transit agencies in support of the Federal Transit Administration's (FTA) National Transit Database (NTD);

directing all activities (outreach strategy, campaign events, primary and general election staffing) as the Ward 6 Coordinator for the Re-Election Campaign of Mayor Anthony Williams; and managing the volunteer-led and publicly funded revitalization efforts of the H Street, NE commercial corridor as the first Executive Director of the H Street Main Street Program. (Complaint at ¶ 7).

Since the positions were in the department of Policy and Government Relations, Deborah Lipman, its Director and a white female, and Ray Feldman, her immediate supervisor and a white male, were picked as the selecting officials for all of the positions. (Exhibit B, pp. 15-16). This was Lipman's sixth occasion as a hiring official at WMATA and was familiar with the defendant's hiring procedures. (Exhibit B, pp. 12-13). According to Lipman, following any interviews, the hiring official sends a recommendation to WMATA's Human Resources Department, which makes the final determinations and extends an offer to a successful candidate. (Exhibit B, pp. 13-16).

On September 1, 2005, submitted her applications for the vacancy announcements. (Tomika Hughey's Applications, incorporated herein as Plaintiff's Exhibit "D"; Declaration of Tomika Hughey ¶3, incorporated herein as Plaintiff's Exhibit "E"). Ms. Hughey and the other candidates' applications were sent to Sandy Reed, a recruiter in the office of Human Resources (Exhibit B, pp. 23-24), and an initial hiring panel consisting of Shiva Pant, who was assigned as chair of the panel, Matthew Greenwald and Candace Smith was convened to screen and interview applicants. (Exhibit B, p. 24; Investigative Report of Anne Anderson, p. 5, incorporated herein as Plaintiff's Exhibit "F").

On November 1, 2005, the panel interviewed Ms. Hughey for each of the three open positions. (Exhibit D ¶ 4). Following their initial interviews, the panel recommended Black,

Potts, Hughey, Robert Fuentes, a Hispanic, Horace Jennings, an African-American male, and Sara Jennings, a white woman, for the Strategic Communications positions. For the Strategic Advocacy position, the panel recommended Jennings, Evelyn Frazier, an African-American woman, and Steve Strauss, a white male, for the position. The panel recommended considering Craig Kwiecinski, a white male, only after interviewing the other candidates. (Written Recommendations submitted by Shiva Pant, incorporated herein as Plaintiff's Exhibit "G"). As to the Strategic Advocacy position, Craig Kwiecinski was one of the two *least* recommended candidates for the position. (Exhibit F, p. 5).

According to Lipman she received the candidates applications after the panel completed its work, and Lipman determined whom to interview based on the panel's recommendations. (Exhibit B, pp. 25-26). Curiously, Shiva Pant informed the investigator that he had not provided Lipman with *any* information about the panel's recommendations until November 9, 2005. Pant further told the WMATA investigator that he did not know how Lipman could effectively hold second interviews without having reviewed the panel's written reports. (Exhibit G, p. 5). Nevertheless, before the panel had even interviewed Ms. Hughey, Lipman and Feldman interviewed two white applicants from outside WMATA, Gregory Potts and Jeanine Black. On October 11, 2005, Lipman and Feldman interviewed Potts. On October 21, 2005, Black was interviewed by Lipman and Feldman. (Exhibit B, pp. 29, 32, 39). Although during the investigation of Ms. Hughey's complaint Lipman denied knowing Black before conducting her interview (Exhibit B, p. 60; Interview Notes of Deborah Lipman, incorporated herein as Plaintiff's Exhibit "H"), Lipman had indeed known Black from her work with a former

employer. (Exhibit B, pp. 33-34, 60). Black was unemployed at the time of her interview. (Exhibit B, pp. 34-35).

Following the interviews of Potts and Black, Lipman determined that she had found candidates with the "skill sets" for the two Strategic Communications positions, and set about interviewing candidates for the Strategic Advocacy position. (Exhibit B, pp. 26, 38-39). Lipman did not recall whether <u>any</u> candidate was interviewed for the Strategic Communications positions other than Potts and Black. (Exhibit B, pp. 40-41). Despite Lipman's protests that she relied on the panel's recommendations in evaluating the candidates, Lipman had interviewed and made initial determinations about Potts and Black's candidacies before the panel had even interviewed Ms. Hughey. (Exhibit B, pp. 31-32).

On November 8, 2005, Lipman began to contact Black's references. (Exhibit B, p. 46). The next day, Lipman directed her assistant to contact Pott's references. (Exhibit B, pp. 46-47). Indeed, despite the fact that Potts and Black had been interviewed weeks earlier, in an email for her assistant regarding Potts and Black's references, Ms. Lipman expressed extreme urgency in completing the hiring process:

> I am requesting this be done ASAP so we can complete the hiring process for two very well qualified candidates. We are in grave jeopardy of losing the selected candidates. So it is imperative that we move this on the fast track.

(Exhibit B, pp. 58-59; Email from Deborah Lipman, dated November 8, 2005, incorporated herein as Plaintiff's Exhibit "I").

Later that day, Lipman and Feldman belatedly got around to interviewing Ms. Hughey. Although Lipman knew Ms. Hughey and they worked in the same building, Lipman and Feldman did not interview Ms. Hughey until November 9, 2005, almost a full month after her

interview with Gregory Potts. (Exhibit B, pp. 30, 33-34, 41, 42, 60; Exhibit F, p. 3; Exhibit E ¶5).

Coincidentally, Lipman received panel's recommendation on the same day as Ms. Hughey's interview as well. (Exhibit B, p. 49).  Although the panel had recommended that Ms. Hughey be interviewed for the Strategic Communications positions, Lipman claimed that the panel's report indicated that Ms. Hughey was "more interested in outreach," and Ms. Lipman considered the Strategic Advocacy position a "better fit" for Ms. Hughey. (Exhibit B, pp. 28-29, 50).  According to Ms. Hughey, Lipman told her during the interview that she believed that Ms. Hughey's "skills best fit" the Strategic Advocacy position, but did not inform her that she was *not* being considered for the two Strategic Communications positions. (Exhibit E ¶ 6).

According to Lipman, a final decision on Black and Potts' candidacies had not yet been made, and that had not been "hired," but WMATA was "moving in that direction."(Exhibit B pp. 48, 50).  During the course of the interview, Ms. Lipman asked, "I am trying to understand how I would send you to Virginia where the 'good old boys' are - how would you represent the Authority." (Exhibit E ¶ 7).  Neither Lipman nor Feldman took notes during the interview. (Exhibit F, p. 2-4).  Lipman and Feldman did not rank the candidates. (Exhibit B, p. 51).

On the day of Ms. Hughey's interview, Lipman forwarded to Sandy Reed a recommendation that Potts and Black be hired for the two Strategic Communications positions. In her memorandum to Reed, Lipman claimed that all six candidates recommended by the panel, including Ms. Hughey, had been "interviewed" for the position. (Report by Deborah Lipman to Sandy Reed, dated November 9, 2005, incorporated herein as Plaintiff's Exhibit "J").

According to Feldman, Ms. Hughey was his choice to fill the Strategic Advocacy position. (Exhibit F, p. 4).  Nevertheless, he agreed with Lipman to interview Craig Kwiecinski

(Exhibit F, p. 4), and Lipman and Feldman interviewed Kwiecinski, a white male, for the Strategic Advocacy position on November 21, 2005. (Exhibit B, p. 57). On November 28, 2005, Lipman recommended Kwiecinski for the Strategic Advocacy position. (Report by Deborah Lipman to Sandy Reed, dated November 8, 2005, incorporated herein as Plaintiff's Exhibit "K"). On or about December 9, 2005, Hughey was informed that another candidate had been hired to fill the Strategic Advocacy position. (Exhibit E ¶ 9).

On February 21, 2006, Ms. Hughey met with Feldman at his request. Feldman informed Ms. Hughey that he believed that Lipman's comments about "good old boys" during the interview were inappropriate and racially motivated. Feldman further informed Ms. Hughey that the Strategic Communications positions had been filled by two external white candidates. (Exhibit E ¶¶ 11-12). The next day, Ms. Hughey filed a complaint through WMATA's internal process on February 22, 2006. Ms. Hughey complained that Ms. Lipman's statement during the interview made her "feel as though constituents may perceive me differently because of my racial background." (Tomika Hughey's Internal WMATA Complaint, incorporated herein as Plaintiff's Exhibit "L"). WMATA also acknowledged that on February 22, 2006, Ms. Hughey had alleged discrimination when WMATA failed to consider her for the Strategic Policy and Communications Specialist positions and failed to select her for the Strategic Advocacy Specialist position. (Letter to EEOC from Teresa Bailey, dated November 20, 2006, incorporated herein as Plaintiff's Exhibit "M").

According to WMATA's internal complaint procedures, investigations into complaints of discrimination were to be completed within 90 days from receipt. (WMATA Procedures: Discrimination Complaints, incorporated herein as Plaintiff's Exhibit "N"). Ms. Hughey cooperated fully with the investigation, and the case was assigned to Devin Walker, an

investigator with WMATA's Office of Civil Rights. (Exhibit E ¶ 14). During the course of the investigation, Walker informed Ms. Hughey that the evidence in her case, along with that of another complainant's, reflected negatively on the WMATA managers and the Human Resources Department. Walker advised Ms. Hughey that he had warned about lax oversight by Human Resources during the past hiring processes. (Exhibit E ¶ 15.). Nonetheless, Walker assured Ms. Hughey that his report on her internal discrimination complaint would be completed within the 90-day period. (Exhibit E ¶ 15). On or about May 4, 2006, well within the 90-day period, Devin Walker referred his findings sustaining Ms. Hughey's allegations of discrimination to Teresa Bailey. As a remedial measure, Walker recommended that Lipman receive a five-day suspension. (Devin Walker Report, incorporated herein as Plaintiff's Exhibit "O"; Email from Devin Walker, dated May 4, 2006, incorporated herein as Plaintiff's Exhibit "P"). On May 10, 2006, Teresa Bailey forwarded to then acting general manager Dan Tangherlini the results of Walker's investigation and findings of probable cause. (Memorandum from Teresa Bailey to Dan Tangherlini, incorporated herein as Plaintiff's Exhibit "Q").

On June 9, 2006, Devin Walker was removed as the investigator on Ms. Hughey's matter, and Walker advised Hughey to "follow-up" with Teresa Bailey, Director of WMATA's Office of Civil Rights. (Tomika Hughey Submission to EEOC, dated July 10, 2006, incorporated herein as Plaintiff's Exhibit "R"). Walker told Hughey for the first time that he had submitted a final report and recommendations to the Office of Civil Rights. (Exhibit R, p. 1). By June 2006, Ms. Hughey had not received the report of investigation for her internal complaint, and on June 23, 2006, Ms. Hughey called Bailey for a status. Bailey eventually told Ms. Hughey that Anne Anderson, another investigator, would be assigned her case. (Exhibit E ¶ 19; Exhibit R, p. 2). Ms. Hughey inquired why another investigator was being assigned to her matter, and Bailey

responded that it was "customary" for cases to be reviewed by other investigators. (Exhibit E ¶ 20).  A few days later, Anderson contacted Hughey and again interviewed her about her claims. (Exhibit E ¶ 20; Exhibit R, p. 2).  Despite the curious delay in completing the investigation into Ms. Hughey's complaints of discrimination, neither Teresa Bailey, Brender Gregory, Deputy Manager of Workforce Development and Administration,  nor Anne Anderson advised her to file a complaint with the EEOC while her internal complaint was reinvestigated. (Exhibit E ¶ 20).

Frustrated with the pace and progress of the investigation, on July 10, 2006, Ms. Hughey went to the Washington Field Office of the EEOC and completed an Intake Questionnaire. (Intake Questionnaire, incorporated herein as Plaintiff's Exhibit "S").  Ms. Hughey believed and told the EEO that the Office of Civil Rights was "dragging its feet" to make a final recommendation for "fear of management's response." (Exhibit E ¶ 21; Exhibit S).  On that day, Ms. Hughey also submitted to the EEOC a written summary of her complaint.   In her submission, Ms. Hughey alleged that "there were three positions advertised under two different postings.  The individuals selected for these positions were offered jobs and began employment with WMATA between the months of November 2005 and January 2006.  In addition to myself another candidate was highly qualified and not selected for either of the advertised positions, according to the current ongoing, internal WMATA investigation." (Exhibit R, p. 1).  Finally, Ms. Hughey complained that she was "not confident in the [WMATA's] Office of Civil Rights to fairly and efficiently resolve my case." (Exhibit R, p. 2).

On July 20, 2006, Ms. Hughey again requested information from Brender Gregory about her complaint and protested WMATA's "lack of action." (Addendum to EEOC Complaint Submitted September 6, 2006, incorporated herein as Plaintiff's Exhibit "T"; Tomika Hughey email to Brender Gregory, dated July 20, 2006, incorporated herein as Plaintiff's Exhibit "U").

13

As a result of her persistent inquiries, Ms. Hughey finally met with Bailey about the status of the investigation on July 28, 2006. (Exhibit T).  On August 2, 2006, Hughey met with Gregory regarding the status of the investigation, and Gregory advised her that the internal investigation was not "fully" completed. (Exhibit E ¶ 26; Exhibit T).

Five days later, on August 7, 2006, Anne Anderson issued an internal report once again finding probable cause for Ms. Hughey's complaints as to all three of the positions. (Exhibit F). In her report, Anderson found that Lipman's reasons for selecting Potts and Black over Ms. Hughey were not "credible." (Exhibit F, p. 8).  Anderson further found that there was no "credible reason" for failing to interview Ms. Hughey, who was an internal candidate and worked in the same building, earlier given the purported urgency of filling the positions. (Exhibit F, p. 8).  In addition, Anderson confirmed that no evidence existed that Lipman reviewed the candidates' applications or the panel's recommendations before conducting her interviews. (Exhibit F, pp. 8-10).  And, Anderson determined that Lipman had not considered the panel's scores and recommendations in making her selections. (Exhibit F, p. 8).  Finally, Anderson ascertained that due to the "mendacity and non-credible statements" by Lipman to support her selections, Ms. Hughey's race was a factor in her non-promotions to the two Strategic Communications positions and the Strategic Advocacy position. (Exhibit F, p. 10).  Anderson recommended a three-day suspension for Lipman and required Lipman and Feldman to attend diversity training. (Exhibit F, p. 10-11).

On August 16, 2006, Ms. Hughes again contacted Ms. Gregory for information about the status of the investigation. (Exhibit T).  On August 23, 2006, Gregory met with Ms. Hughey and orally presented Anderson's findings. (Exhibit T).  On September 5, 2006, Ms. Hughey received a letter from Teresa Bailey, WMATA's Director of the Office of Civil Rights ("CIVR"),

formally informing her of the results of CIVR's investigation into her complaints for her non-promotions to the Strategic Communications and Strategic Advocacy positions. (Letter from Teresa Bailey to Tomika Hughey, dated August 30, 2006, incorporated herein as Plaintiff's Exhibit V).   The investigation by the Office of Civil Rights, according to Bailey, found "sufficient evidence to support a probable cause finding of discrimination in the failure to consider you for the Strategic, Policy and Communications Specialist position and fairly to select you for the Strategic Advocacy Specialist position.   Moreover, witness statements tend to give credence to your claim regarding Ms. Lipman making a statement that appeared to have racial overtones." (Exhibit V).   Ms. Bailey also advised Ms. Hughey that "Ms. Lipman's conduct will be subject to appropriate administrative action, including a requirement to attend diversity training." (Exhibit V).   Finally, Bailey informed Ms. Hughey that WMATA's decision was "final," and that she had a "right to file a complaint of discrimination with the U.S. Equal Employment Opportunity Commission." (Exhibit V).

The next day, Ms. Hughey filed an "addendum" to her initial filing with the EEOC.   By that addendum, Ms. Hughey alleged that on February 21, 2006, "I became aware that I was not selected for the positions of Strategic Policy and Communications Specialist (2 vacancies) and Strategic Advocacy Specialist (1 vacancy)." (Tomika Hughey's Addendum to EEOC, dated September 6, 2006, incorporated herein as Plaintiff's Exhibit "W").   Ms. Hughey further contended that it was "though the course of the formal WMATA investigation that I was made aware of the hiring dates, interviews, etc. of the incumbents for the positions in question." (Exhibit W).   Ms. Hughey also provided the EEOC with a copy of WMATA's final report. (Exhibit E ¶ 27; Exhibit W).

On September 28, 2006, Eugene Reed, an intake officer at the EEOC, forwarded to Ms.

Hughey a copy of the charge of discrimination he had drafted for her signature. (Letter from Eugene T. Reed, Jr. to Tomika Hughey, dated September 28, 2006, incorporated herein as Plaintiff's Exhibit "X").  Ms. Hughey signed and filed the charge of Discrimination drafted by the EEOC on October 5, 2006. (Charge of Discrimination, incorporated herein as Plaintiff's Exhibit "Y").

Deborah Lipman was given a one-day suspension for her discriminatory conduct against Ms. Hughey. (Exhibit B, p. 66).

## ARGUMENT

### I.     Summary Judgment Standards.

Rule 56 of the Federal Rules of Civil Procedure allows a trial court to render summary judgment for a moving party only where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to summary judgment as a matter of law." Fed. R. Civ. P. 56(c); Aka v. Washington Hosp. Ctr., 156 F.3d 1284, 1288 (D.C. Cir. 1998). In its initial review of the evidence submitted in support and opposition to summary judgment, the trial court may not make credibility determinations or weigh the evidence, which are jury functions, not those of the judge. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 254-255 (1982). Thus, although the court should review the record as a whole, it must disregard all evidence favorable to the moving party that the jury is not required to believe. Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 151 (2000).

It is equally well-settled that the moving party bears the burden of showing that there is no genuine issue of material fact or that the opposing party has failed to make a showing sufficient to establish the existence of an element essential to that party's case. Celotex Corp. v.

Catrett, 477 U.S. 317, 322-23 (1986). In short, summary judgment is appropriate only when there are no triable issues of fact, and if the opposing papers reveal even one issue of disputed material fact, summary judgment must be denied. And, when, as here, the validity of a complaint turns on questions of defendant's motive and intent, the Court must be especially cautious in granting summary judgment. Lipsett v. U. of Puerto Rico, 864 F.2d 881, 895 (1st Cir. 1988); Lewis v. AT&T Technologies, Inc., 691 F. Supp. 915, 918 (D. Md. 1988)(citing Morrison v. Nissan Co., Ltd., 601 F.2d 139, 141 (4th Cir. 1979)). Summary judgment, to be sure, is an extreme remedy and should be invoked with "special caution," particularly in, as here, discrimination cases. Richards v. Nat'l Rifle Assoc., 871 F. Supp. 499, 501 (D.C. Cir. 1994).

Rule 56 of the Federal Rules of Civil Procedure allows the Court to render summary judgment for a moving party only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to summary judgment as a matter of law." Fed. R. Civ. P. 56(c); Barwick v. Celotex Corp., 736 F.2d 946, 958 (4th Cir. 1984). Summary judgment is an extreme remedy and should be invoked with "special caution," particularly in, as here, discrimination cases. Richards v. Nat'l Rifle Assoc., 871 F. Supp. 499, 501 (D.C. Cir. 1994). And, of course, in reviewing a motion for summary judgment, the Court must be extra-careful to view all the evidence in the light most favorable to the non-moving party, Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986), according the non-moving party the benefit of all reasonable inferences.

Here, the evidence submitted by defendant does not remotely meet its initial burden of showing the absence of a genuine issue concerning any material fact. Ms. Hughey identifies numerous issues of fact that when viewed in the light most favorable to her will not allow the

Court to enter summary judgment, much less summary judgment in defendant's favor.  That these disputed facts, as outlined above, are material to the essence of Ms. Hughey's claims and defendant's defenses can hardly itself be disputed as they relate directly to matters of credibility and the ultimate issues in the case. In sum, to the extent defendant contends that there are no disputed facts in this matter and that they should prevail as a matter of law, its arguments are without any merit.

## II.    Ms. Hughey Timely Exhausted All of Her Administrative Remedies for Each of Her Non-Selections.

By its specious Motion for Summary Judgment, defendant does not contest that Ms. Hughey has and can prove a prima facie case of race discrimination for her former employer's failure to promote her to positions for which she was qualified.  Nor has defendant articulated any reason whatsoever, legitimate or otherwise, for its adverse employment actions against Ms. Hughey.  Further, defendant does not contest that Ms. Hughey timely filed a complaint under its own internal procedures protesting defendant's intentional discrimination.  And, finally, defendant does not protest that it mismanaged and delayed its own internal investigation into Ms. Hughey's meritorious complaint under circumstances that would lead a reasonable jury to conclude that WMATA was attempting to manipulate its own findings regarding Ms. Hughey's complaint, specifically, and the failings of its Human Rights division, generally.  Rather, defendant complains that Ms. Hughey failed to timely file her complaint with the EEOC when, after persistently seeking resolution of her internal WMATA complaint, she went to the EEOC on July 10, 2006.  In short, defendant's posit on this score is utterly without merit.

It is, of course, defendant's burden to prove by a preponderance of the evidence that Ms. Hughey failed to exhaust her administrative remedies. Brown v. Marsh, 777 F.2d 8, 13 (D.C. Cir. 1985) (stating that "because untimely exhaustion of administrative remedies is an affirmative

defense, the defendant bears the burden of pleading and proving it"). Meager and conclusory allegations that the plaintiff failed to exhaust her administrative remedies will not satisfy the defendant's burden. Brown v. Marsh, 777 F.2d at 12.   Simply put, defendant's specious contention that Ms. Hughey sat on her well-founded rights while it played office politics with her internal complaint must be rejected.

      A.    Ms. Hughey Filed a Timely Charge for the Strategic Policy and  Communications Specialist Position

The statutory enforcement scheme of Title VII requires that a plaintiff file a charge of discrimination with the EEOC with facts supporting her claim of unlawful discrimination. 42 U.S.C. Section 2000e-5(e)(1); Ledbetter v. Goodyear Tire & Rubber Co., 550 U.S. 321 (2007). These statutory limitations of the EEOC filing deadline "protect[s] employers from the burden of defending claims arising from employment decisions that are long past. Delaware State College v. Ricks, 449 U.S. 250, 256-257.  The relatively short 180-day deadline is intended to encourage "*prompt processing* of all charged of employment discrimination through *voluntary conciliation and cooperation*." Mohasco Corp. v. Silver, 447 U.S. 807, 825 (1988)(Emphasis added).  The EEOC limitation serves to ensure that an adversary is "put on notice" to defend within a specified period of time and the right to be free of stale claims.  Ledbetter v. Goodyear Tire & Rubber Co., 550 U.S. at  342.

Here, defendant first asserts that Ms. Hughey failed to file a timely charge for her non-selection for the Strategic Policy and Communications Specialist position because, defendant argues, she was advised of her non-selection for both of the positions on December 8, 2005. Defendant's Motion for Summary Judgment, p. 4.  In support of this contention, defendant relies, in part, on a second-hand statement in Ms. Hughey's civil Complaint that defendant had announced the hiring of Potts and Black on December 7, 2005, as evidence that she knew in

early December 2005 that she had not been selected for either Communication position and that white candidates had been chosen in her stead. During the course of her *own* investigation into defendant's illegal conduct in the Spring of 2007, however, Ms. Hughey learned that defendant had announced on or about December 7, 2005, that the positions for the Strategic Policy and Communications positions had been filled. Ms. Hughey had no actual or first-hand, contemporaneous knowledge of any WMATA announcement or that the positions had been filled until she was informed on February 21, 2006, when Feldman told her. (Exhibit E ¶¶ 12, 29; Memorandum of Ray Feldman, November 17, 1006, p. 8, incorporated herein as Plaintiff's Exhibit "Z"). Indeed, defendant proffers no evidence that such an announcement actually took place. In short, nothing in the record contradicts Ms. Hughey's representations that she first learned on February 21, 2006, about the Strategic Communication positions, and defendant's insistence that "she is trying to have it both ways" is laughable.

In support of its contention that Ms. Hughey knew that she was not getting a promotion to either of the Strategic Communication positions in November or December 2005, defendant also relies on a declaration submitted by Deborah Lipman after her deposition. Deborah Lipman Declaration at ¶7. Lipman's deposition testimony, however, contradicts her eleventh hour declaration that she told Ms. Hughey that she would only be interviewing for the Strategic Advocacy position:

> Q:    When you were interviewing Ms. Hughey, you weren't considering her for the strategic policy position, were you?
>
> A:    I don't believe so.
>
> Q:    When you say you "don't believe so," what do you mean?
>
> A:    I believe that we told her that it was—that she was being interviewed for the advocacy position.

Q:    When you say "believe," is that a reference to that your recollection about that is not perfect or --

A:    Correct.

(Exhibit B, pp. 48-49).  Lipman's declaration does not contain any of the caveats regarding her memory that she attested to in her deposition.  Most importantly, Lipman's "refreshed" recollection contradicts Ms. Hughey's recollection of Lipman's statements during the interview. Simply stated, Lipman's proffered self-serving declaration cannot rehabilitate her deposition testimony. Galvin v. Eli Lilly & Co., 488 F.3d 1026, 1030 (D.C. Cir. 2007(a deposition is the time to make a record capable of granting summary judgment); Frederick v. TPG Hospitality, Inc., 56 F. Supp. 2d 76, 79 n.4 (D.D.C. 1999)(if an affidavit is inconsistent with deposition testimony, the deposition testimony controls).

Indeed, defendant's motion is devoid of any proof that Ms. Hughey knew or had reason to know in December 2005 that those positions had been filled.  To be sure, had defendant possessed any evidence of Ms. Hughey's personal notification in December 2005, it would have produced it.  It does not have any such proof because none exists.  Absent also is any indication that defendant bothered to personally notify any of the other applicants of their non-selection for the positions.  Defendant appears to wrongly impugn to Ms. Hughey knowledge of all of its hiring announcements and decisions.  Absent such proof of actual knowledge of the announcements, defendant's argument is flawed at its inception, and summary judgment should not be granted.

In further support of its complaints that Ms. Hughey's case should be dismissed, defendant argues that even if the date that Ms. Hughey's cause of action arose was February 21, 2006, her initial contact with the EEOC on July 10, 2006, was insufficient to put defendant on notice of her claim for the Strategic Policy and Communications positions.  By its own argument

on this score, defendant concedes that Feldman's notice to Ms. Hughey on February 21, 2006, "started the clock" on her EEOC filing deadline. Delaware State College v. Ricks, 449 U.S. at 261. Nevertheless, defendant's insistence that summary judgment should be granted on these facts is plainly wrong.

It is now all too well-settled that the filing of a subsequent, verified charge of discrimination will relate back to the time of an initial contact with the EEOC for purposes of establishing timeliness. Federal Express Corp. v. Holowecki, 128 S.Ct. 1147 (2008); Edelman v. Lynchburg College, 535 U.S. 106 (2002). Here, Ms. Hughey was notified on February 21, 2006, of her non-selection for the Strategic Policy and Communications positions. The record is undisputed that she made an initial contact with the EEOC on July 10, 2006, well within the 180 day statutory time limit. On that date, Ms. Hughey completed an Intake Questionnaire and submitted a written summary of her claims. By that summary, Ms. Hughey specifically cited her internal WMATA complaint, referred to Lipman's discriminatory comments, specifically discussed the three positions that she had not been prompted to and expressed severe apprehension that the investigation was being mishandled. Exhibit S. In short, Ms. Hughey clearly articulated facts at the time of her initial contact alleging discrimination in defendant's promotion practices. Finally, on September 6, 2006, Ms. Hughey supplemented her initial filing with an addendum further outlying her claims as to the three positions and even submitted the Office of Civil Rights' final determination supporting her claims discrimination.

Faced with these facts, defendant fails to articulate any basis for its contention that Ms. Hughey's initial contact or her subsequent filings as to the Communication positions should not relate back to her initial filing or somehow failed to put it on notice of the nature of Ms. Hughey's claims. Defendant's failure on this score is, of course, not surprising. Indeed,

defendant was all too aware of the nature of Ms. Hughey's complaints relating to the hiring practices for the government relations positions in the fall and winter of 2005, and its complaint that Ms. Hughey's EEOC filings failed to provide defendant with notice of the nature of her claims because she did not list the specific job titles in her Intake Questionnaire is simply absurd.

In light of the overwhelming evidence adduced by Ms. Hughey, defendant's unsurprisingly efforts to distinguish the clear controlling precedent in Edelman and Carter v. WMATA, 503 F.3d 143 (D.C. Cir. 2007), must fail. Contrary to defendant's wishes, these cases are both directive and dispositive. Carter, in particular, could not be more similar where, in addition to involving the same defendant, an initial questionnaire failed to include information that was not in dispute and that this defendant had actual notice of from the employee's internal charge. Here, Ms. Hughey, arguably, did not list the specific jobs in which she was alleging discrimination. In both Carter and in this instance, however, both questionnaires contained sufficient information apprising WMATA of the alleged discriminatory practice which was the subject of protest. Moreover, it is not in dispute, nor a secret to WMATA, that Ms. Hughey was complaining about not being promoted to any of the three new government relations positions. In short, WMATA had notice from the outset. Having rejected defendant's utterly specious argument once before in Carter, this Court should do so once again.

Recently, and in the context of an Age Discrimination claim, the Supreme Court resolved the matter of whether an initial questionnaire can be construed as charge in the affirmative. See, Federal Express Corp. v. Holowecki, 128 S.Ct. 1147 (2008). In affirming the lower court's decision, the court reasoned:

> Documents filed by an employee with the EEOC should be construed, to the extent consistent with permissible rules of interpretation, to protect the employee's rights and statutory remedies. Construing ambiguities against the drafter may be the more efficient rule to encourage precise expression in other

contexts; here, however the rule would undermined the remedial scheme Congress adopted. It would encourage individuals to avoid filing errors by retaining counsel, increasing both the cost and litigation.

Id. Here, Ms. Hughey supplemented her Intake Questionnaire with substantial written addenda in which she specifically protested the adverse employment decisions for all three positions. In short, defendant's contentions that it was not put on notice by Ms. Hughey's various filings with the EEOC of the nature of her complaints are unfounded.

B.    Equitable Tolling or Estoppel is Warranted for all of the Non-selected Positions Because of the Defendant's Misconduct in Their Internal Civil Rights Investigation

It is well-settled that "the requirement of filing a timely administrative complaint is 'not a jurisdictional prerequisite to suit in federal court, but a requirement that, like a statue of limitations, is subject to waiver, estoppel, and equitable tolling.'" Currier v. Radio Free Europe/Radio Liberty, Inc., 159 F.3d 1363 (D.C. Cir. 1998); Sanders v. Veneman, 131 F. Supp. 2d 225, 230 (D.D.C. 2001)(quoting Ziper v. Trans World Airlines, Inc., 455 U.S. 385, 392 (1982)). Here, the undisputed record proffered by Ms. Hughey raises doubts about the integrity of defendant's internal investigation into Ms. Hughey's complaint which resulted in delays in its completion that lulled Ms. Hughey into detrimentally relying on their word to conduct a fair, unbiased and timely investigation of her claims. After all, it is undisputed that Devin Walker, the civil rights investigator, told Ms. Hughey that he had determined that the actions of defendant's managers and Human Resources division were to blame for the discriminatory hiring process in Ms. Hughey's matter, as well as the case of another complainant. It is further undisputed that in an initial draft of Ms. Hughey's Report of Investigation, Walker named names and exposed the mismanagement in the Human Rights Division. Nor is it disputed by defendant that Teresa Bailey instructed Walker to omit his broad indictment of WMATA management

from Ms. Hughey's Report of Investigation not long before Walker was summarily removed from Ms. Hughey's investigation.  Finally, defendant does not dispute that, in response, Walker protested that he had been "retaliated against and subjected to intimidation for finding discrimination" in another matter. (Email from Devin Walker to Teresa Bailey, dated June 9, 2006, incorporated herein as Plaintiff's Exhibit AA).  Oblivious to its own mandated timelines and Ms. Hughey's persistent inquiries into the status of her case, defendant strung Ms. Hughey along for four months, insisting that the assignment of a second investigator was "customary" while all along it knew that a finding sustaining Ms. Hughey's claims on all scores had been made.

Most important, Walker led Ms. Hughey to believe that her complaint would be resolved in her favor and that his report was complete.  Based on that representation, Ms. Hughey awaited a final resolution that she believed would be in her favor.  By June, however, when it appeared that defendant would overturn Walker's favorable determination by redoing the investigation, Ms. Hughey went to the EEOC.  Based upon Walker's representations that he was about to rule in her favor, any reasonable employee, Ms. Hughey included, would be reluctant to file a complaint with the EEOC for fear of jeopardizing her chances for positive relief.  Coupled with the proffered evidence that defendant was attempting to engineer a different result, defendant must be estopped from benefiting from what was, charitably, a misleading and unseemly investigation into Ms. Hughey's claims. Currier v. Radio Free Europe/Radio Liberty, Inc., 159 F.3d at 1368.

Cast in any light, defendant's reliance on Washington v. WMATA, 160 F.3d 750 (D.C. Cir. 1998), is hopelessly misplaced.  Nothing in Washington supports defendant's argument that Ms. Hughey should not be entitled to equitable estoppel or tolling.  Washington cannot wipe

clean the unclean hands of defendant or sanitize the misconduct of WMATA's Office of Civil Rights misleading Ms. Hughey about the results of the investigation. In this case, a reasonable jury could more than find that WMATA management engaged in obstructive and intimidating measures to manipulate and hinder Ms. Hughey's investigation. This misconduct resulted in Ms. Hughey missing the 180-day filing deadline for the Strategic Advocacy Position.

Moreover, none of the factors supporting the grant of summary judgment in <u>Washington</u> are remotely applicable here. Ms. Hughey did not simply sit on her hands and watch the clock tick by. Rather, she filed her internal complaint with WMATA's Office of Civil Rights, on February 22, 2006, just two months after being notified of the discriminatory non-selection for the Strategic Advocacy Specialist Position and one day after being notified of the non-selection for the Strategic Policy and communications Specialist Position, where she clearly alleged discrimination in the Strategic Advocacy Specialist Position and the Strategic Policy and Communications Specialist Positions. She submitted her Initial Intake Questionnaire with the EEOC on July 10, 2006, just seven months after the discriminatory non-selection where she listed the underlying facts surrounding her allegations of discrimination. Hughey Intake Questionnaire, July 10, 2006. In the Initial Questionnaire, she listed the ground for her discrimination complaint and also expressed her concern about defendant's internal Civil Rights investigation, stating:

> Currently in current employer-based civil right claim and am being subjected to undue and unjustified second round of interviews…. [T]he Civil Rights Office Director, Ms. Teresa Bailey is attempting to defer making a final recommendation on my case for fear of management's response. (Exhibit S).

Additionally, on July 10, 2006, five (5) days later, Ms. Hughey submitted a lengthy, type-written Addendum, with attachments, to her Initial Intake Questionnaire, wherein she more fully explained her allegations and listed the positions of Strategic Advocacy Specialist and Strategic

26

Policy and Communications Specialist positions as the jobs in which she as alleging discrimination. Exhibit R.  In that Addendum, Ms. Hughey also listed the actions she has taken in inquiring about the status of her investigation and complaining about the lack of action being taken:

> The first investigator was removed from he investigation over a month ago and advised that I contact the Director of Civil Rights as he had submitted his final report and recommendations and Ms. Bailey should be prepared to close the complaint soon thereafter.  After speaking with Ms. Bailey on June 23rd, she advised that a second investigator would be reviewing the complaint and after that occurred, she would contact me.  As of July 10, 2006, I have essentially been re-interviewed by the second investigator, revising the case and very emotional issues for the second time around. It has been over 120 days since filing my complaint and I am not confident in the Office of Civil rights to family and efficiently resolve my case.

Id.

In the timeline attachment accompanying the addendum, Ms. Hughey also listed the dates emails and calls she sent inquiring about her case and meetings she initiated to find out the status of her case. Exhibit T.  In sum, this is precisely the type of due diligence that the Supreme Court has held warrants equitable tolling when a defective pleading was filed or where the complainant was induced by the opponent's misconduct into missing a filing deadline. Irwin v. Department of Veterans Affairs, 498 U.S. 89, 96 (1990).

Finally, unlike Washington, it is not disputed that Ms. Hughey was not represented by counsel during the filing period and had no legal guidance on the consequences of her reliance on WMATA's internal investigation and any affect it may have on her EEOC filing deadline. This case represents just the precise "extraordinary and carefully circumscribed instance" mandated by the Court in Smith-Haynie v. District of Columbia, 155 F.3d 575, 579-580 (D.C. Cir. 1998)(quotation omitted).  In short, the malfeasance of defendant in failing to conduct a

forthright and lawful investigation of Ms. Hughey's meritorious complaints of discrimination more than justifies application of equitable tolling or estoppel.

## III. <u>Summary Judgment Is Inappropriate On Ms. Hughey's Claims of Intentional Discrimination under Title VII.</u>

By her Complaint, Ms. Hughey alleged that defendant violated Title VII, without basis or justification, when it denied her promotion opportunities because of her race in 2005 and 2006. Plaintiff submits, therefore, that defendant denied to Ms. Hughey employment opportunities, perks and opportunities for advancement because of her race.

It is well established that in order to prevail in an action under Title VII, plaintiff bears the burden of establishing by a preponderance of the evidence a prima facie case of discrimination. <u>Texas Dep't. of Community Affairs v. Burdine</u>, 450 U.S. 248, 277 (1981); <u>McDonnell Douglas v. Green</u>, 411 U.S. 792, 802-804 (1973). Such a prima facie case can be established under circumstances, which give rise to an inference of unlawful discrimination. <u>Texas Dep't. of Community Affairs v. Burdine</u>, 450 U.S. at 253. "A plaintiff meets her initial burden of establishing a prima facie case by offering evidence adequate to create an inference that she was denied an opportunity on the basis of a discriminatory criterion." <u>Id.</u>, at 254.

It is true, that to maintain an action under these statutes, Ms. Hughey must prove discriminatory intent.  In cases brought under Title VII involving allegations of non-selection, a plaintiff establishes a prima facie case, thereby creating an inference of unlawful discrimination, by showing that: (1) she was a member of the statutorily protected group; (2) she was qualified for the position in question; (3) she was not hired or promoted to that position; and (4) a person not in a statutorily protected group was selected instead of her. <u>Holcomb v. Powell</u>, 443 F.3d 889 (D.C. Cir. 2006); <u>Lathram v. Snow</u>, 336 F.3d 1085, 1088 (D.C. Cir.  2003); <u>Koger v. Reno</u>, 98 F.3d 631, 633 (D.C. Cir. 1996).

Here, even defendant does not dispute that Ms. Hughey can establish a prima facie case of unlawful discrimination. After all, Ms. Hughey, at the time of her non-selections was an African-American female. Nor can defendant honestly protest that Ms. Hughey was not qualified for the position she was seeking. Further, white candidates, all of whom were external applicants, were promoted instead of her. Int'l Brotherhood of Teamsters v. United States, 431 U.S. 324, 358 n.44 (1977); Holcomb v. Powell, 443 F.3d 889 (D.C. Cir. 2006); Morgan v. Fed. Home Loan Mortgage Corp., 328 F.3d 647, 650-51 (D.C. Cir. 2003). Simply put, Ms. Hughey has firmly established a prima facie case of discrimination.

In sum, Ms. Hughey has produced overwhelming evidence that would permit a reasonable jury to find unlawful discrimination. Defendant has not even attempted to show that there exists an issue of material fact that Ms. Hughey non-selection was under circumstances giving rise to an inference of unlawful discrimination. Nor can it. In sum, defendant's motion for summary judgment must be denied.

**CONCLUSION**

WHEREFORE, Plaintiff Tomika Hughey respectfully requests that defendant's meritless

Motion for Summary Judgment be denied.

Respectfully submitted,

    /s/ Lisa Alexis Jones
Lisa Alexis Jones
1200 G Street, N.W. Suite 800
Washington, D.C. 20005
(202) 434-4507
(202) 434-8707 Fax
orbitcv@erols.com

Cynthia Goode Works
7500 Greenway Center Drive
Suite 330
Greenbelt, Maryland 20770

*Counsel for Plaintiff*

Dated: August 3, 2008

**CERTIFICATE OF SERVICE**

I hereby certify that on this 3rd day of August 2008, a true and correct copy of Plaintiff's

CORRECTED Opposition to Defendant's Motion for Summary Judgment, Statement of Material

Facts in Dispute, and accompanying Proposed Order was sent via ECF to:

David J. Shaffer, Esq.
Assistant General Counsel
WMATA
600 Fifth Street, N.W.
Washington, D.C. 20001

       /s Lisa Alexis Jones
Lisa Alexis Jones